IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| LIONEL SCOTT ELLISON, | Cause No. CV 21-26-BLG-DLC-TJC |
| Petitioner, | |
| vs. | ORDER AND FINDINGS AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE |
| JAMES SALMONSEN; STATE OF MONTANA, | |
| Respondents. | |

This case comes before the Court on Petitioner Lionel Scott Ellison's

("Ellison") application for writ of habeas corpus under 28 U.S.C. § 2254.  Ellison

is a state prisoner appearing pro se.

Ellison has also filed two Motions for Hearing, (Docs. 4 &10); two Motions

to Change Venue (Docs. 6 & 30); a Motion for Order, (Doc. 15); two Motions for

Recusal (Docs. 17 & 30); a Motion to Appoint Counsel (Doc. 21); a Motion for

Summary Judgment, (Doc. 26); and a Motion for Relief from Judgment (Doc. 33.)

Each will be addressed in turn.

## I.    28 U.S.C. § 2254 Petition

The Court is required to screen all actions brought by prisoners who seek

relief.  28 U.S.C. § 1915(a).  The Court must dismiss a habeas petition or portion

thereof if the prisoner raises claims that are legally frivolous or fails to state a basis upon which relief may be granted.  28 U.S.C. § 1915A(b)(1), (2).  As explained below, Ellison's claims are either lacking in merit or they do not survive deferential review under 28 U.S.C. § 2254(d).  Accordingly, Ellison's petition should be denied and dismissed.

### i.    Background

This Court is very familiar with Ellison.  He first filed a petition under 28 U.S.C. § 2254, challenging his 2015 Arson conviction.  That matter was dismissed without prejudice as unexhausted.[1]

Ellison again sought to challenge his 2015 Arson conviction.  That matter was also dismissed as unexhausted, because Ellison had a direct appeal pending simultaneously with the Montana Supreme Court.[2]

Ellison next sought to challenge a 2009 Arson conviction.  He believed the two arson matters were connected and sought to join the proceedings, alleging both were based on a "continuous course of wrongful conduct" on the part of Yellowstone County officials, in particular Detective Frank Fritz ("Fritz").  According to Ellison, the series of events began with a 2007 arson charge and continued with an arson conviction in 2009, together with two abductions which

---

[1] See, *Ellison v. Kirkegard*, Cause No. CV-16-123-BLG-SPW, Or. (D. Mont. Oct. 31, 2016.)
[2] See, *Ellison v. Fletcher,* Cause No. CV-17-102-H-DLC, Or. (D. Mont. Nov. 2, 2017).

occurred over the course of the criminal proceedings, and additional events that

Ellison posits ultimately led to a 2014 arson charge and conviction in 2015 of

Tampering with or Fabricating Evidence and Impersonation of a Public Servant.[3]

The matter was dismissed with prejudice as untimely.[4]

Prior to the instant petition, Ellison made one additional challenge to his

2015 arson convicted which was also dismissed as unexhausted.[5]  Ellison has also

filed four §1983 civil complaints in this Court.[6]

In order to understand the conspiracy that Ellison believes to be at work

against him, it is helpful to have an appreciation of the timeline of his state

criminal and civil proceedings.

### ii.   Timeline

May 7, 2007-    A vehicle Ellison is driving, belonging to his ex-girlfriend,
                catches fire.  Ellison is charged with Arson in Yellowstone
                County Cause No. DC 07-0907.[7]

April 1, 2008-  Ellison pleads guilty via *Alford* to Arson.  The sentencing is
                scheduled for May 29, 2008.

May 19, 2008-   The Ellisons (Ellison and his parents, Claude and Marlene)

---

[3] See e.g., *Ellison v. Fletcher*, Cause No. CV-17-168-BLG-DLC, Mot. For Joinder (filed Oct. 29, 2019).

[4] See, *Ellison v. Fletcher*, Cause No. CV-17-168-BLG-DLC, Or. (D. Mont. Feb. 25, 2020).

[5] *Ellison v. Guyer*, Cause No. CV-18-176-BLG-DLC, Or. (D. Mont. June 10, 2020).

[6] See, *Ellison v. Yellowstone County et al.*, Cause No. CV-18-56-BLG-BMM-JTJ, Comp. (filed March 23, 2018); see also, *Ellison v. Yellowstone County et al.*, Cause No. CV-18-60-BLG-BMM-JTJ, Comp. (filed April 2, 2018); *Ellison v. Yellowstone County et al*, Cause no. CV-18-173-BLG-DLC-TJC, Comp. (filed Nov. 30, 2018); see also, *Ellison v. Kirkegard et al.*, Cause No. CV-17-45-H-DLC-JTJ, Comp. (filed April 17, 2017).

[7] See, Information (Doc. 2-1 at 1066-67.)

individually and on behalf of WallPro, Inc., their family business, file a lawsuit against LCG Pence, LLC, and Lonnie Higgins, among others, in Gallatin County District Court.  The suit alleges various tort causes of action based on work WallPro had been hired by Defendants to do on an assisted living facility in Bozeman, MT.[8]

May 28, 2008-    The day prior sentencing on the arson charge, Ellison claims he is attacked and abducted from the family business and thrown in the Yellowstone River.  He is found clinging to the banks of the Yellowstone River near Lockwood, Montana.  Ellison believes the perpetrator is Keith Hariss, who was allegedly acting at the behest of Lonnie Higgins, a defendant in the Wall Pro lawsuit.  The sentencing in the arson matter is delayed as a result of the purported abduction.

June 16, 2008-    The Ellisons move to dismiss the civil suit against LCG Pence, LLC and Lonnie Higgins, without prejudice.  The matter is dismissed.[9]  But it appears various civil business matters remain ongoing.[10]

June 23, 2008-    Videotaped sworn statements are taken of Justin Stevens and Aaron Stevens, two admitted felons, who claim they believe Keith Hariss may have had something to do with Ellison being abducted and thrown in the river a month earlier.[11]

July 28, 2008-    Ellison seeks to withdraw his *Alford* plea entered in the Arson matter.

May 26, 2009-    Following the denial of his motion to withdraw his *Alford* plea to Arson, Ellison is sentenced to 5-years in the Montana State Prison ("MSP"), with all the time suspended.

---

[8] See, (Doc. 2-1 at 714-764.)
[9] *Id*. at 713 (Civil Docket Sheet, Doc. Seq. 16-17).
[10] See e.g., (Doc. 2-1 at 766) (letter to Ellison from Alback & Boschert, P.C.)
[11] See, (Doc. 2-1 at 954-1007) (videotaped statement under oath of Justin Stevens); see also, (Doc. 2-1 at 1008-1016) (videotaped statement under oath of Aaron Stevens). It appears not long after giving these statements, Aaron was jailed and Justin left the state of Montana.  See, (Doc. 2-1 at 769, 771)(from e-mail prepared by Ellison and attorney Honaker on July 25, 2011).

| | |
|---|---|
| Sept. 19, 2009- | Ellison is charged with Partner Family Member Assault ("PFMA") and associated offenses in Yellowstone County. |
| Sept.-Nov. 2009 | Detective Fritz is assigned to investigate a Tampering/Violation of Order of Protection charge that arose in conjunction with PFMA.  Fritz applies for search warrants in conjunction with his investigation.  Fritz arrests Ellison and serves a search warrant at the home of Claude and Marlene, seizing three computers.[12]  Ellison is ultimately convicted of PFMA and violating an Order of Protection.[13]  The victim of the offenses was Ellison's then-wife, Rhonda Quarters. |
| July 20, 2010- | One day prior to criminal sentencing proceedings in Yellowstone County, Ellison is discovered off the interstate in Park County, Montana, with his limbs bound and a plastic bag over his head.  He claims he was kidnapped from Billings and transported by a Mexican man and a black man; notably, there is no mention of Fritz.[14]  The Yellowstone County criminal proceedings are delayed as a result of the purported abduction. |
| Aug. 30, 2010- | Claude and Marlene file a civil suit against Yellowstone County Sheriff's Office and Fritz, individually, alleging intimidation and infliction of emotional distress in conjunction with the investigation and arrest of Ellison in the criminal PFMA proceedings, Cause No. DV-10-1500.[15] |
| Dec. 20, 2010- | Ellison is charged with Tampering with Evidence as a result of the July 20, 2010, "abduction."[16] |
| Oct. 7, 2011- | Claude and Marlene's civil suit against Yellowstone County |

---

[12] See e.g., (Doc. 22-1 at 65-67)(civil complaint).

[13] See e.g., (Doc. 2-1 at 545-547); see also, (Doc. 2-1 at 405) (prosecutor's summation of prior proceedings at 2015 omnibus hearing: ("[Fritz] conducted a thorough investigation, got search warrants, body wire warrants, the victim made a taped phone call with a court order, to the Defendant, where he made certain admissions that were used at trial.  And so that's where the State believes that the Defendant's enmity specifically towards Detective Fritz began.").

[14] See e.g. (Doc. 2-1 at 912, 914)(medical records).

[15] See, Comp. (Doc. 2-1 at 697-706.)

[16] A copy of the charging Affidavit was attached to this Court's F&R issued in conjunction with *Ellison v. Fletcher*, Cause No. CV-17-168-BLG-DLC-TJC, see (Doc. 28-2).

and Det. Fritz was never served and is dismissed without prejudice for Failure to Prosecute.[17]

March 12, 2012-   Ellison is admitted to the Montana State Hospital ("MSH") for an Evaluation in conjunction with the Park County Tampering with Evidence/abduction matter.[18]

May 23, 2012-   MSH issues its report finding Ellison fit to proceed.[19] It was noted that Ellison believed his abductors were "likely in the employ of a company he and his family are suing."[20] There is no mention of Fritz being involved in the abduction.

March 14, 2013-   A fire was reported at the Ellison's family home at 4:40 a.m. Marlene states that the doors are tied shut from the outside. Law enforcement responds and the matter is placed under investigation. A pocketknife with the name "Fritz" scribbled on it is found in the yard. Ellison had a revocation hearing scheduled at 9:00 a.m. that same morning.[21]

Of note, at this same day and time, Fritz is part of a team executing a search warrant at a homicide scene on the other side of town. Briefing began at 2:30 a.m. and Fritz left briefing

---

[17] See, (Doc. 2-1 at 707)(Notice of Dismissal). Claude and Marlene did not receive notice that the lawsuit was dismissed until after Ellison was arrested in 2014. See e.g., (Doc. 2-1 at 452/trial trans. at 178:25, 179:1-21; 460/trial trans. at 210:14-25; 211:1-7)(testimony of Marlene and Claude).

[18] 5/23/12 Report, (Doc. 2-1 at 899-906)(authored by Dean Gregg, Ph.D. and Virginia Hill M.D.)

[19] While Ellison is found to be fit to proceed in the tampering case, it was noted that he has a Personality Disorder, which was explained as: habitual, long standing behaviors that are problematical or self-defeating, but not associated with a severe mental disease, defect, or developmental disability. In this particular case there is evidence that Mr. Ellison tends to have difficulty with trust, be rigid and over-controlling, arrogant and "entitled to do as he pleases, and has repeatedly engaged in behaviors that are grounds for arrest." (Doc. 2-1 at 905.) Of note, a prior evaluation had found Mr. Ellison unfit to proceed in the Tampering case, in part, because he was found to be "profoundly troubled by what he believes are interlocking conspiracies perpetrated by individuals from the criminal and corporate worlds and by government officials in cooperation with his ex-wife." *Id.* at 904, (citing from Dr. Wollston's Sept. 2011 Evaluation.)

[20] *Id.* at 904.

[21] (Doc. 2-1 at 486/trial trans. at 314:10-13)(indicating the Ellisons were more concerned with a court hearing than with the arson investigation).

6

between 3:30- 4:00 a.m. He was then on the scene for many hours. Fritz was with Detective Shane Bancroft ("Bancroft") the entire time photographing the scene.[22] Fritz believes he was on scene until 1:00 p.m.[23]

May 23, 2013-  Ellison's sentence in DC-07-0907, the vehicle Arson case, is revoked; he is committed to MSP.

May 29, 2013-  The State moves for dismissal of the Park County Tampering case; the matter is dismissed.[24]

Dec. 20, 2013-  The Montana Supreme Court affirms the denial of Ellison's postconviction petition challenging the car arson.[25]

Jan. 28, 2014-  Park County Attorney Brett Linneweber ("Linneweber") submits his letter of resignation to the Park County Commissioners because he accepted a senior deputy county attorney position in Yellowstone County.[26]

Feb. 24, 2014-  Effective date of Linneweber's resignation from Park County.[27]

July 31, 2014-  Ellison is arrested for Arson and Tampering with Evidence in conjunction with the fire that occurred the prior year at the Ellison family home. Ellison is placed in custody at the Yellowstone County Detention Center ("YCDC").

---

[22] (Doc. 2-1 at 543-544/trial trans. at 541-545.)

[23] *Id*. at 548/trial trans. at 563:8-22.

[24] The basis given for dismissal: unavailable witnesses, including one due to medical reasons; Ellison back in prison in an unrelated matter; no direct victim; and, the interests of justice met with dismissal rather than continued prosecution and expending judicial resources. See e.g., *Ellison v. Fletcher*, Cause No. CV-17-168-BLG-DLC-TJC, (Doc. 28-3).

[25] In its opinion, the Montana Supreme Court noted Ellison's trial counsel believed an Alford plea to be in his best interest because the State had evidence that Ellison offered to pay a potential witness to tell the same story as Ellison about the car fire and such a plea would ensure the State would not charge Ellison with witness tampering. See, *Ellison v. State*, 2013 MT 376, ¶ 4, 373 Mont. 159, 315 P. 3d 950.

[26] "Park County Attorney Resigns for Job In Billings," Missoulian, https://missoulian.com/news/state-and-regional/part-county-attorney-resigns -for-job-in-billings/article_079e22ee-89d5-11e3-a13d-0019bb2963f4.thml (Jan. 30, 2014)(November 29, 2021).

[27] *Id*.

August 19, 2014-    Marlene purchases a cell phone with the number (406) 794-8821, in preparation for Ellison being released on bond.  The phone is activated the same day.[28]

Sept. 4, 2014-      Ellison is released on bond from the YCDC.[29]

Sept. 29, 2014-     Sue Vinton receives call at Vinton Construction, Ellison's employer, from a caller purporting to be Fritz.  The caller instructs Vinton not to hire Ellison. The call was made from (406) 794-8821.[30]

October 7, 2014-    Summer Frickle at Labor Ready gets a call from an individual purporting to be Fritz; the caller discourages the business from employing Ellison.  This call also was made from (406) 794-8821.[31]

March 13, 2015-     An Amended Information is filed adding a charge against Ellison for Impersonating a Public Servant as a result of the phone calls made in which the caller identified himself as Detective Fritz.

Sept. 21, 2015-     Ellison's jury trial begins.

Sept. 24, 2015-     Jury returns its verdict.  Ellison is acquitted of Arson.  He is found guilty of two counts of Tampering with or Fabricating Physical Evidence and one count of Impersonation of a Public Servant.

### iii.    State Court Appellate/Collateral Proceedings

Following his 2015 jury trial, Ellison timely filed a direct appeal.  The

Montana Supreme Court reversed Ellison's conviction for the second count of

---

[28] (Doc. 2-1 at 539/trial trans. 526-7.)
[29] (Doc. 2-1 at 460/trial trans. 211:11-13.)
[30] See e.g., (Doc. 2-1 at 441/state trans. at 134-135)(Vinton testified by video deposition).
[31] (Doc. 2-1 at 469/trial trans. at 246-7.)

Tampering with Evidence, finding that trial counsel was ineffective for failing to object to the second count under Montana's multiple conviction statute, Mont. Code Ann. § 46-11-410(2)(a).  See, *State v. Ellison*, 2018 MT 252, ⁋ 29, 393 Mont. 90, 428 P. 3d 826 (*Ellison I*).  The convictions on the other two charges were affirmed, and the matter was remanded for resentencing.  *Id*.

Upon remand, the district court sentenced Ellison to ten years at MSP for the remaining Tampering conviction and to a five-year prison sentence for Impersonation.  Ellison again appealed, raising challenges to both the sentence imposed on remand and the underlying convictions.  See, *State v. Ellison*, 2019 MT 217N, ⁋ 4, 397 Mont. 554, 455 P.3d 447 (*Ellison II*).  The Montana Supreme Court affirmed the sentence.  *Ellison II,* at ⁋ 13.  Additionally, the Court held that Ellison's collateral attacks to the underlying convictions were beyond the scope of the appeal, and that such challenges would be properly raised in a postconviction relief ("PCR") proceeding, which Ellison already had pending in the district court. *Id*. at ⁋ 11.  Similarly, the Court advised Ellison that his IAC claims relative to the guilt phase of his trial and during his first appeal were beyond the scope of the action, and that the PCR proceedings "may be the appropriate vehicle" in which to make such challenges.  *Id*. at ⁋ 12.

In his PCR petition, Ellison advanced the following claims: (1) insufficiency of the evidence at trial; (2) judicial bias of the trial judge due to

supposed business interactions with Ellison's family; (3) mental impairment at trial affecting Ellison's ability to assist in his own defense; (4) malicious prosecution and prosecutorial misconduct; (5) perjury committed by the State's witnesses; (6) ineffective assistance of trial and appellate counsel; and (7) violation of the prohibition against double jeopardy by charging him with two counts of Tampering with or Fabricating Physical Evidence.[32]

On July 9, 2020, the state district court entered a 26-page order addressing the merits of Ellison's claims and denying each.[33] The Court determined an evidentiary hearing was not necessary and observed:

> Even within the context of the Petition itself and the voluminous documents that Ellison has filed, he has been self-contradictory and consistently misrepresented the meaning of evidence and cases presented in support of his arguments. The only evidence that Ellison has in support of his claims is the testimony of himself and his parents. The Court finds Ellison's story and that of his parents to be completely without merit, frivolous, and one that Ellison intends to uphold even when the evidence directly contradicts it.

See, Ellison v. State, 2020 MT 324N, ¶¶ 3-7, 402 Mont. 430, 477 P.3d 1123 (Table) (Mont. Dec. 29, 2020) (Ellison III) (citing page 25 of Judge Wald's PCR order).

Ellison appealed the denial of his PCR petition.  On appeal, the Montana

---

[32] See, (Doc. 2-1 at 370).    This order will be discussed at length below.

[33] A copy of Judge Wald's PCR order is attached to Ellison's petition.  See, (Doc. 2-1 at 365-389.)  This document is missing the last page.  For purposes of a complete record, a copy of the entire order will be attached as an exhibit to this Order.

Supreme Court noted that it had reviewed the record, and the district court's "exhaustive order" addressing Ellison's PCR claims, and found no error in the rejection of Ellison's petition or in the lower court's determination that an evidentiary hearing was not warranted. *Ellison III*. at ⁋ 10.  The Court further held that although the district court did not address Ellison's double jeopardy claim, it was wholly lacking in merit because the Court had previously vacated Ellison's second Tampering with Evidence conviction in his first appeal.  *Id*. at f.n. 1, citing *Ellison I*, ⁋ 29.

### iv.   Ellison's Claims

In his present petition, Ellison presents the following general claims: (1) actual innocence, lack of evidence, lack of probable cause; (2) judicial bias; (3) forced mental incoherence at trial; (4) malicious prosecutorial misconduct, including lack of probable cause and *Brady* violations; Linneweber's false statements in Park County, Prosecutor Julie Mees' ("Mees") illegal attack on eyewitnesses, (5) ineffective assistance of trial and appellate counsel; (6) perjury by public officials, (7) collateral estoppel; (8) excluded material evidence; and, (9) an equal protection violation.

### (1) Analysis

### Applicable Legal Standard

Claims 8 and 9 were never presented to the state courts.  Additionally,

Ellison has changed the nature of the claims and/or added additional considerations to portions of his judicial bias and prosecutorial misconduct claims that were not presented to the state courts.

When a habeas petitioner has not fairly presented a constitutional claim to the highest state court, and it is clear that the state court would now refuse to consider it because of the state's procedural rules, the claim is said to be procedurally defaulted. *Gray v. Netherland*, 518 U.S. 152, 161-62 (1996). Generally, federal courts will not hear such claims unless the petitioner can demonstrate cause for his noncompliance and actual prejudice, or establish that a miscarriage of justice would result from the lack of review. See*, Schlup v. Delo*, 513 U.S. 298, 321 (1995); see also, *McKinney v. Ryan*, 730 F.3d 903, 913 (9th Cir. 2013). But the Court is empowered to bypass a procedural default issue in the interest of judicial economy when the claim clearly fails on the merits. See, *Flournoy v. Small*, 681 F. 3d 1000, 1004 n. 1 (9th Cir. 2012); see also, *Franklin v. Johnson*, 290 F. 3d 1223, 1232 (9th Cir. 2001); *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) (noting that, in the interest of judicial economy, courts may proceed to the merits, in the face of procedural default issues). Accordingly, as set forth below, this Court will address the merits of Ellison's Claim 8 and Claim 9, as well as those portions of claims outlined above that were not presented to the state courts.

As to Ellison's remaining claims, 1 through 7, the state courts addressed the merits of each. Therefore, this Court's consideration of each claim is constrained by the applicable standard of review. The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") "bars relitigation of any claim 'adjudicated on the merits' in state court subject only to the exceptions listed in §§ 2254(d)(1) and (d)(2)." *Harrington v. Richter*, 562 U.S. 86, 89 (2011). Accordingly, this Court cannot grant habeas relief under AEDPA unless the state court's analysis "was contrary to, or involved an unreasonable application of, clearly established Federal law," 28 U.S.C. § 2254(d)(1), or it "was based on an unreasonable determination of the facts," *id*. § 2254(d)(2). "This is a difficult to meet and highly deferential standard for evaluating state-court rulings, which demand that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (internal citation and quotations omitted).

As set forth above, the Montana Supreme Court found no error with the state district court's decision denying the merits of Ellison's petition. Accordingly, this Court must presume that the Montana Supreme Court adopted the state district court's reasoning. See, *Wilson v. Seller*s, __ U.S.__, 138 S. Ct. 1188, 1192, 200 L. Ed. 2d 530 (2018); see also, *Cannedy v. Adams*, 706 F. 3d 1148, 1156 (9th Cir. 2013) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803)(1991)(noting a federal court looks through to the "last reasoned decision" from a lower state court to determine

the rationale for the state courts' denial of a claim).  This Court will address each of Ellison's claims in turn and explain why the state courts' decisions were not unreasonable and, accordingly, must be afforded deference.

    **a. Claim 1**: Sufficiency of the Evidence/Lack of Probable Cause/Actual Innocence

 **State Court Background**

Much of Ellison's first claim focuses on the reliability of DNA evidence introduced into evidence at Ellison's trial.  The Montana Supreme Court summarized the relevance of the DNA evidence as follows:

> On March 13, 2013, Ellison staged a crime scene in which he attempted to implicate Yellowstone County Detective Frank Fritz (Fritz), by tying the doors shut to the trailer home he shared with his parents, starting a small fire outside, and placing a knife on the ground outside the home with "Fritz" scribbled on it. The Fire Department was summoned and, during the investigation, Ellison reported he saw flames from his bedroom window but was unable to escape the house because the doors had been tied shut from the outside. Ellison and his parents claimed they saw someone who looked like Fritz or his "twin" in their yard on the night of the fire, and that the same man had been at their home several times before. They later made statements in the proceeding that Fritz was responsible for starting the fire at the home. At trial, Fritz and other officers testified that Fritz was investigating another crime scene elsewhere in Billings in the hours before, during, and after the fire at Ellison's home.

> After testing, the Montana State Crime Lab determined the DNA found on the ropes tied to the doors of Ellison's home matched Ellison's DNA.

*State v. Ellison*, 2018 MT 252, ¶¶ 2-3, 428 P.3d 826, 828–29.

On postconviction, Ellison argued the state lacked any reasonable evidence

with which to charge him, because of the possibility of "secondary DNA transfer" of his DNA from the doorknobs on the family home to the rope used to tie the doors shut.  Ellison argued that the possibility of "secondary transfer" rendered the DNA evidence worthless, and that the Court and jury relied upon the DNA evidence in finding him guilty, making the conviction infirm.

The district court initially found that because the claim could reasonably have been raised on direct appeal, it was procedurally barred in PCR proceedings.[34] Nevertheless, the district court also determined the claim lacked merit.

The district court first observed that the cases relied upon by Ellison did not support his position.  First, Ellison cited to the following language contained in *DA's Office v. Osborne*, 557 U.S. 52 (2009):

> modern DNA testing technology is so powerful that it actually increases the risks associated with mishandling evidence. STR tests, for example, are so sensitive that they can detect DNA transferred from person X to a towel (with which he wipes his face), from the towel to Y, (who subsequently wipes his face), and from Y's face to a murder weapon later wielded by Z (who can use STR technology to blame X for the murder). . . .  Any test that is sensitive enough to pick up such trace amounts of DNA will be able to detect even the slightest, unintentional mishandling of evidence.

*Id.*, 557 U.S. at 82.  The district court observed, however, that the Supreme Court in *Osborne* referenced these specific DNA characteristics in concluding, "[i]t gives short shrift to such risks to suggest that anyone…should be given a never-before-

---

[34] (Doc. 2-1 at 370-71.)

recognized constitutional right to rummage through the State's genetic-evidence locker." (Doc. 2-1 at 372, citing *Osborne*, 82-83). The district court noted the actual holding of *Osborne* was that a defendant "has no constitutional right to obtain postconviction access to the State's evidence for DNA testing." *Id.*, citing *Osborne* at 52. Thus, contrary to Ellison's arguments, *Osborne* did not hold that DNA testing characteristics bring DNA evidence outside the realm of reliable scientific evidence, or stand for the premise that such evidence cannot be used as probable cause for a warrant or as evidence at trial. (Doc. 2-1 at 372.)

The district court similarly found that Ellison's reliance on the Montana case, *State v. Pope*, 80 P.3d 1232 (Mont. 2003), was unhelpful and distinguishable. *Pope* was concerned with a complete absence of DNA evidence implicating the defendant, not with the presence of DNA that could have resulted from possible "secondary transfer." *Id.* at 1237-38.

The district court determined Ellison's DNA argument essentially asked the court to hold that DNA evidence has no probative value if there is the mere possibility that the DNA came from "secondary transfer." The court noted Ellison provided no caselaw or authority to support such a finding, and that the few courts that have addressed secondary transfer refused to take such a broad view. *Id.*

In addition, the district court found that Ellison's touching of the rope was undisputed. During his cross-examination, Claude testified that Ellison touched

the rope which tied the kitchen door shut.  *Id.* at 373-74.[35]  Further, Ellison's trial attorney conceded it was undisputed that Ellison touched the ropes, and there was "no point in challenging the DNA analysis."  *Id.* at 374.  Accordingly, the presence of his DNA had little relevance, and the district court, therefore, determined that the existence of his DNA on the rope did not have such an impact on the jury's verdict as to warrant a new trial or justify postconviction relief.  *Id.*

To the extent that Ellison attempted to advance other challenges to the sufficiency of the evidence, including "eyewitness testimony" from Claude and Marlene that disputed the state's allegations, the court found the claims could have been raised on direct appeal and were procedurally improper.  But, much like the DNA claim, the district court found the arguments to be insufficient to cast doubt upon the jury's verdict.  *Id.*

The Montana Supreme Court found no error in the district court's denial of this claim.  See, *Ellison v. State*, 2020 MT 324N, ⁋ 10.

**Present claim**

As a preliminary matter, is appears that Ellison may be attempting to advance a stand-alone claim of actual innocence.  See, "Declaration of Actual Innocence," (Doc. 1 at 23.)  He then appears to conflate this stand-alone claim of

---

[35] See also, (Doc. 2-1 at 462/trial trans. at 218-19)(Claude testified Ellison touched the rope tying the kitchen door shut and believes he touched the rope tied to the other door around the corner of the house).

innocence with his insufficiency of the evidence claim.  *Id*. at 24.  While procedural hurdles can be overcome by a credible showing of actual innocence, the Supreme Court has not resolved whether a freestanding actual innocence claim is cognizable in federal habeas.  See, *Herrera v. Collins*, 506 U.S. 390, 404 (1993). The Ninth Circuit has suggested that such a claim exists in capital cases.  *Carriger v. Stewart*, 132 F. 3d 463, 476-77 (9th Cir. 1997).  But as explained herein, even assuming that such a claim is cognizable in the present proceedings, Ellison cannot make the requisite showing.

As set forth above, habeas relief is proper under 28 U.S.C. § 2254(d) if the state court's decision (1) resulted in a decision that was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States, § 2254(d)(1), or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceedings, § 2254(d)(2).  As discussed below, Ellison has not satisfied either provision.

### 28 U.S.C. § 2254(d)(1)

Ellison again cites the *Osborne* case and posits that the DNA evidence is unreliable simply because of the possibility of "secondary transfer."  This Court agrees with the state district court that the dicta cited by Ellison from the *Osborne* decision does not stand for the legal premise which Ellison advances.

Likewise, Ellison's reliance upon *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 324 (2009), is similarly misplaced.  The issue in  M*elendez-Diaz* was whether the Confrontation Clause prohibits the admission of a forensic report prepared by an analyst who swore to the truth of the reported test results before a notary public. *Melendez-Diaz*, 557 U.S. at 307-08.  The Court held "[a]bsent a showing that the analysts were unavailable to testify at trial and that [the defendant] had a prior opportunity to cross-examine them," admission of the certificates violated the defendant's Sixth Amendment confrontation right.  *Id*. at 311.  But in Ellison's case, the forensic analysts from the Montana State Crime Lab[36] testified at trial and were subject to cross-examination.  Thus, there was no *Melendez-Diaz* confrontation issue.

Ellison then cites to *Thompson v. City of New York*, 2 F. Supp. 3d 374 (E.D.N.Y. 2014), aff'd, 592 Fed. Appx. 36 (2d Cir. 2015) (unpublished), and asserts that "other U.S. District Courts agree with Ellison that secondary DNA Transfer, which involves the possibility of a person's DNA being transferred onto

---

[36] These analysts included: Lacey Van Grinsven, (serologist who collected DNA samples from: the knots of the ropes found at the crime scene, the lighter, and the pocketknife for DNA analysis)(Doc. 2-1 at 507-512/trial trans. at 397-417); Jennifer Revis-Siegfried (performed DNA analysis on the collected items. On one of the ropes she identified the major DNA profile as a mix of two contributors, with the major profile being that of an unknown male), *Id*. at 512-518/trial trans. at 418-443; Megan Ashton (forensic scientist who compared buccal swab provided by Lionel Ellison matched the DNA profile that was obtained from the swabs taken from the rope knots), *Id*. at 518-525/trial trans. 444-471; and, Judith Hoffman, (analyzed items for possible ignitable liquid residue), *Id*. at 525-528/trial trans. 472-482.

an object without direct contact between the person and the object." (Doc. 1 at 28.) He goes on to say that in *Thompson*, "Officers did not have probable cause for arrest, because they had not ruled out innocent explanations for why [Thompson's] DNA was on the hat." *Id.*, citing *Thompson*. Ellison then analogizes the ropes in his case to Thompson's hat.

But what Ellison is actually citing is Thompson's argument regarding DNA evidence, not the holding of the Court. In fact, the court flatly rejected Mr. Thompson's secondary transfer argument, and found that the DNA on the hat left behind in an apartment following a burglary, linked Thompson to the crime. *Thompson*, 2 F. Supp. 3d at 377.

Thus, under the relevant AEDPA standard, Ellison has not established that the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." See, 28 U.S.C. § 2254(d)(1).

**2254(d)(2)**

The "unreasonable determination" section of 2254(d) applies when a petitioner challenges "purely factual questions resolved by the state court," and requires this Court to ask "whether an appellate panel, applying the normal standards of appellate review, could reasonably conclude that the finding is supported by the record." *Lambert v. Blodgett*, 393 F. 3d 943, 978 (9th Cir. 2004).

This clause applies "most readily to situations where petitioner challenges the state court's findings based entirely on the state record," including where "the finding is unsupported by sufficient evidence…the process employed by the state court is defective… or [where] no finding was made by the state court at all." *Taylor v. Maddox*, 366 F. 3d 992, 999 (9th Cir. 2004), overruled on other grounds by *Murray v. Schiro*, 745 F. 3d 984, 999-1000 (9th Cir. 2014).

Ellison argues that the evidence was insufficient to convict him.  See, (Doc. 1 at 28.)  To review the sufficiency of the evidence in a habeas corpus proceeding, the Court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *Parker v. Matthews*, 567 U.S. 37, 43 (2012) (per curiam); see also, *Coleman v. Johnson*, 566 U.S. 650, 656 (2012) (per curiam) ("[T]he only question under *Jackson* is whether [the jury's] finding was so insupportable as to fall below the threshold of bare rationality."). Furthermore, under AEDPA, federal courts must "apply the standards of [*Jackson*] with an additional layer of deference." *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005); *Boyer v. Belleque*, 659 F.3d 957, 964-65 (9th Cir. 2011).

Ellison's argument seems to be that he was only charged because his DNA was found on the ropes tying the doors shut.  Operating on this assumption, Ellison

argues the State believed he was somehow able to get back into the house after setting off the "bomb-thing," despite the ropes and the "eyewitness testimony" of his parents.  See, (Doc. 1 at 24.)  Ellison then seems to argue that the prosecution ignored the fact that his DNA was likely on the ropes due to "secondary transfer," a fact which he believes the prosecution should have been well-aware.  *Id*. at 26.  Ellison asserts this evidence was faulty and, therefore, insufficient to charge him.

But the trial testimony revealed that at 4:40 in the morning on March 14, 2013, Marlene made a call to 911 reporting that the doors to the family's home had been tied shut from the outside and the house was on fire.[37]  Law enforcement and fire department officials immediately responded.  When officers arrived, the fire was already out, there were black marks on the outside of the house that looked like a fire had burned.[38]  Both Marlene and Claude testified that the house did not catch fire and there was no damage to the house, only soot on the outside.[39]  Only some of the grass and weeds next to the house burned.  Ellison told officers he had to break out glass on the door,[40] cut a rope to get out of the house, and then used a fire extinguisher to put out the fire.[41]

---

[37] See, trial testimony of Officer Gunther (Doc. 2-1 at 444/trial trans. 146: 4-11.)
[38] (Doc. 2-1 at 444/trial trans. 148:6-8.)
[39] See, Marlene trial testimony (Doc. 2-1 at 450/trial trans. at 170); summary of Claude's trial testimony (Doc. 2-1 at 485/trial trans. at 310:15-17.)
[40] As discussed below, there is a dispute as to whether Lionel broke out the glass with his fist or with a fire extinguisher.
[41] (Doc. 2-1 at 444-45/trial trans. 148, 150); see also, testimony of Claude Ellison (Doc. 2-1 at 458/trial trans. 204:21-25.)

Deputy Fire Marshall Schilling ("Schilling") testified that although the fire was made to look like it was started by a Molotov-cocktail type bomb, his investigation revealed that the scene was actually staged.  Schilling arrived at this conclusion by noting the fact that someone had embedded glass fragments in the window screen, to make it look like a Molotov-cocktail had been deployed, but actually only a small fire had been lit.[42]  The lack of damage to the house was inconsistent with a bottle being thrown against it and exploding.

Additionally, Schilling testified that one of the ropes tied to the doorknob on the house at one end and to a gas meter at the other end, had a lot of slack in it and the door could still be opened.[43]  Another rope was tied from the garage door to an unsecured wagon wheel sitting outside.  If one pulled hard on the rope, the wagon wheel would have tipped over and the door could be opened.[44]  Another door was tied shut toward the hinge side, meaning it could still be opened, allowing someone to get in or get out.[45]  This evidence, coupled with the "Molotov-cocktail" evidence, led investigators to believe the scene had been a set-up.[46]

Additionally, officers noted that none of the Ellisons seemed particularly bothered or shaken by the incident.  They also appeared to have given inconsistent

---

[42] (Doc. 2-1 at 477-78/trial trans  at 280-281); see also, *Id*. at 482-83/trial trans. 300-302.
[43] *Id*. at 481/trial trans. 296:18-20.
[44] *Id*. at 482/trial trans. 297-8.
[45] *Id*. at 485/trial trans. 311-12.
[46] *Id*. at 485/trial trans. 312; see also, Det. Richardson's testimony describing his belief the crime scene was staged and "looked really hokie."  *Id*. at 499/trial trans. 368:7-14.

statements about what transpired after Ellison noticed the fire.  Claude and Marlene testified that he broke out the window with a fire extinguisher, but Ellison told officers he punched out the window with his hand.  Responding officers noticed no injury to Ellison's hand.

Detective Richardson ("Richardson") testified that the knots on the ropes had been sent away for DNA testing.  On March 11, 2014, the crime lab sent back the results which revealed the major contributor to the DNA was Lionel Ellison.[47] Based upon his experience, knowledge of the scene, investigation of the scene, and the DNA results, Richardson believed the crime scene had been staged.[48]

Thus, contrary to Ellison's assertions, it was not just the DNA that led to the determination to charge him with criminal acts, it was the totality of the evidence gleaned from the investigation.  Additionally, as the state district court noted, there was trial testimony from Claude that Ellison had touched at least one, if not two of the ropes.  Thus, the district court's conclusion that the DNA evidence had little probative value and was largely unchallenged, was a reasonable finding.

Ellison has failed to demonstrate that the state court's finding, regarding the sufficiency of the evidence and existence of probable cause to charge him, was not supported by sufficient evidence from the state court record.  See, *Taylor*, 366 F.

---

[47] *Id*. at 500/trial trans. at 371:5-12.
[48] *Id*. at 500/trial trans. 371:13-17.

3d at 999.  Ellison's insistence on the "secondary transfer" theory does not serve to undermine the state court decision.

Ellison also points to the fact that he was acquitted of Arson in an effort to bolster his insufficiency of the evidence claim.  Ellison argues he was acquitted of arson, so he must have been improperly charged in the first place, and the subsequent charges of Tampering and Impersonation lacked a legitimate basis. See (Doc. 1 at 29-30.)

This claim also has no merit.  The fact that the jury did not find Ellison guilty of arson does not necessarily mean they did not believe he set the fire. Under Montana law, the offense of arson to the property of another requires damage without consent that exceeds $1,500.  Mont. Code Ann. § 45-6-103(1)(a). Both Marlene and Claude testified that there was no damage to the house, only soot on the outside, and that the house did not catch on fire, only some of the grass and weeds burned.[49]  Deputy Schilling testified that there was a "small burn mark" or blackened marks on the house but no charring of the wood, and the siding was not damaged and it could have been painted over.[50]  In fact, during his closing argument, Ellison's attorney stated the following:

We've had some discussion today, folks, not today, this week, about

---

[49] See e.g., Marlene trial testimony (Doc. 2-1 at 450/trial trans. 170:21-23)(indicating the house did not catch on fire, but some grass and weeds burned); see also, summation of Claude's trial testimony that there was no damage to the house, just soot (Id. at 485/trial trans. 310:13-15).
[50] Schilling testimony (Doc. 2-1 at 476/trial trans. 274:15-17; 281:6-9).

damage.  If you folks want to say that house wasn't damaged, therefore, he's not guilty of arson because of the 6 to 8 inches of soot or whatever was on there that you heard the testimony referring to, go ahead.  I'm not going to belabor that point.[51]

The Court also notes that on re-sentencing, the State submitted its belief that the jury acquitted Ellison of Arson because they believed Claude and Marlene were in on the plan and, by so doing, consented to the property damage of their own house.[52]  Regardless, the jury heard all of the evidence and determined there was not proof beyond a reasonable doubt that Ellison committed Arson, but there was sufficient evidence to sustain the Tampering with Evidence and Impersonation charges.  Such a verdict is consistent with trial testimony and with the state courts' adjudication of this claim.

Finally, Ellison incorporates several disconnected events to challenge the Impersonation charge, and argues these events are evidence of a conspiracy against him, initiated by Fritz years before the criminal case at issue.  Ellison claims Dr. Virginia Hill of the Montana State Hospital already "investigated" these matters and determined that Fritz was involved with Ellison's then-wife, Rhonda Quarters, and that they together hired two "Nortanio" gang members to abduct, torture, rape, and dump Ellison in 2010.  (Doc. 1 at 29.)

The report from the Montana State Hospital says no such thing.  The

---

[51] Kakuk closing (Doc. 2-1 at 560/trial trans. 611:18-24).
[52] See, (Doc. 2-1 at 630-631)(12/14/18 sent. trans.)

purpose of the evaluation was not to investigate Ellison's conspiracy claims, but rather to determine whether Ellison was fit to stand trial in 2012 in conjunction with the felony charges stemming from the purported July 20, 2010 "abduction." See, (Doc. 2-1 at 899-906). There is no mention of Fritz in the evaluation. Additionally, there is no mention of text messages between Fritz and Quarters, despite Ellison's claims before this Court to the contrary. See, (Doc. 1 at 29). Rather, the text messages were purportedly between Ellison and his ex-wife and were referenced in a prior Montana Supreme Court opinion.[53] At the time of the evaluation, Ellison believed his abductors to be "persons likely in the employ of a company he and his family are suing" and not Fritz and hired Nortanio gang members. Moreover, the Court fails to see how Ellison's baseless suppositions and inflammatory accusations regarding events in 2010 lend credibility to his overarching claim that there was no probable cause to charge him in 2014 for the underlying criminal matter.

In consideration of the deference due not only under AEDPA, but also under

---

[53] The messages, which Ellison claims were from Rhonda, were received from the address "anonymous@textem.net," and read as follows:
    Oct. 4, 2009: "I L Y 4vr 2. scared of you tho."
    Oct. 5, 2009: "do you want me dead?"
    Oct. 6, 2009: "psswrd 4 ur mail is sillybear"
    Oct. 6, 2009: "all ur passwords are sillybear Crgslist + email"
    Oct. 6, 2009: "Honey I went 2 C attny 2 day told em truth Manic attack like AK I know you not hurt only tryn 2 protect ILY PLEASE forgive PLEASEEE!!! ILY"
*State v. Ellison*, 272 P.3d 646, 648 (Mont. 2012); see also, Hill Evaluation (Doc. 2-1 at 902)(referencing Montana Supreme Court opinion).

*Jackson* itself, Ellison has failed to demonstrate that the jury's findings were unsupported or fell below the threshold of "bare rationality."  See, *Coleman*, 566 U.S. at 656.  Moreover, there is no indication that there has been an "extreme malfunction" in the state criminal justice system, see *Jurado v. Davis*, 12 F. 4th 1084, 1091 (9th Cir. 2021).  Accordingly, there is no legal basis under AEDPA to disturb the state courts' ruling.  This claim should be denied.

### b.  Claim 2: Judicial Bias

**State Court Background**

Ellison claimed that the trial judge, Judge Jones, was biased against him as a result of a construction dispute arising from work that Claude's company performed at the Special K Ranch.  Ellison claimed that acrimony stemming from the dispute led to Judge Jones being biased against him during the criminal proceedings.  In the PCR proceedings, the court determined the alleged business dealing was an invention of Ellison's own mind, in an effort to create claim of bias where none existed.  (Doc. 2-1 at 375.)

The district court noted that Ellison was inconsistent relative to the purported business dealings with Judge Jones and the Special K Ranch.  Post-trial, he expressed gratitude and respect for Judge Jones.[54]  At his sentencing hearing,

---

[54] Ellison wrote in a 10/3/15 letter to Judge Jones, he "pray[s] that [Judge Jones] [is] as honest as [he was] in that past in business with …Special K Ranch and [Ellison's] company in helping [Ellison's] family get paid."  (Doc. 2-1 at 375) (citing State's Resp. to PCR Petition).  Ellison

Ellison told Judge Jones, "you were honest in our dealings with my dad and me when I did…the Special K stuff…" *Id*. at 375 (citing sent. Trans. 26:21-27:3)).  At resentencing, Ellison again brought up the Special K ranch and the alleged business transaction at which time Judge Jones informed Ellison, "I don't know who you're thinking of, but I don't have any association with" the Special K Ranch.  *Id*. (citing resentencing trans. 35:15-36:13).  The district court went on to note that the only support Ellison had for any purported business association with Judge Jones was an affidavit from Claude, which the Court viewed with great skepticism.  *Id*. at 376-77.  In summarizing the shift in Ellison's view and characterization of the alleged relationship with Judge Jones, the PCR court explained, "these stories can only be reconciled by concluding that Ellison is structuring this story in accordance with his goal—avoiding liability for the criminal offenses for which he was convicted."  *Id*. at 376.

Finally, the Court noted that Ellison had previously attempted to raise the bias claim before the Montana Supreme Court, which found Ellison's bias claims to be based on conjecture, without any evidentiary support.  *Id*., citing *State v. Ellison*, 2019 MT 217N, ¶N.

The district court determined Ellison's claims and affidavit from Claude were insufficient to overcome the "presumption of honesty and integrity in those

---

repeated similar sentiments in a 12/22/15 letter.  *Id*.

serving as adjudicators," and that his continued assertions of the same baseless claims, did not make them so. *Id*. at 376. Ellison failed to demonstrate that Judge Jones was unfairly biased against him and the claim was denied. *Id*. at 377. As set forth above, the Montana Supreme Court affirmed the denial on appeal. See, *Ellison v. State*, 2020 MT 324N, ¶ 10.

### Present claim

Before this Court, Ellison advances a multi-part judicial bias claim. (Doc. 1 at 31-38.) Only one part of this claim involves Judge Jones and the claim that was presented in his PCR proceedings. The remainder of the claim focuses on the conspiracy that Ellison believes to be at play against him, by the PCR court, the Montana Supreme Court, and others. The Judge Jones issue will be addressed first.

In relation to his original claim against Judge Jones, Ellison offers no new argument or evidence. Rather, he points this Court to two affidavits from Claude which were provided in prior proceedings, outlining the purported business dealings with Judge Jones surrounding greenhouses which were built, but not paid for, at the Special K Ranch. See, (Doc. 1 at 36), referencing (Doc. 2-1 at 681-84; and 694.)[55] These are the same affidavits that the PCR court viewed with

---

[55] The first affidavit also outlines the overarching conspiracy Ellison believes to be at play including, not only the Judge Jones/Special K Ranch matter, but also: the family's business dealings/lawsuits; the car arson and the "set-up" by Yellowstone County officials; unjust legal

skepticism.  Ellison reasserts that there was a heated disputed between the Ellisons and the Special K Ranch Manager, which Judge Jones witnessed.  (Doc. 1 at 36.)

Ellison claims that despite Judge Jones' failure to remember his business dealings with the Ellisons, his "bias is present and implied."  Ellison provides no legal or evidentiary support for this position.  Ellison also seems to question Judge Wald's impartiality in the PCR proceedings.  Judge Wald assumed the PCR matter following Judge Jones' retirement.  Ellison argues that Judge Wald failed to adjudicate one of the claims in his PCR petition and states that Judge Wald replaced Judge Jones "from his district prosecutor's office."  Ellison's characterization of Judge Wald is simply inaccurate.[56]

The Due Process Clause guarantees a criminal defendant the right to a fair and impartial judge.  See, *In re Murchison,* 349 U.S. 133, 136 (1955).  But a petitioner claiming judicial bias, as explained by the PCR court, must overcome a "presumption of honesty and integrity" on the part of the judge.  See *Withrow v.*

---

proceedings; the alleged "bounty" being placed upon Ellison by Keith Hariss; the abduction of Ellison; wrong doing by prosecutors Mees and Linneweber; the events leading to the Arson/Tampering charges and blood being on the ropes; a conspiracy to convict Ellison between prosecutors and his defense counsel, including defense counsel asking for the maximum sentence; and, Yellowstone County jail employees conspiring against Ellison.  See, (Doc. 2-1 at 681-84)(Aff. of Claude Ellison).

[56] Wald was elected as a district court judge to Montana's Twenty-Second Judicial District in 2018.  Prior to that, he spent the majority of his career in private practice working as a criminal defense attorney.  See e.g.: Montana Association of Criminal Defense Attorney's website: https://www.mtacdl.org/lawyers/lawyers-of-the-year/380-2015-john-adams-award-matt-wald (accessed December 8, 2021).

*Larkin*, 421 U.S. 35, 47 (1975).  Moreover, a claim of judicial bias based upon improper conduct by a state judge in the context of federal habeas review does not simply require that the federal court determine whether the state judge's conduct was improper; rather, the question is whether the state judge's conduct "rendered the trial so fundamentally unfair as to violate federal due process under the United States Constitution." *Duckett v. Godinez*, 67 F. 3d 734, 740 (9th Cir.1995) (citations omitted).  A state judge's conduct must be significantly averse to a defendant before it violates constitutional requirements of due process and warrants federal intervention.  *Id*.

Ellison has presented no facts to support a claim of actual bias, rather he appears to assert the appearance of bias based upon the alleged prior business relationship.  The Supreme Court has found the appearance of bias sufficient to require recusal only in a few limited circumstances.  See, *Greenway v. Schriro*, 653 F. 3d 790, 806 (9th Cir. 2011); *Carter v. Galaza*, 491 F. 3d 1119, 1131 (9th Cir. 2007).  "First, due process requires recusal of a judge who 'has a direct, personal, substantial pecuniary interest in reaching a conclusion against [one of the litigants].'"  *Carter*, 491 F. 3d at 1131, (quoting *Tumey v. Ohio*, 273 U.S. 510, 523 (1927)).  "Second, due process requires recusal if a judge becomes 'embroiled in a running, bitter controversy' with one of the litigants."  *Id*., (quoting *Mayberry v. Pennsylvania*, 400 U.S. 455, 465 (1971)).  "Third, due process requires recusal if

the judge acts as 'part of the accusatory process.'" *Id.*, (quoting *In re Murchison*, 349 U.S. 133, 137 (1955)).

In this case, Ellison's claim does not suggest any possible connection between Judge Jones that is comparable to the involvement of the judges in the cited cases.  As Ellison acknowledges, Judge Jones began presiding over this matter once all of the district court judges in Yellowstone County had either recused themselves or been substituted.  See, (Doc. 1 at 36.)  Accordingly, Judge Jones could not have been part of the accusatory process.  See, *In re Murchison*, 349 U.S. at 137.  Judge Jones himself flatly rejected any knowledge or association with the Ellisons or with Special K Ranch.  The Montana Supreme Court affirmed Judge Jones' position and rejected Ellison's claim of bias.  See, *State v. Ellison*, 2019 MT 217N, ¶ 8.  Judge Wald's rejection of the PCR claim reasonably followed.  There is nothing in the record before this Court to contradict that finding, or to indicate that Judge Jones had been embroiled in any form of a controversy with Ellison, Claude, or the family's construction company.  See, *Mayberry*, 400 U.S. 465.  In this same vein, Judge Jones, having no association with Special K Ranch, likewise had no pecuniary interest in Ellison's proceedings. *Tumey*, 273 U.S. at 523.

Moreover, Ellison's own expressions of gratitude and appreciation to Judge Jones post-trial, belie his claims of bias which arose post-sentencing.  Also, to the

33

extent that Ellison believes Judge Jones' sentencing and re-sentencing of him

demonstrate bias, adverse rulings alone are insufficient to make such a showing.

See, *Litkey v. United States*, 510 U.S. 540, 556 (1994); *Larson v. Palmateer*, 515 F.

3d 1057, 1067 (9th Cir. 1995).

Because Ellison offers only speculation for his claim of bias, and an

unreliable affidavit from Claude regarding a purported business dealing that

occurred years earlier, Ellison fails to demonstrate actual bias or the appearance of

impropriety.  He has also not demonstrated that the state court decision was

contrary to, or involved an unreasonable application of clearly established federal

law.  See, 28 U.S.C. § 2254(d)(1).  Accordingly, this Court must afford deference

under AEDPA; Ellison is not entitled to relief.

### Remainder of Judicial Bias Claim

The rest of Ellison's judicial bias claim is somewhat difficult to follow, but

it begins with the premise that PCR court erred when it failed to adjudicate his

Claim 7, which dealt with collateral estoppel and double jeopardy.  As previously

noted, Ellison believes that once he was acquitted of arson, he could not have been

found guilty of either count of Tampering with or Fabricating Evidence, under

Montana's statue prohibiting prosecution based on the same transaction as a former

prosecution, Mont. Code Ann. §46-11-503.  See, (Doc. 1 at 31); see also, PCR

Pet.) (Doc. 2-1 at 250-54) (Ellison's Claim 7).  On appeal from the denial of his

postconviction, the Montana Supreme Court, in an opinion authored by Justice

Shea, addressed this issue in a footnote:

> Ellison also faults the District Court for failing to address his double
> jeopardy claim. Ellison alleges that the two charges of evidence tampering
> violated his right to be free from double jeopardy. Although the District
> Court did not address that issue, it lacks merit in any event because we
> vacated the second evidence tampering charge in Ellison's first appeal.
> *Ellison I*, ¶ 29.

*Ellison v. State*, 2020 MT 324N, f.n.1, 402 Mont. 430, 477 P.3d 1123 (Table).

The Court will address the merits of the double jeopardy/collateral estoppel

claim below.[57]  But for purposes of consideration of the judicial bias issue,

Ellison's argument is that the failure of the state to brief the issue,[58] and of the PCR

court to decide the issue, deprived Ellison of his right to redress and corresponding

constitutional rights.  See, (Doc. 1 at 32.)  He then posits that, much like Fritz and

his ex-wife allegedly paying Nortanio gang members to abduct him,[59] members of

the judiciary have been paid off not to address the claim and keep Ellison

incarcerated, in an effort to prevent him from pursuing a civil right lawsuit under

42 U.S.C. § 1983.  *Id*. at 33-34.[60]  Ellison then goes on to conflate the Montana

Supreme Court disposing of this claim in a footnote, with a prior decision,

---

[57] See, Section I(1)(g), Collateral Estoppel, below.

[58] As explained below, the State did brief this issue on PCR appeal.  See e.g., State's App. Br.
(Doc. 2-1 at 80-83.)

[59] The Court would again note there is no evidence of this occurring.

[60] The Court would also note that Ellison has not been deterred from filing § 1983 complaints in
this Court. See, f.n. 6, *supra*.  Additionally, Ellison's claim regarding payments being made to
members of the judiciary is incredible and completely unfounded.

authored by Justice Rice, in which the Montana Supreme Court inadvertently stated Ellison had not committed sexual intercourse without consent.  See, *State v. Ellison*, 2019 MT 217N, ¶ 9.

As a result of this misstatement in the Montana Supreme Court opinion, Ellison filed complaints with the Montana Judicial Standards Commission.  See, (Doc. 1 at 35); see also, (Doc. 2-1 at 1040-1043).[61]  Ellison seems to believe that these two Montana Supreme Court opinions demonstrate the ongoing judicial misconduct that, according to him, has permeated not only the state district courts, but also the Montana Supreme Court.  Ellison believes that the misstatement in the 2019 opinion authored by Justice Rice prejudiced the other justices in his later appeal.  Ellison also asserts that the justices were likely prejudiced by the false narratives put forth by Yellowstone County officials, including prosecutors Mees and Linneweber.  Ellison also asserts again, without any basis, that Linneweber was fired as Park County Attorney for his role in protecting Fritz after "dumping" Ellison's body.[62]

---

[61] Ellison previously sought this Court's intervention in his state court appellate proceedings based upon this misstatement.  This Court declined to intervene in the proceedings.  See, *Ellison v. Guyer,* Cause No. CV-18-176-BLG-DLC-TJC, Ord. and Find. & Rec. (Doc. 33 at 11-13)(addressing Ellison's "Motion for Immediate Relief").

[62] Throughout his filings, Ellison repeats this conclusory statement that Linneweber was fired from his job as Park County Attorney based upon a purported *Brady* violation and other wrongdoing in connection with  Ellison's Park County Tampering/abduction case. See e.g., (Doc. 1 at 24, 34).  Ellison provides no support for his contention.  In fact, it appears Linneweber resigned of his own volition in 2014 when he accepted a position with the Yellowstone County Attorney's Office.  See, f.n. 26, *supra*.

36

Ellison then circles back to the footnote in Justice Shea's opinion and argues it demonstrates the unlawful bias and misconduct in the courts of Montana, and that they choose not to address claims and refuse to follow the applicable statutes in violation of his right to redress. Ellison asserts he has demonstrated structural error and that his right to due process has been violated.

As set forth above, it has been clearly established that Ellison has a due process right to a fair trial in a fair tribunal. Also, as previously explained, Ellison must plead and prove facts sufficient to overcome a presumption of honesty and integrity in those serving as adjudicators in his case. *Withrow*, 421 U.S. at 47. In the instant case, Ellison provides no facts, aside from his own conjecture and conspiracy theories, that would demonstrate the Montana Supreme Court justices did not act with honesty and integrity. There is nothing in the record before this Court that suggests the Montana Supreme Court acted in concert with any other entity, including Yellowstone County prosecutors or law enforcement, to deny Ellison a fair appeal. To the contrary, Ellison continues to advance a narrative of his own making, which has been repeatedly unsuccessful.

In sum, Ellison has failed to establish facts pointing to a serious risk of actual bias; without such facts, there is no constitutional violation. *Caperton v. A.T. Massey Coal Co., Inc*. 556 U.S. 868. 883-84 (2009). This portion of Ellison's

claim, although not presented to the state courts, should be denied nonetheless for lack of merit.

### c.  Claim 3: Alleged Mental Impairment During Trial

### State Court Background

Ellison claimed he suffered from mental impairment when he was denied food during the last two days of his trial, resulting in hypoglycemia and harming his ability to participate in his defense.  Ellison asserts this made him incoherent and violated his Eighth Amendment right to be free from Cruel and Unusual Punishment and his Fifth and Fourteenth Amendment rights to a fair trial.

In disposing of this claim, the district court noted that Ellison's trial attorney, Michael Kakuk ("Kakuk") denied Ellison's contention noting, "Ellison was always coherent and actively involved in the defense of his case.  He was never not fed.  I bought him lunch during the trial."  (Doc. 2-1 at 378) (citing Kakuk Aff., ¶ 15.)  The court also noted that after the close of the state's case-in-chief, Kakuk and Ellison met to finalize their defense strategy.  Ellison initially wanted to take the stand but informed the court that he ultimately determined not to do so, based upon the advice of counsel.  *Id*., (citing trial trans. at 571:4-15). The district court found the record demonstrated Ellison was not mentally impaired and actively participated in discussions with counsel and the court, which is in stark contrast to Ellison's contention that he sat "like a zombie through the last two

days of trial." *Id.* (citing Ellison's Resp. to Ans. at p. 6.)

The district court also noted that Ellison falsely claimed that this Court had held "it is undisputed fact that [Ellison] was forced into a mental state of incoherence during the second and third day of a three-day trial" in support of his contention that the issue had already been decided. *Id*. (citing Ellison's Resp. to Ans, at p. 4). The district court determined Ellison either did not understand this Court's order in his 1983 case, or that Ellison was attempting to mislead the court. The district court explained that this Court had simply found there was a genuine issue of material fact as to whether or not a detention officer made an intentional decision to deny Ellison food. *Id*. at 378-79. It was not a finding that there was "undisputed fact"; rather, it was a determination that there was an issue that was not appropriate to dispose of on summary judgment. *Id*. at 379.

Finally, the Court noted that Ellison failed to explain what impact his being "more coherent" would have had on the trial. Had Ellison chose to testify, he likely would have presented the same wide-ranging conspiracy story that he advanced in his PCR petition. The district court found it "difficult to comprehend how that could have helped him." *Id*. The court determined Ellison followed the advice of competent counsel, knowingly waived his right to testify, and did so unhampered by mental impairment. *Id*. at 379-80.

//

**Present Claim**

Ellison does not point out fault with the state court decision.  He instead reiterates the same argument presented to the state court and additional claims that are the subject of an ongoing 1983 case before this Court.  See, *Ellison v. Officer Washington*, et al., No. CV-18-56-BLG-BMM-JTJ.  That matter is currently stayed on Ellison's own motion.[63]

Remarkably, Ellison again attempts to mischaracterize Judge Johnston's Order on the motion for summary judgment before this Court.  See, (Doc. 1 at 41) ("The Magistrate has held that it is undisputed fact, that the [guards' refusal to provide food] occurred in his Findings and Recommendations.)  The state district court properly found that Ellison was attempting to either mislead the PCR court, or he misconstrued the ruling.  In fact, this Court informed Ellison of the very same misapprehension in a prior ruling, and clearly advised him that his understanding of Judge Johnston's order was inaccurate.  *Ellison v. Guyer*, Cause No. CV-18-176-DLC-TJC, Or. and Find. & Rec. at 16-17 (filed April 21, 2020).

In short, Ellison has failed to show that the state courts denial of this claim "was contrary to, or involved an unreasonable application of, clearly established Federal law," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable

---

[63] See, *Ellison v. Officer Washington*, Cause No. CV-18-56-BLG-BMM-JTJ, Or. (entered March 9, 2021).

determination of the facts," *id*. § 2254(d)(2).  Accordingly, this Court must afford

deference and the claim should be denied.

### d.  Claim 4: Malicious Prosecution/Prosecutorial Misconduct

### State Court Background

In the state district court Ellison alleged the State engaged in malicious

prosecution and prosecutorial misconduct which impaired his ability to get a fair

trial, and adamantly asserted the existence of a wide-ranging conspiracy against

him on the part of the law-enforcement and the prosecutors.  Ellison first claimed

the State committed three separate *Brady* violations[64] by withholding: (1) a taped

statement that he and his parents gave to Detective Richardson on the morning of

the fire; (2) a picture of a cut on his hand; and, (3) a photo allegedly showing blood

on one of the doors that was tied shut.  The State countered that none of this

evidence existed and that, even if it did, Ellison suffered no prejudice.  The district

court agreed.  *Id*. at 381.

In relation to the taped statement Ellison alleged to exist, he argued this item

would have supported his parents' trial testimony that Fritz was present at the

scene of the house fire.  *Id*.  The State countered that none of the Ellisons gave a

taped statement to Detective Richardson or Deputy Fire Marshall Schilling at their

---

[64] The rule established in *Brady v. Maryland*, 373 U.S. 83 (1963), requires the prosecution to disclose materially exculpatory evidence in its possession to the defense.

home on the morning of the fire. *Id*. The trial testimony of Marlene and Deputy Schilling supported the State's position. *Id*. Claude Ellison testified that he did not want to give a recorded statement and would have instead preferred a deposition. *Id*. Aside from his own self-serving statements, Ellison provided no evidence of the existence of the recorded statement. In addition, the PCR court found that, for purposes of *Brady*, the tape was not "material." *Id.* Claude and Marlene testified at trial and told the same story Ellison alleged would be on the tape. Thus, there was nothing to suggest that even if the tape did exist and had been disclosed, the result of the trial would have been different. *Id*.

Ellison also claimed that there was a picture of an injury to his hand that shows he cut his hand while reaching out of the broken window to cut the rope tying the door shut, and that the photo was suppressed. The district court noted that Ellison's trial attorney "strongly disagree[d]" that such a photo existed and that all items of evidence were turned over in discovery. *Id*. at 382.

The court further noted that "Photo 77" which was admitted during the State's case in chief did not show any blood on the door. *Id*. The district court went on to find that even if a photo of an injury to Ellison's hand or of blood on the door existed, neither would have had any impact on the result of the case. *Id*.

In relation to Ellison's ongoing claim regarding a wide-ranging conspiracy against him, the court found that Ellison failed to provide any evidence of such a

42

plot, aside from his own self-serving statements and those of his parents.  *Id.*  at

382-83.  The district court also noted that during his resentencing, Ellison

attempted to enter photographs and documents relating to the 2010 Park County

"abduction."  The district court observed that the Montana Supreme Court held the

items were properly excluded as irrelevant to the 2015 Tampering and

Impersonation convictions.  The court found Ellison's belief that a conspiracy was

in place against him was based on his own shifting beliefs, was not supported by

evidence, and did not justify post-conviction relief.  *Id*. at 383.

### Present Claims

On appeal from the denial of his postconviction claim, Ellison altered the

nature of his claims.  Because the state did not respond to three of the claims,

presumably because they were not presented to or adjudicated by the district

court,[65] Ellison now believes the State "has conceded and abandoned these issues

by law."  (Doc. 1 at 42, 49, 51.)  The Court disagrees and will address the issues in

turn.  Before this Court Ellison appears to raise two distinct issues: *Brady*

violations and prosecutorial misconduct.

---

[65] The general rule in Montana is that the Supreme Court will not address either an issue raised
for the first time on appeal or a party's change in legal theory.  See, *Day v. Payne*, 280n Mont.
273, 276, 929 P. 2d 864, 866 (1996)(citation omitted).  The basis for the general rule is that "it is
fundamentally unfair to fault the trial court for failing to rule correctly on an issue it was never
given the opportunity to consider.  *Day*, 280 Mont. At 276-77, 929 P. 2d at 866 (citation
omitted); see also, *City of Missoula v. Mt. Water Co*., 2018 MT 114, ⁋ 23, n. 4, 391 Mont. 288,
417 P. 3d 321).

### i.  *Brady* **violations**

Ellison reiterates his argument that Detective Richardson "suppressed" the recorded statements he took of Ellison, Claude, and Marlene the morning the "bomb thing" woke them up.  *Id*. at 44.  Ellison also maintains his assertion that a photo showing his bloody hand was withheld from the jury, and that such a photo would have impeached Richardson's testimony that there was "no injury" to his hand."  *Id*. at 46.  Ellison believes that, had the jury heard this recording and had the photo of the injury to his hand, and also have known of the unlawful acts that occurred previously in Park County, it is more likely than not that they would have acquitted on all counts.  Ellison maintains *Brady* violations occurred, and the State courts erred in finding there was none.  *Id*. at 44-46.

A *Brady* violation occurs when: 1) evidence is favorable to the accused because it is exculpatory or impeaching; 2) the evidence is not disclosed by the prosecution; 3) the nondisclosure results in prejudice to the accused.  *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).  Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *United States v. Bagley*, 473 U.S. 667, 682 (1985); see also *Kyles v. Whitley*, 514 U.S. 419, 433-434 (1995).  In assessing the issue of materiality, the court must review the trial record and decide whether it remains confident that the outcome would be the same even if the jury

heard the suppressed evidence.  See, *Kyles*, 514 U.S. at 434 ("The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.").

With respect to the alleged photo of his hand, the Court notes that not only did Detective Richardson testify that he observed no injury to Ellison's hand in the early morning hours during which he responded to the Ellison home,[66] Fire Marshall Schilling also observed no injury.  Schilling testified that he did not notice any cuts, bruising, or lacerations to Lionel's hand, and that he had no difficulty using his right hand.  Ellison told Schilling his hand was fine and Schilling observed him use his hand and hold a coffee mug without issue.[67] Schilling explained he was surprised because, had Ellison punched the glass window as he claimed to have done, Schilling would have expected to see some injury or bleeding.  He observed no such injury to either hand.[68]  Moreover, Claude Ellison was unable to testify with any clarity as to whether or not he saw a cut to Lionel's hand.  He testified that he saw a picture of Lionel's hand, and believed it to be bruised but was unsure if his hand was cut with a knife.[69]

---

[66] See, (Doc. 2-1 at 492/trial trans: 340:9-21; 341:5-12.)
[67] (Doc. 2-1 at 475/trial trans. at 271:2-15.)
[68] *Id.*/trial trans. at 271:16-20.
[69] *Id*. at 463/trial trans. at 222:2-8; 224: 5-12.

It has also not been established that a photo of his Leonel's hand exists; and if so, whether it was ever in possession of the state.  Ellison now states that the photo he asserts was withheld was actually taken by Marlene at the direction of his then-attorney, Elizabeth Honaker.  See, (Doc. 1 at 46.)  Thus, there is no indication the state ever possessed a photo, much less suppressed it.  Therefore, Ellison fails to meet the first prong of the *Brady* test because he cannot show this evidence exists or that it is favorable to him.  See, *Strickler*, 527 U.S. at 281-82.

Even if the photograph existed, however, there has been no showing that the evidence was material.  Ellison asserts that the photo of his hand would have clearly disputed the State's affidavit of probable cause and explained the blood/DNA on the ropes.  But the serologist from the crime lab testified that there was no blood on any of the ropes that were obtained from the Ellison home and tested.[70]  Thus, there was no blood evidence which needed to be explained.

In relation to the recorded statement that was purportedly given when Schilling and Richardson responded to the Ellison home, Claude's trial testimony reveals that he did not give a formal statement to authorities, despite knowing that they wanted to obtain additional information from both him and Marlene.  Instead, after consultation with his attorney, Patrick Sweeney, he advised authorities they could seek a subpoena and/or take his deposition.  (Doc. 2-1 at 461/trial trans. at

---

[70] See, (Doc. 2-1 at 510/trial trans: 412:8-19)(Van Grinsven testimony).

213:5-15).  Detective Richardson confirmed Claude's testimony.  He explained that despite initially agreeing to come in and give a formal statement following Ellison's court appearance, *id*. at 493/trial trans. 341:18-24, they never did so and instead referred authorities to their attorney.  *Id*. at 400/trial trans. 366-68.

In addition, as observed by the district court, Ellison's parents testified during the State's case-in-chief and repeated the same story that Ellison asserts was given on the taped recording.[71]  The jurors were able to judge their credibility, as well as that of Marshall Schilling and Detectives Blake and Richardson.  Therefore, Ellison has not established this taped statement is material for purposes of *Brady*.  Even if it existed and was admitted at trial, there is no indication the result of the proceeding would have been different.  See, *Bagley*, 473 U.S. at 682.

Accordingly, Ellison cannot establish the existence of a *Brady* violation under any prong.  Ellison only advances his own beliefs and conclusory statements about what the evidence may have shown, and has not shown the state court's ruling was lacking in justification or constitutes an error of existing law.  See, *Richter*, 562 U.S. at 103.  Because he has not met his burden, this Court must afford AEDPA deference to the state court's decision.  Ellison's *Brady* claim should be denied.

//

---

[71] See, (Doc. 2-1 at 381)(PCR Order); see also, Pet. (Doc. 1 at 57.)

### ii.     Prosecutorial misconduct

A petitioner is entitled to habeas corpus relief if the prosecutor's misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974).  To constitute a due process violation, the prosecutorial misconduct must be "of sufficient significance to result in the denial of the defendant's right to a fair trial."  *Greer v. Miller*, 485 U.S. 756, 765 (1987) (quoting *United States v. Bagley,* 473 U.S. 667 (1985)).  Any claim of prosecutorial misconduct must be reviewed within the context of the entire trial.  *Id.* at 765-66.  The Court must keep in mind that "[t]he touchstone of due process analysis in case of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor" and "the aim of due process is not punishment of society for the misdeeds of the prosecutor but avoidance of an unfair trial to the accused."  *Smith v. Phillips*, 455 U.S. 209, 219 (1982).

Before this Court, Ellison maintains his insistence that prosecutors Mees and Linneweber, in concert with Fritz, worked together to fabricate probable cause for the Yellowstone County offenses, and also prevented him from seeking redress for the wrongs that occurred against him as a result of his 2010 Park County abduction.  See e.g., (Doc. 1 at 43).  Ellison claims Linneweber knew Detective Fritz was responsible for his 2010 abduction, and that he was fired "immediately"

48

from his job as the Park County prosecutor once the Park County Commissioners learned he had suppressed a 40-minute dash camera video of law enforcement officials locating Ellison.  *Id*. at 43-44.  Ellison then likens the "disappearance" of the Park County dash camera video to the "disappearance" of the recorded statement of his family members.  *Id*. at 44.  As he has maintained during his various federal proceedings, Ellison is adamant that a continuous conspiracy is at play against him and has been for nearly fifteen years.  Ellison also asserts Linneweber presented false statements to the trial court during a pretrial hearing in relation to his prior crimes, which prejudiced the court against Ellison.  (Doc. 1 at 49.)  Ellison argues Mees acted improperly by commenting on the credibility of Claude and Marlene and suggesting the jury take their testimony "with a grain of salt."  *Id*. at 50.

As a preliminary matter, this Court agrees with the state courts assessment that Ellison has failed to provide any evidence, aside from his own conjecture and self-serving statements of his parents, that prosecutors and law enforcement officials are part of a conspiracy against him.  The district court noted that Ellison "misconstrues the exhibits he attaches as 'evidence,' and the story of the conspiracy and who is involved appears to shift over time."  (Doc. 2-1 at 383.)  The district court found Ellison's "evidence" to be nothing more than conclusory statements, not supported by evidence, and not warranting postconviction relief.

49

*Id*.  The Montana Supreme Court agreed.

As previously stated, there is no indication that Linneweber was fired from his position as the Park County Attorney, much less for any reason having to do with Ellison's 2010 abduction.  To the contrary, publicly available information indicates Linneweber voluntarily left his position in Park County when offered employment with Yellowstone County. The Court has independently reviewed the MSH Report, as well as the "suppressed" dash camera video surrounding the 2010 "abduction."  Neither item supports Ellison's contention that he was abducted and tortured at the behest of Detective Fritz.  Moreover, as noted by this Court in 2020, Ellison's version of these events and the parties responsible has shifted over time, supported by nothing more than Ellison's own conclusions and conjecture.  See e.g., *Ellison v. Fletcher*, Cause No. CV-17-168-BLG-DLC-TJC, Or. at 9, f.n.10 (filed Jan. 7, 2020) (discussing Ellison's shifting account of events and responsible parties over time).

To the extent that Ellison believes either Mees or Linneweber prosecuted him maliciously as a result of statements made during the August 10, 2015 omnibus hearing, the claim lacks merit.  Various issues were addressed at the hearing, including the defense's motion in limine, seeking to exclude reference to Ellison's previous convictions and acts as irrelevant and/or unfairly prejudicial. See e.g., (Doc.2-1 at 403-407).  The State explained in detail why each incident

should be admitted at trial, including the 2010 Park County abduction.  See, (Doc. 2-1 at 405/hrg. trans. at 20:4-27.)  This argument was not made in an effort to intentionally prejudice the trial court against Ellison, rather it was part of a lengthy hearing in which the State was responding to one of the defense's motions and explaining to the Court what it believed to be the relevance of the information at issue.  The state was prepared to call witnesses to present this testimony, but the parties agreed to allow the State to make an offer of proof.  *Id*. at 404/hrg. trans. 17-18. The state then made its offer of proof as to what the State believed it could prove at trial and how it related to the Arson, Tampering, and Impersonation charges.[72]

The Court reserved ruling on the evidentiary issues surrounding Ellison's prior acts and they became the subject of argument outside the presence of the jury regarding admissibility.[73]  This was an area of much discussion throughout the proceedings.  Ellison's effort to cherry-pick a comment made by Linneweber at a pre-trial hearing, does not show what occurred in the entire context of the pretrial and trial proceedings.  Additionally, Ellison has not demonstrated the comments

---

[72] During the course of this hearing the State discussed Ellison's vehicle arson case, (Doc. 2-1 at 404/hrg. trans at 18-19); Ellison's 2008 "abduction," *id*./hrg. trans. at 19; the 2009 PFMA and Violation of Order of Protection investigated by Detective Fritz, id./hrg. trans. 19-20; the 2010 Park County "abduction," *id*. at 405/hrg. trans. 20; the civil suit filed by Claude and Marlene against Yellowstone County and Detective Fritz, *id*. at 405/hrg. trans. 21; a 2011 insurance fraud case, *id*. at 405/hrg. trans. 21-22; and provided argument as to why the information was relevant and probative.  *Id.* at 405/hrg. trans. 22-23.

[73] See, (Doc. 2-1 at 487/trial trans. 319-328.)

made during a pretrial hearing were of such significance that they affected

Ellison's right to a fair trial.  See, *Greer*, 485 U.S. at 765-66.

Similarly, Ellison pulls out a statement from Mees' closing argument to

support his claim that she unlawfully attacked the credibility of Claude and

Marlene's testimony by suggesting the jury take their testimony "with a grain of

salt."  See, (Doc. 1 at 50).  But looking at the entire context of the State's closing

argument reveals there was no prejudicial error.  The statement occurred in

conjunction with a discussion of several matters that may have affected Claude and

Marlene's credibility.  The statement was not prominent, it was not repeated, and

constituted a very small part of Mees' initial closing argument,[74] which also

included a discussion of the jury instructions and argument as to the evidence and

witness testimony.  The defense did not object to Mees' "grain of salt" reference

and had adequate opportunity to respond with its own closing argument.[75]

In relation to a prosecutorial misconduct conduct claim based upon remarks

made by a prosecutor, "it is not enough that the prosecutor's remarks were

undesirable or even universally condemned."  *Darden v. Wainright*, 477 U.S. 168,

181 (1986).  As set forth above, the inquiry is whether "the prosecutor's comments

---

[74] Mees' initial closing argument consumed 27 pages of the trial transcript.  See, (Doc. 2-1 at
551-558/ trial trans. 575-602.)  Mees' rebuttal closing argument consumed 10 pages of the trial
transcript.  (Doc. 2-1 at 563-565/trial trans. at 621-631.)
[75]See, Defense Closing Argument (Doc. 2-1 at 560-563/trial trans. at 610-621.)

'so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181 (quoting *DeChristoforo*, 416 U.S. at 643. The "*Darden* standard is a very general one, leaving courts 'more leeway…in reaching outcomes in case-by-case determinations. *Parker v. Matthews*, 567 U.S. 37, 48 (2012) (quoting *Yarborough v. Alvarado,* 541 U.S. 652, 664 (2004).

Mees' "grain of salt" comment falls far short of this standard. It was simply part of her overarching argument that the State, when considering the evidence as a whole, had proven Ellison's guilt. Moreover, the jury was properly instructed on credibility of witnesses, the presumption of innocence, and corresponding legal standards. Viewing the statement in light of the entire trial and closing arguments, leaves this Court to conclude the comment did not infect the trial with unfairness so as to make Ellison's resulting convictions a denial of due process.

In short, to the extent that Ellison believes the state courts' adjudication of his prosecutorial misconduct claim is "contrary to existing and established United States Supreme Court law" for purposes of 2254(d)(1), see (Doc. 1 at 51), he is incorrect. His claim does not survive deferential review and should be denied in its entirety.

### e.  Claim 5: Ineffective Assistance of Counsel

### State Court Background

Ellison claimed that his trial counsel, Kakuk, was ineffective in various

ways, including: instructing his parents not to testify that they saw Detective Fritz at their house the morning of the house fire; not conducting an adequate pre-trial investigation; not adequately communicating with Ellison; possessing a phone that allegedly contained a picture of Ellison's bloody hand and electing not to show it to the jury; conducting a second omnibus hearing without Ellison's knowledge where the "rules at trial changed;"  abandoning the defense trial strategy and refusing to allow Ellison to testify; not cross-examining Detective Fritz; not ensuring Ellison was adequately fed, leading to his mental impairment during trial and inability to assist in his own defense; and, failing to argue that no witness identified Ellison on the phone call relative to his Impersonation of a Public Servant conviction.  See, (Doc. 2-1 at 384.)  Ellison further argued appellate counsel was ineffective for failing to present his PCR claims on direct appeal.  The district court determined Ellison's allegations had no basis in fact, and that his attorneys' actions met the objective standard of reasonableness.  *Id*. at 385.

The district court applied the two-prong test established in *Strickland v. Washington*, 466 U.S. 668, (1984), to analyze the ineffective assistance of counsel claims.  Under the *Strickland*, a defendant must establish: (1) that counsel's performance was deficient, and (2) that counsel's deficient performance prejudiced the defendant.  *Strickland*, 466 U.S. at 687.  The district court first found that Ellison could not show that Kakuk's performance fell below an objective standard

of reasonableness.  (Doc. 2-1 at 385.)  Further, the Court determined nothing complained of in Ellison's petition would have changed the outcome of the proceeding, and the majority of his claims were "frivolous and lacked procedural and substantive merit."  *Id*. at 385-86.

In relation to Ellison's claim about Kakuk instructing his parents not to testify that they saw Detective Fritz, Kakuk strongly denied the claim.  *Id*. at 386.  He explained he told them not to testify about Ellison's history, because he was concerned about either Ellison parent opening the door to evidence regarding Ellison's history of staging crime scenes.  *Id*.  The district court found these decisions to be strategically sound and reasonable.  Additionally, the court observed that both Claude and Marlene testified they believed they saw Fritz.  So even if Kakuk had instructed them to say differently, they disregarded his instructions.  Thus, Kakuk's alleged instruction did not affect the outcome of Ellison's proceedings.  *Id*.

Likewise, the district court found Ellison's claims regarding an inadequate investigation lacked merit.  Kakuk explained he had contacted Ellison's prior attorney.  Kakuk also did not hire a serologist because the serologist at the State Crime Lab determined there was no blood on the ropes.  Additionally, Detective Richardson had photographed the ropes and there was no blood shown.  *Id*.  Further, Kakuk believed it was pointless to challenge the DNA evidence, and felt

making such a challenge would have highlighted the problematic narratives advanced by Claude and Marlene.  *Id.*

As to the photograph contained on the cell phone, Kakuk explained he obtained the phone from Greg Stovall, the investigator for Ellison's former attorney, Elizabeth Honaker.  Kakuk personally viewed the photos, and stated there was no photo of Ellison's hand, bloody or otherwise, contained on the phone.  *Id.* Accordingly, the district court agreed with Kakuk's assessment that there was no reason to call a witness to testify about an injury for which there was no evidence and was irrelevant to the case.  *Id.* at 386-87.

To the extent Ellison alleged Kakuk refused to communicate with him, the district court noted this issue was one of the areas covered by the trial court during the August 10, 2015, hearing.[76]  While Kakuk acknowledges there were some problems with calls from the jail coming through initially, the issue was subsequently resolved.  *Id.* at 387.  Ellison failed to allege what specific impact the purported refusal to communicate had on his trial.

The court was also unconvinced regarding Ellison's claim that the "rules changed" at his second omnibus hearing.  Ellison failed to identify any specific change in rules and any impact it had on his trial.  *Id.*

Contrary to Ellison's assertion, Kakuk stated he met with Ellison and they

---

[76] See, (Doc. 2-1 at 400-403.)

discussed and agreed upon the best trial strategy.  *Id*.  The district court further

noted Kakuk presented compelling logic for why he advised Ellison not to testify

in his own defense: Ellison did not present well, had little control of himself, and

Kakuk was very concerned he would open the door to charged and uncharged

criminal history.  The latter of which Kakuk believed would be "disastrous."  *Id*.

The district court noted Ellison made no complaints regarding this strategy at the

time of trial.  The court also found Ellison's claim that he was precluded from

testifying lacked credibility because he did not object at the time, and affirmatively

stated on the record that he understood his right to testify and was waiving the

right.  *Id*. at 388.

The court found the decision not to cross-examine Detective Fritz was not

ineffective, but rather was based on a strategic decision, because doing so would

have reinforced elements of the State's theory.  *Id*.  Thus, Kakuk's performance

was objectively reasonable.  *Id*.

Finally, the district court noted that Kakuk did argue that no witness

identified Ellison's voice on the phone call, attempting to provide reasonable doubt

relative to the Impersonation charge.  *Id*., (citing trial transcript 617:22-618:1.)

Also, the court found any argument Ellison had relative to the location of the knife

was irrelevant, because photographs of the location of the knife and the knife itself

were admitted into evidence.  *Id*.  The issues had no impact on the outcome of the

57

case. *Id*.

In relation to appellate counsel's performance, the district court found all claims to be unconvincing.  Because the claims Ellison presented in his PCR petition were lacking in merit, appellate counsel's refusal to present them on appeal did not fall below an objective standard of reasonableness and Ellison was not prejudiced by the decision.  *Id*.  The district court determined, and the Montana Supreme Court affirmed, that all of Ellison's IAC claims failed.

## **Present Claims**

Generally, Ellison claims the state courts erred in rejecting his IAC claims against trial and appellate counsel.  See, (Doc. 1 at 52-59.)

As set forth above, IAC claims are governed by the two-part test announced in *Strickland*.  Under *Strickland*, a petitioner claiming IAC has the burden of demonstrating that (1) the attorney made errors so serious he was not functioning as the "counsel" guaranteed by the Sixth Amendment, and (2) that the deficient performance prejudiced the defense.  See, *Williams v. Taylor*, 529 U.S. 362, 390-91 (2000) (citing *Strickland*, 466 U.S. at 687).  To establish ineffectiveness, the defendant must show that counsel's representation fell below an objective standard of reasonableness.  To establish prejudice, the defendant must show that here is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is "probability

sufficient to undermine confidence in the outcome." *Id*.  Additionally, any review of the attorney's performance must be "highly deferential" and must adopt counsel's perspective at the time of the challenged conduct, in order to avoid the distorting effects of hindsight.  *Strickland*, 466 U.S. at 689.  It is the petitioner's burden to overcome the presumption that counsel's actions might be considered sound trial strategy.  *Id*.

If the state court has already rejected an IAC claim, a federal habeas court may only grant relief if that decision was contrary to or an unreasonable application of *Strickland*.  See, *Yarborough v. Gentry*, 540 U.S. 1, 5 (2003).  There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.  *Id*.

The Supreme Court has described federal review of a state court's decision on an IAC claim as "doubly deferential."  *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011)(quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).  The Supreme Court emphasized: "We take a 'highly deferential' look at counsel's performance…through the 'deferential lens of 2254(d).'" *Id*. at 190 (internal citation omitted).  Moreover, federal habeas review of an IAC claim is limited to the record before the state court that adjudicated the claim on the merits. *Pinholster*, 563 U.S. at 181-84.

Applying these standards to Ellison's present claims, it is apparent that he

has failed to show the Montana courts' denial of his IAC claims was contrary to or involved an unreasonable application of *Strickland*.

First, Ellison claims that trial counsel was ineffective for not identifying the multiple prosecution statute and raising the issue at trial, and that appellate counsel was ineffective for not raising the issue on appeal. See, (Doc. 1 at 52-3.) But this issue was addressed on direct appeal. The Montana Supreme Court reversed Ellison's conviction for the second count of Tampering with Evidence, finding that trial counsel was ineffective for failing to object to the second count under the multiple conviction statute, Mont. Code Ann. § 46-11-410(2)(a). See, *State v. Ellison*, 2018 MT 252, ⁋ 29, 393 Mont. 90, 428 P. 3d 826 (*Ellison I*). Accordingly, this issue was raised and Ellison prevailed.

To the extent that Ellison believes Kakuk performed deficiently for attempting to dissuade his parents from identifying Detective Fritz as present at the scene of the home fire, the Court agrees that even if Kakuk had provided such advice, neither Ellison parent heeded the advice and both testified that they saw either Fritz or "his twin" fleeing from the scene. Moreover, Kakuk was adamant that he did not give such advice, but instead cautioned both Ellison's against providing testimony that could open the door to their son's prior bad acts. In either event, the advice of Kakuk was reasonable and had no impact on the outcome of the trial.

60

Ellison next contends the state court erred when it was determined that Kakuk performed an adequate investigation and presented an adequate defense. Ellison again argues Kakuk performed deficiently by not cross-examining Detective Fritz or using the lawsuit Claude and Marlene had filed against him as impeachment evidence. Ellison also faults Kakuk for refusing to recall Claude and Marlene during the defense's case-in-chief, refusing to present a letter purporting to impeach the alibi of Detective Fritz on the night of the home fire, and failing to consult with a DNA expert regarding "secondary transfer" prior to trial. See, (Doc. 1 at 54.) Ellison also faults Kakuk for failing to call a serology expert, and failing to introduce the phone that had been in Attorney Honaker and/or Investigator Stovall's possession. *Id*. at 55.

In relation to the recalling Claude or Marlene or presenting their lawsuit, or to cross-examine Fritz, Kakuk's explanation of strategy was a reasonable basis to deny the IAC claim. Kakuk explained that both Ellison parents presented "problematic" theories, and he hoped to limit their testimony in order to prevent inadvertently opening the door to any prior bad acts. Similarly, Kakuk elected not to cross-examine Detective Fritz in an effort to avoid highlighting certain theories advanced by the state. The "alibi" letter was not discussed in the district court order, but the provenance of the letter is suspicious. But even taking the letter as true, it does not establish that Detective Fritz did not have an alibi in the early

morning hours of March 13, 2014.  See e.g., (Doc. 1 at 53) (Ellison's excerpt of letter.)  In short, Kakuk had a strategic reason for electing to present the defense's case and witnesses in the manner that he did.

Ellison also refers back to the "suppressed" recording of the interview of Claude and Marlene and claims that this information could have been used to impeach the testimony of Detective Richardson, Detective Fritz, and Detective Bancroft. See, (Doc. 1 at 57-8.)  Ellison again argues that this recording would have cast doubt on the whereabouts of Detective Fritz and supported the testimony of Claude and Marlene that Fritz was the perpetrator.  But, as discussed above, Claude and Marlene both testified at trial and stated their version of events.  The purported inconsistencies regarding Detective Fritz's whereabouts on the night of the home fire was presented.  It was for the jury to decide which witness provided the most credible testimony.  The Court fails to see how cumulative testimony from Claude and Marlene, in the form of the recording, would have resulted in a reasonable probability of a different outcome.  Ellison has not established that the state court's denial of this claim resulted from an unreasonable application of *Strickland*.

Additionally, the state court reasonably determined that Kakuk did not perform deficiently in failing to investigate the DNA and blood evidence, because it was undisputed that Ellison had touched the ropes, and no blood was found on

the ropes.  As discussed above, this DNA/blood issue not only lacks merit, but the purported evidence is also either immaterial to Ellison, non-existent, or both.

Ellison asserts that the serologist was advised not to test for blood.  See, (Doc. 1 at 58).  But her own testimony undermines this assertion.  The serologist testified that she did not see any staining on visual examination, and she would have tested for blood if she had seen any evidence of blood on the rope.  (Doc. 2-1 at 510/trial trans: 412:8-19.)  Aside from his citations to cases that are inapplicable to the present matter, Ellison has failed to demonstrate that any expert would have testified differently than the state's expert, or that any expert would have identified the existence of blood.  In either case, he has not shown that the state courts unreasonably determined that Kakuk performed proficiently, or that he was prejudiced, by failure to pursue this avenue of investigation.

Finally, in relation to the phone, there is an inherent inconsistency in Ellison's argument.  Ellison maintains that the phone at issue was first used in the timeframe immediately following the home fire, when Marlene took a picture of the purported cut to his hand, at the direction of Attorney Honaker.  Ellison then maintains that this phone remained in Honaker and/or Investigator Stovall's possession, and thus, it could not have been used by him to make the calls for which he was charged with Impersonation.  See, (Doc. 1 at 54.)[77]  But the house

---

[77] See also, (Doc. 2-1 at 691)(letter purportedly written by Claude and Marlene to Judge Jones

fire occurred on March 14, 2013.  The phone with the number (406) 794-8821,

from which the Impersonation calls were made, was not purchased by Marlene

Ellison until August 19, 2014, a year and five months after the alleged injury to

Ellison's hand.  In any event, the Court fails to see how Kakuk could have

performed deficiently in this regard.  Ellison's own argument relative to the phone

makes no sense.

Additionally, Ellison fails to show that had Kakuk employed an investigator,

it would have led to the discovery of any material evidence or resulted in a

different outcome at trial.  Aside from his own conjecture, Ellison has failed to

show what further investigation would have revealed or that it would have resulted

in a different outcome.

Finally, Ellison's allegation that Kakuk coerced him into choosing not to

testify lacks merit. The Court went into recess, and Ellison met with Kakuk

following the close of the State's case-in chief.  (Doc. 2-1 at 550/trial trans. at

570:8-11.)  Kakuk then advised the trial court, that on the advice of counsel,

Ellison was not going to present any testimony, and the defense intended to call no

additional witnesses.  *Id*. at 570:19-23.  Ellison advised the Court that he initially

wanted to take the stand, but that counsel advised him not to do so.  *Id*. at 570:24-

---

explaining their theory that Lionel could not have made the Impersonation calls because
Investigator Stovall had the phone the entire time because it contained the picture of the
injury/cut to Ellison's hand.)

25; 571:1-3.  Ellison was advised that the decision whether or not to testify was ultimately his to make; Ellison informed the Court that on the advice of counsel he was waiving his right to testify.  *Id*. at 571:4-15.

There is no indication in the record that Ellison was in an incoherent, hypoglycemic state.  Ellison's post hoc claim that he did not knowingly waive his right to testify, and that Kakuk, pressured him to do so, is unconvincing.  Moreover, Ellison fails to explain what testimony he would have provided or that it would have been helpful and altered the outcome of his trial.  Ellison's various theories and filings before this Court lend credence to the idea that he certainly could have opened the door to the excluded prior bad acts and had an adverse effect.

Kaku performed within the "wide range" of reasonable professional assistance.  *Harrington*, 562 U.S. at 104.  "The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom."  *Id*. at 105.  The state courts' determination that Kakuk performed proficiently and that Ellison was not prejudiced is a reasonable one.  Accordingly, this Court must afford deference under the doubly deferential standard at play.

In relation to appellate counsel, Ellison faults counsel for stating the Ellison home was a "trailer" home and that the pocket-knife with "Fritz" written on it was

found outside the trailer.  (Doc. 1 at 57.)  This Court fails to see how this demonstrates appellate counsel was constitutionally ineffective.  Further, as set forth above, appellate counsel was successful on appeal, and one of Ellison's Tampering convictions was vacated.  While Ellison advances that an error occurred in the description of the home, it was typographical in nature and entirely immaterial, not an error rising to a level of constitutional magnitude.  The state courts reasonably rejected Ellison's claim relative to appellate counsel.  Ellison's IAC claim should be denied in its entirety.

### f.  Claim 6: Perjury

### State Court Background

The district court was also not swayed by Ellison's claim that Detectives Richardson and Fritz committed perjury during trial.  The court found the statements with which Ellison took issue were matters of opinion, not material, and insufficient to warrant relief.  (Doc. 2-1 at 383.)

Ellison first claimed that Detective Richardson lied about the manner in which the ropes were tied to the doors.  Richardson testified the ropes were tied in such a way that the doors could still easily be opened.  Ellison disputed this assertion and claimed the doors were tied tightly.

The district court pointed out the jury had access to the ropes and the items the doors were tied to, and could give the proper weight to Richardson's testimony

and the physical evidence.  *Id*.  As the factfinder, the jury had the responsibility of judging Richardson's credibility.  The district court also noted what is considered "tight" and "easily opened" are amorphous issues, not rising to the level of perjury and not justifying overturning Ellison's conviction.  *Id*. at 384.

Ellison also claimed Detective Fritz committed perjury by testifying he had only seen Ellison once.  The district court noted Detective Fritz testified that he believed he had two "face-to-face interactions" with Ellison, something distinct from merely seeing Ellison.  *Id*.  Further, if Fritz was merely mistaken, it was not perjury and the number of interactions the two previously had was not material to the case.  *Id*.  The court found Ellison was not entitled to relief.

### **Present Claims**

Ellison reasserts that Detective Richardson testified falsely when he stated the ropes were loose.  Ellison further believes Richardson could have been impeached by the photo which showed his hand was cut.  (Doc. 1 at 60.)  Ellison also claims that Detective Fritz committed perjury by stating he had only seen Ellison twice; Ellison claims they had encountered each other many times. *Id*. Ellison claims that the State's knowledge that these two individuals were providing false statements violates *Napue v. Illinois*, 360 U.S. 264 (1959), and that the state courts unreasonably denied his claim.  See, (Doc. 1 at 60.)

The Ninth Circuit summarized the law on perjured testimony as follows:

In *Napue*, the Supreme Court held "that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." Nonetheless, a *Napue* claim succeeds only if three elements are satisfied. First, the testimony or evidence in question must have been false or misleading. Second, the State must have known or should have known that it was false or misleading. And third, because "*Napue* does not create a 'per se rule of reversal,'" the testimony or evidence in question must be material.

*Panah v. Chappell*, 935 F. 3d 657, 664 (9th Cir. 2019)(citations omitted).

Although the state courts applied state law of perjury and materiality to Ellison's claim, the decision was also reasonable under application of *Napue*. As to Detective Richardson, his statement that the ropes were loose, was not false or misleading. It was his assessment of the scene. Detective Richardson's opinion also coincides with that of Deputy Fire Marshall Schilling.[78] Additionally, Ellison has presented no evidence which would tend to indicate that the State knew this evidence to be false or misleading, only that he disagrees with it. Consequently, Richardson's testimony regarding the ropes fails to meet the first two criteria of *Napue*.

Ellison asserts again that Richardson committed perjury by stating he observed no injury to Ellison's hand. In relation to the third *Napue* prong, and as discussed above, the Court fails to see how this information is material because no

---

[78] See e.g., (Doc. 2-1 at 481/trial trans. at 296: 19-20)(regarding to the rope tied to the gas meter he stated "…there was a lot of slack in there, so the door would still have been opened. Additionally, the Court has independently reviewed the photos from the scene provided by Ellison; there does appear to be slack in the ropes. See, (Doc. 2-1 at 655-658, 664.)

blood was discovered on the ropes.  But, even so, Richardson's testimony that he observed no injury to Ellison's hand, despite Ellison's claim that he punched out the window, is consistent with other trial testimony, including that of Deputy Fire Marshall Schilling.  See e.g., (Doc. 2-1 at 471/trial trans. at 269-71.)  Thus, Ellison fails to show that this testimony was false or that the State knew it to be false.  The claim was reasonably denied and should be afforded deference under § 2254(d).

Ellison again claims that Detective Fritz committed perjury when he testified that "he had only seen Ellison twice."  (Doc. 1 at 60.)  Ellison claims the civil suit filed by Claude and Marlene documents 20 times when Fritz "harassed the Elder Ellisons and the Petitioner."  (Doc. 1 at 60.)

Ellison again mischaracterizes Fritz's testimony.  When asked if he knew Lionel Ellison, Detective Fritz responded that he had "conducted several investigations into Mr. Ellison."  (Doc. 2-1 at 545/trial trans. at 550:25-551:1.)  Fritz went on to testify that in September of 2009 he investigated a witness tampering/Temporary Order of Protection violation.  *Id*. at 545-6/trial trans. at 551-553.)  He then explained that in October or November of 2009 he investigated a second restraining order violation/witness tampering allegation.  *Id*. at 546-7/trial trans. at 554-557.  Fritz was then asked how many "face-to-face" interactions he had had with Ellison.  Fritz responded two: when he conducted the initial interview of Ellison in September 2009 and again when he arrested Ellison sometime later in

69

2009.  *Id.* at 547/trial trans. at 557:5-13.[79]  Fritz explained the last time he had

anything to do with Ellison was in 2010, *id.* at 547/trial trans. at 557:24-25-558:1,

and that in 2012 he attempted to serve an arrest warrant at Claude and Marlene's

home, but Ellison was not present.  *Id.* at 547/trial trans. at 558:4-8.  There were no

additional clarifications or questions asked of Detective Fritz regarding interactions

with Ellison by either the State or defense counsel.

     As pointed out by the district court, a face-to-face interaction is distinct from

merely seeing Ellison.  Moreover, Ellison's claim that his parents' civil lawsuit

disproves Fritz's trial testimony is unavailing.  A review of the complaint reveals

that the elder Ellison may have had additional "face-to-face" interactions with

Detective Fritz, see e.g., (Doc. 2-1 at 699, ⁋ 14; 701, ⁋ ⁋20-22; 702, ⁋⁋ 25-27), but

not Ellison himself.  Also, accepting the allegations contained in the complaint as

true, Detective Fritz may have been present in the courtroom during several

courtroom proceedings and one foreclosure action where Ellison was also present.

See, (Doc. 2-1 at 702, ⁋⁋ 24 & 26.)  But this does not prove, as Ellison alleges, that

they had any more "face-to-face" interactions with Ellison than those to which

Fritz testified.

     With respect to Fritz's alleged perjury, Ellison fails to meet any of the three

---

[79] It appears this arrest occurred on November 17, 2009.  See e.g., (Doc. 2-1 at 700-701)(Claude and Marlene's civil suit).

prongs of *Napue*.  The testimony is not false, there is no indication the state knew it was false, and, as pointed out by the state district court, the number of interactions between Ellison and Detective Fritz is immaterial to the underlying charges.  *Panah*, 935 F.3d at 664, see also, (Doc. 2-1 at 384.)  The state court's denial of this claim was reasonable and is entitled to deference under § 2254(d).

Ellison also reiterates his conspiracy claim that Dr. Hill's "investigation" provides evidence of Fritz's affair with his ex-wife, and proves Fritz's involvement in the abduction and torture of Ellison, in addition to other elements of the perceived conspiracy against him.  See, (Doc. 1 at 60.)  Ellison finally claims that the Neiss letter could have been used to impeach Detective Bancroft.  As set forth above, Dr. Hill was not performing an investigation into the conspiracy against Ellison; she was performing a mental health evaluation at the Montana State Hospital.  Despite Ellison's insistence, her evaluation simply does not say what Ellison believes it says.  Likewise, the letter from Neiss does not prove that Detective Fritz was at the Ellison home on the morning of the fire, or that Detective Bancroft was dishonest when he testified about Fritz's whereabouts on March 14, 2013.  As to the testimony that was presented, the Court agrees with the assessment of the state court that the statements were immaterial and insufficient to warrant relief.

//

### g.  Claim 7: Collateral Estoppel

### <u>State Court Background</u>

Ellison claims the State erred by not briefing his double jeopardy/collateral estoppel claim during PCR proceedings, and that the district court erred by not addressing the claim in its order.  (Doc. 1 at 61.)  But the State did brief the claim on appeal from the PCR proceedings.  See e.g., State Br. (Doc. 2-1 at 80-83) (addressing Claim G.)  The State argued Ellison did not present a cognizable claim because his double jeopardy claim had been resolved on direct appeal, and the doctrine of res judicata prevented consideration of claims previously raised on appeal.  *Id*. at 80-1(citing Mont. Code Ann. §46-21-105(2)).[80]  The State noted Ellison had already received a remedy for his double jeopardy claim relating to the tampering charges when the Montana Supreme Court vacated his second tampering conviction.  *Id*. at 81, citing *Ellison I*, 2018 MT 252, ℙ 26.  By virtue of its ruling that only one of the two tampering convictions should be reversed, the Montana Supreme Court implicitly determined the remaining tampering conviction should stay in place.  Any attempt by Ellison to relitigate the matter was barred by res judicata.  *Id*.

---

[80] This section of the statute provides: "When a petitioner has been afforded the opportunity for a direct appeal of the petitioner's conviction, grounds for relief that were or could reasonably have been raised on direct appeal may not be raised, considered, or decided in a proceeding brought under this chapter."

The State further argued that Ellison's claim that the application of collateral estoppel should apply to the other charges in the same trial was nonsensical, as collateral estoppel is a form of res judicata that "bars the reopening of an issue in a second cause of action that has been litigated and determined in a prior suit." *Id.* at 81-2 (citations omitted).  Overturning one of Ellison's tampering convictions did not mean that the remaining conviction should have been disposed of in the same proceeding.  *Id.* at 82.  The State argued the PCR court was correct in not considering the claim because it was invalid.  But even if it should have considered the claim in the PCR proceedings, the district court still arrived at the proper result-dismissal of Ellison's entire petition.  *Id.* at 82-83.

The Montana Supreme Court agreed with the State's analysis of the issue. In a footnote, the Court determined, "Ellison also faults the District Court for failing to address his double jeopardy claim.  Ellison alleges that the two charges of evidence tampering violated his right to be free from double jeopardy. Although the District Court did not address that issue, it lacks merit in any event because we vacated the second evidence tampering charge in Ellison's first appeal." *Ellison v. State*, 477 P. 3d 1123, f.n.1, citing, *Ellison I*, ¶ 29.

### Present Claim

Ellison's claim before this Court is somewhat difficult to follow, but he alleges the state courts have denied him the benefit of two "state created double

73

jeopardy laws." (Doc. 1 at 61.) Ellison first cites *State v. Tadewalt*, 922 P.2d 463 (Mont. 1996) for the premise that the state violated its own "double jeopardy/same transaction holdings." *Id.* at 61-62.

Ellison's citation to *Tadewalt* is incomplete, but is inapplicable, nonetheless. The rule from that case is used to determine whether a subsequent prosecution in a state court is barred under state law.[81]

Ellison also points to the state statutory definition of "same transaction" in support of his argument.[82] See, (Doc. 1 at 62.) Finally, Ellison cites to the state statute which provides a prosecution based upon the same transaction is barred by former prosecution. MCA§ 46-11-503(1)(a). *Id.*

Ellison seems to be of the impression that the arson and tampering charges all arose out of the same offense or transaction, and that once the jury acquitted

---

[81] In making this determination, the State uses a three-part test:
> (1)   a defendant's conduct constitutes an offense within the jurisdiction of the court where the first prosecution occurred and within the jurisdiction of the court where the subsequent prosecution is pursued;
> (2) the first prosecution resulted in an acquittal or a conviction; and
> (3) the subsequent prosecution is based on an offense arising out of the same transaction [as defined in §46-1-202(23)].

*See, State v. Neufeld*, 212 P. 3d 1063, 1065 (2009).

[82] This definition states:
> "Same Transaction" means conduct consisting of a series of acts or omissions that are motivated by:
>> (a) a purpose to accomplish a criminal objective and that are necessary or incidental to the accomplishment of that objective; or
>> (b) a common purpose or plan that results in the repeated commission of the same offense or effect upon the same person or the property of the same person.

M.C.A. § 46-1-202(23).

him of "major" crime of arson, the state was precluded from further pursuit of the

tampering charges.  See e.g., (Doc. 1 at 64-65.)  Ellison's argument is that he could

not have been prosecuted further for tampering because it would be considered a

conspiracy or preparation to the commission of the charge of arson, for which he

was acquitted.  *Id*.

Ellison's argument is fundamentally flawed.  First, he was not prosecuted by

two separate jurisdictions for the same conduct in violation of *Tadewalt*, nor was

he prosecuted multiple times for conduct based upon the same transaction.  The

Montana Supreme Court determined Ellison was wrongly prosecuted for two

counts of tampering when the events arose out of the same transaction; he was

granted relief on direct appeal.  But at no point did the Montana Supreme Court

determine, under state law, that the charge of arson and the charge of tampering

arose out of the same transaction.

In addition, to the extent that Ellison asks this Court to review the Montana

Supreme Court's application of state law, such a claim is not cognizable in federal

habeas.  The Montana Supreme Court is the final authority on the meaning and

application of state law.  See, *Hendricks v. Zenon,* 993 F. 2d 664, 674 (9th Cir.

1993) (claim exclusively concerned with state law not cognizable in federal

habeas); *Menendez v. Small*, 298 F. 3d 1154, 1158 (9th Cir. 2002) ("[a] state court

has the last word on interpretation of state law"); *Estelle v. McGuire*, 502 U.S. 62,

67-68 ("we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions").  In sum, the Montana Supreme Court's denial of this claim was reasonable.

### h.  Claims 8 and 9: Due Process and Equal Protection Violations

As set forth above, both of these interrelated claims appear to be procedurally defaulted.  In the interest of judicial economy, however, this Court will address them both.  *Lambrix*, 520 U.S. at 525.

Ellison claims the State courts, and by extension this Court, have violated his due process rights by refusing to include and consider transcripts of two recorded video statements taken in 2008 from Justin and Aaron Stevens, two "Seattle Bad Men."  Ellison believes consideration of these items would lend credence to his theory that he is the victim of a vast conspiracy.  First, Ellison points to the Stevens' statements for the premise that he did not commit the 2007 car arson- that it was the doing of Keith Hariss- who then had him "terrorized," presumably by abducting him and throwing him in the Yellowstone River.  (Doc. 1 at 66.)  Ellison seems to assert some nefarious plot is afoot to hide these recorded statements from him, *id*. at 66-67, despite the fact that the statements were taken by two of his prior civil attorneys, Russell Waddell and Casey Magan, along with a prior criminal attorney, Chuck Watson.[83]

---

[83] See also, *Ellison v. Fletcher*, Cause No. CV-17-168-DLC, Ellison's Disclosure (Doc. 40 at 2-

Ellison claims these statements were considered by Dr. Hill in her "report" to Park County and then-Park County Attorney Linneweber.  *Id*. at 66.  Ellison asserts that Linneweber then hid Dr. Hill's report, along with the 2010 Park County dash camera video, and these violations led to Linneweber's firing from Park County.  Ellison believes these items prove his actual innocence of the car arson, and that he did not stage his own abduction and/or tamper with evidence in Park County in 2010.

According to Ellison, these statements link all of his criminal matters, and that the depositions of the "bad men" establish that someone affiliated with Fritz was paying for others to continue to terrorize and conspire against Ellison.  See (Doc. 1 at 67-60); see also, *Ellison v. Fletcher*, Cause No. CV-17-168-DLC, Ellison's Disclosure (Doc. 40 at 2) (Ellison's explanation of the relevance of the Stevens transcripts).[84]  Ellison believes the state and federal courts have violated his constitutional rights by not considering these transcripts.  Ellison then claims that without having been convicted of the car arson, he would not have been treated as a persistent felony offender under state law and would not have received at 15-year prison sentence.  See, (Doc. 1 at 70.)

---

3)(Ellison's acknowledges he knew of the existence of these statements but did not obtain them. A Yellowstone County Clerk of Court apparently provided the transcripts to Ellison on April 27, 2020).
[84] See also, (Doc. 2-1 at 41)("The Exculpatory Evidence Unlawfully Excluded")(regarding the Stevens transcript Ellison asserts this confirms that "the Oregon Company had placed a 'Bounty" on Ellison, and supporting evidence that Det. Fritz hired two 'Nortanio' gang members, to Abduct, Torture and Rape Ellison for '$50k.'").

Ellison also believes his harsh sentence evidences a violation of his right to Equal Protection.  He claims he was misled regarding the sentence he would receive for the car arson by his attorney and Judge Watters, then the state district court judge, who subsequently refused to allow him to withdraw his *Alford* plea. *Id*. at 72-73.  Ellison believes this Court further compounded the constitutional violation when it found his habeas petition challenging the car arson to be untimely, and that he failed to meet the diligence and actual innocence exceptions to excuse his late filing in *Ellison v. Fletcher,* Cause No. CV-17-168-DLC-TJC. See, *Id*. at 73.  He goes on to claim the undersigned was involved in the car fire matter by fielding complaints from Claude and himself while serving as an Assistant United States Attorney, and had prior knowledge, bias, and opinion as a prosecutor.[85]  *Id*. at 74.

Ellison asserts the Equal Protection clause mandates this Court reopening *Ellison v. Fletcher*, Cause No. CV-17-168, and that the judges of this Court should not preside over the newly re-opened proceedings.  *Id*. at 78.

To the extent Ellison argues that this Court erred by not considering the Stevens transcripts, in conjunction with *Ellison v. Fletcher*, Cause No. CV-17-168-

---

[85] The Court would note that Ellison has filed prior motions of recusal against the undersigned, but this is the first time he has made this precise claim.  The documents Ellison provides in support of this claim were prepared in either 2018 or 2021, in either case well after the undersigned took the federal bench. See, (Doc. 2-1 at 1050-1061)("criminal complaints" purportedly prepared by Ellison in April of 2018 but notarized on April 21, 2021).

DLC, the documents were filed nearly four months after the matter was closed.

Nevertheless, the Court did consider the documents in resolving his motion to

reopen the matter.  As explained then:

> Ellison seems to argue that the information contained in the two 2008
> depositions should alter this Court's prior finding that his federal habeas
> petition was untimely.  But Ellison fails to make the requisite showing of a
> convincing nature that would compel this Court to alter its prior decision.
> The deposition evidence at issue is not newly discovered.  Although Ellison
> may have not had the physical deposition transcripts in his possession, he
> knew of their existence and the information they contained.  See, (Doc. 40 at
> 3.)  Moreover, upon review of the deposition, there is nothing in either
> document which would establish that Ellison was actually innocent of the
> crime of Arson.  Ellison has not submitted evidence to demonstrate clear
> error exists.  Likewise, he has not established this case presents the rare
> circumstance in which extraordinary relief should be afforded.  Therefore,
> Ellison's motion for reconsideration shall be denied.  Ellison's remedy, if
> any, lies in appeal.

*Ellison v. Fletcher*, Cause No. CV-17-168-DLC, Or. at 2-3 (D. Mont. June 9,

2020).  Contrary to Ellison's assertion that this Court violated his right to due

process by ignoring the transcripts, this Court did consider the documents at issue

and determined that they would not have altered the original finding that Ellison's

petition was untimely.  Moreover, the Court flatly disagrees with Ellison's claim

that these transcripts somehow link together all of purported conspiracies against

him, including acts on the part of Detective Fritz.  He has made no such showing.

It is undisputed that Ellison was sentenced as a Persistent Felony Offender

("PFO").  A PFO designation is not a separate crime carrying a separate sentence;

rather, it is "a procedural sentence enhancement required by statute."  *State v.*

*DeWitt*, 2006 MT 302, ℙ 11.  Sentences imposed based upon an offender's status as

a PFO replace the sentence for the underlying felony.  *State v. Gunderson*, 2010

MT 166, ℙ 54.  The PFO statue provides that one "shall be imprisoned in the state

prison for a term of not less than 5 years or more than 100 years."  See, MCA §46-

18-502, MCA.  Based upon his designation as a PFO, upon resentencing, the

district court sentenced Ellison to a 10-year prison sentence on Count II,

Tampering with or Fabricating Physical Evidence, and to a consecutive 5-year

prison sentence on Count IV, Impersonation of a Public Servant.  See, (Doc. 2-1 at

648-9)(12/14/18 sent. trans.)[86]

　　　To the extent Ellison alleges the State of Montana violated his rights by

deeming him a persistent felony offender and imposing a lengthy sentence, a claim

of state sentencing error is generally not cognizable on federal habeas review.  See,

*Lewis v. Jeffers*, 497 U.S. 764, 780 (1990); *Rhoades v. Henry*, 611 F. 3d 1133,

1142 (9th Cir. 2010), cert. denied, 565 U.S. 946 (2011).  Federal habeas relief is

available for such claims only where a petitioner demonstrates that a state court's

sentence either was fundamentally unfair such that it violated the Due Process

Clause, or infringed upon a particular constitutional right.  See, *Richmond v. Lewis*,

506 U.S. 40, 50 (1992) (question to be decided on federal habeas review is whether

---

[86] The State of Montana had asked that Ellison be sentenced to 25-years on both counts, with the
sentences to run concurrently. (Doc. 2-1 at 618-19.)  The defense argued that Ellison be released
on community supervision.  *Id*. at 624-25.

state sentencing error was "so arbitrary or capricious as to constitute an independent due process or Eighth Amendment violation.") (citing *Lewis v. Jeffers*, 497 U.S. at 780); see also, *Makal v. State of Arizona*, 544 F. 2d 1030, 1035 (9th Cir. 1976) ("So long as the type of punishment is not based upon any proscribed federal grounds such as being cruel and unusual, racially or ethnically motivated, or enhanced by indigency, the penalties for violations of state statutes are matters of state concern."), cert. denied, 430 U.S. 936 (1977).  The sentence imposed upon Ellison, a net 15-year sentence, was well within the 5-year to 100-year sentencing range provided by the PFO statute.  Thus, he fails to demonstrate that his sentence is fundamentally unfair or arbitrary and capricious.

Ellison claims, however, that his sentence violates the Equal Protection Clause of the Fourteenth Amendment.  Ellison's equal protection argument turns on his continued claims that his car arson conviction should not have stood; that the state then wrongfully prosecuted him for the home arson; and that his convictions are based upon "conjecture and presumption."  (Doc. 1 at 75.)  Ellison also asserts this Court has denied him relief, at various points, based upon flawed procedural grounds.  *Id*. at 77.

Ellison reiterates arguments and issues that have already been litigated and resolved.  Ellison's continued insistence that he is innocent of the car arson and that he is victim to a conspiracy against him, see *id*. at 77-78, are based upon his

81

own conclusions.  The fact that he uses these conclusions to support his belief that his state sentence is unduly harsh, does not convert the matter into a valid equal protection claim.  There is no basis in fact or law to support such a claim and it certainly does not merit federal habeas relief.  See, *Jones v. Gomez*, 66 F. 3d 1999, 204-05 (9th Cir. 1995) (conclusory allegations unsupported by a statement of specific facts do not warrant habeas relief), cert. denied, 517 U.S. 1143 (1996); see also, *Blackledge v. Allison*, 431 U.S. 63, 75 n. 7 (1977) (summary disposition of habeas petition appropriate where allegations are vague or conclusory).

Finally, Ellison claims the courts have engaged in "continued retaliation" against him for his refusal to withdraw his claims.  (Doc. 1 at 75.)  In support of this claim he states the Attorney General "has conceded the State lacked probable cause to charge" him.  *Id*.  Ellison then cites to *Lozman v. City of Riviera Beach, Fla*., 138 S. Ct. 1945 (2018) for the premise that "a plaintiff alleging retaliatory prosecution must show the absence of probable cause for the underlying criminal charge."  *Id*.

But *Lozman* does not stand for the premise which Ellison asserts.  There, the Court was presented with a choice regarding the manner of proof of causation required in a First Amendment retaliatory arrest claim.  The Court found that if the plaintiff alleges an official municipal policy of intimidation, then he need not prove the absence of probable cause with respect to that arrest.  *Lozman*, 138 S. Ct. at

1953-55.  *Lozman* is inapplicable and Ellison fails to set forth a cognizable

retaliation claim.  Claims 8 & 9 should be denied in their entirety for lack of merit.

### (2) Conclusion

Ellison's petition should be denied and dismissed.  As outlined herein, all of

his claims either do not survive deferential review under AEDPA or are

conclusively lacking in merit.

### (3)  Certificate of Appealability

"The district court must issue or deny a certificate of appealability when it

enters a final order adverse to the applicant."  Rule 11(a), Rules governing § 2254

Proceedings.  A COA should issue as to those claims on which a petitioner makes

a "substantial showing of the denial of a constitutional right."  28 U.S.C. §

2253(c)(2).  The standard is satisfied if "jurists of reason could disagree with the

district court's resolution of [the] constitutional claims" or "conclude the issues

presented are adequate to deserve encouragement to proceed further."  *Miller-El v.*

*Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484

(2000)).

A certificate of appealability should be denied because Ellison has not

demonstrated that the state courts unreasonably denied his claims.  Accordingly,

this Court must afford deference to the state courts' decisions under AEDPA.

Additionally, Ellison has failed to make a substantial showing of a denial of his

constitutional rights. There are no close questions and there is no basis to encourage further proceedings at this time.

## II.    Outstanding Motions

### i.    Motion for Hearing

Ellison requests this Court hold a "Franks evidentiary hearing" and allow him to challenge the State's use of DNA evidence by application of "Secondary DNA Transfer." See, (Doc. 4 at 1-2.) Ellison maintains the State recklessly disregarded the possibility that his DNA was transferred from the outside doorknobs onto the ropes tying the doors shut. *Id*. at 2-3. Ellison cites to the *Osborne*, *Melendez-Diaz*, and *Thompson* cases cited above in support of his hearing request. *Id*. at 3; see also, Section I(1)(a), *supra*. Ellison also relies upon the Innocent Protection Act, 18 U.S.C. § 3600. *Id*. at 4. Ellison reiterates his belief that the State of Montana has conceded multiple issues he presents before this Court. See, (Doc. 10 at 1.) Ellison then reasserts arguments addressed above that the State lacked probable cause to charge him, disregarded evidence of his actual innocence, engaged in vindictive prosecutorial misconduct, his convictions should have been barred by state law and collateral estoppel principles, and he is a victim of a conspiracy. *Id*. at 3.

As a preliminary matter, the standard for a *Franks* hearing is not applicable

in the instant case.[87]  But an evidentiary hearing is authorized under Rule 8 of the

Rules Governing § 2254 Cases.  An evidentiary hearing is not required, however,

if the issues can be resolved by reference to the state court record.  *Totten v.*

*Merkle*, 137 F. 3d 1172, 1176 (9th Cir. 1998) ("It is axiomatic that when issues can

be resolved with reference to the state court record, an evidentiary hearing

becomes nothing more than a futile exercise."); see also, *Schriro v. Landrigan*, 550

U.S. 465, 474 (2007) ("[I]f the record refutes the applicant's factual allegations or

otherwise precludes habeas relief, a district court is not required to hold an

evidentiary hearing"); *Clark v. Chappell*, 936 F. 3d 944, 967 (9th Cir. 2019) ("[A]n

evidentiary hearing is not required on allegations that are conclusory and wholly

devoid of specifics or on issues that can be resolved by reference to the state court

record.  Nor is an evidentiary hearing required if there are no disputed facts and the

claim presents a purely legal question.").

As explained herein in great detail, the majority of Ellison's claims are either

purely legal in nature, or have been resolved by referencing the state court record

and applying the applicable standards of review.  The remainder of Ellison's

claims are entirely conclusory in nature.  In either case, an evidentiary hearing is

not necessary.

---

[87] In *Franks v. Delaware*, 438 U.S. 154 (1978), the Supreme Court developed a test to determine when a defendant is entitled to a hearing to challenge the validity of information supporting a search warrant.

Ellison's motions for hearing (Docs. 4 & 10) will be denied.

### ii.    Motion to Change Venue & Motion for Recusal

Ellison requests that the venue in this matter be transferred to another

district, and that the undersigned and District Court Judge Christensen be recused.

See, (Doc. 6.)[88]  The basis for this request is that Judge Watters presided over

Ellison's initial arson matter in Cause No. DC-07-0907, when she was a state

district court judge.  *Id*. at 1.  Ellison now asserts that the undersigned had previous

involvement in his case when employed at the United States Attorney's Office,

because Ellison and Claude attempted to contact the United States Attorney's

Office in Billings and make complaints regarding both the car arson and the

"criminal acts of Detective Fritz."  *Id*. at 1, 4; see also, (Doc. 6-1), (Doc. 17 at 3.)

Based upon alleged prior knowledge of his circumstances, Ellison believes the

undersigned's recommendation denying him relief in his prior habeas matter was

biased and prejudicial and tainted Judge Christensen's decision to adopt the

Findings and Recommendations.  See, (Doc. 17 at 3.)  Ellison believes it would be

"suspect" for the undersigned to preside over his pending petition.  In fact, Ellison

seems to assert that no judge within the District of Montana could be fair or

impartial to him.  See e.g., (Doc. 17 at 5-7.)

Ellison also believes Judge Christensen should be recused based upon his

---

[88] Ellison has also attached an affidavit to his motion.  See, (Doc. 6-1.)

refusal to consider "relevant newly discovered exculpatory evidence" in Ellison's prior habeas proceedings, *Ellison v. Fletcher*, Cause No. CV-17-168-BLG-DLC-TJC.  (Doc. 6 at 2.); see also, (Doc. 17 at 2.)  Ellison believes this refusal evidences his inability to receive a fair trial in a fair tribunal.  (Doc. 6. at 3) (citing *In re Murchison*, 349 U.S. at 136).  Based upon these perceived wrongs, Ellison has filed judicial complaints with the Ninth Circuit against both the undersigned and Judge Christensen.[89]

Additionally, Ellison asserts that Judge Christensen committed perjury in a prior matter currently on appeal when Judge Christensen stated in an order denying Ellison a Certificate of Appealability that Magistrate Judge Johnston had handled the pretrial proceedings[90] when, in fact, it was the undersigned.  See, (Doc. 30 at 1); see also, (Doc. 30-1 at 3.)  Ellison appears to believe this statement by Judge Christensen was not an oversight, but rather an attempt to mislead and defraud the Circuit into believing Magistrate Judge Johnston had handled the prior underlying habeas proceedings "in an effort to escape joint culpability with Cavan" for denying the petition.  (Doc. 30-1 at 3.)  Ellison alleges this was a "cover-up" for

---

[89] See, (Doc. 17-1 at 4-9)(Judicial Misconduct Complaint filed with the Ninth Circuit); see also, (Doc. 33-1 at 9-14.)

[90] The order Ellison references *Ellison v. Fletcher*, Cause No. CV-17-168-BLG-DLC, Or. at 2-3 (D. Mont. Sept. 1, 2021)(indicating Judge Johnston handled pretrial proceedings and recommended on January 7, 2020, that Ellison's petition be dismissed with prejudice as time-barred without excuse). A copy of this order is attached to Ellison's Motion for Relief from Judgment, See, (Doc. 33-1 at 17-20.)

the undersigned failing to recuse myself in relation to Cause No. CV-17-168-BLG-DLC-TJC.  *Id.*  Ellison asks for a "full court recusal," and that this matter be moved to a distant venue which will not be predisposed to rule against him.  (Doc. 17 at 7.)

### a. Motion for Recusal

In support of his motion for recusal, Ellison cites to 28 U.S.C. § 455 and 28 U.S.C. § 144.

### 28 U.S.C. § 455

Section 455(a) provides that a judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned."  "The test for disqualification under section 455(a) is an objective one: whether a reasonable person with knowledge of all the facts would conclude that the judge's impartiality might reasonably be questioned."  *United States v. Nelson*, 718 F.2d 315, 321 (9th Cir. 1983).  The "reasonable person" is not someone who is "hypersensitive or unduly suspicious," but rather a "well-informed, thoughtful observer" who "understand[s] all the relevant facts" and "has examined the record and law."  *United States v. Holland*, 519 F.3d 909, 914 (9th Cir. 2008).  This standard does not mandate recusal upon the mere "unsubstantiated suspicion of personal bias or prejudice."  *Id.* (citations omitted).  Additionally, Section 455(a) is "limited by the 'extrajudicial source' factor which generally requires as the basis for recusal

something other than rulings, opinions formed, or statements made by the judge during the course of [proceedings]."  *Id*. at 913-14.

Additionally, with respect to the undersigned's employment with the U.S. Attorney's Office, a judge must also disqualify himself under § 455(b)(3) "[w]here he has served in government employment and in such capacity participated as counsel, adviser or material witness concerning the proceeding or expressed an opinion concerning the merits of the particular case in controversy."

## 28 U.S.C. § 144

Section 144 requires a party to file a "timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party . . . ."  To be legally sufficient, the affidavit "must state facts which if true fairly support the allegation that bias or prejudice stemming from (1) an extrajudicial source (2) may prevent a fair decision on the merits."  *United States v. Azhocar*, 581 F.2d 735, 739 (9th Cir. 1978).  The judge must look at "the substantiality of the support given by these facts to the allegation of bias."  *Id*. at 739-40.  Conclusory statements alleging personal bias or prejudice are not statements of fact, and do not provide a basis for disqualification. *Wilenbring v. United States*, 306 F.2d 944, 946 (9th Cir. 1962).

When a court considers a motion under § 144, it should: (1) first evaluate whether to "grant recusal pursuant to [§ 455]"; and (2) if it determines that recusal

is inappropriate under § 455, proceed to "determine the legal sufficiency of the affidavit filed pursuant to [§ 144]." *United States v. Sibla*, 624 F.2d 864, 868 (9th Cir. 1980). Under § 144, recusal is not automatic. "An affidavit filed pursuant to [§144] is not legally sufficient unless it specifically alleges facts that fairly support the contention that the judge exhibits bias or prejudice toward a party that stems from an extrajudicial source." *Id*.

### Analysis

Ellison has failed to establish that recusal is warranted. The basis for recusal rests entirely upon Ellison's conclusory statements that are unsupported by the record before this court, a legally sufficient affidavit, or information obtained from extrajudicial sources.

Ellison alleges the undersigned was involved in and became a witness in his underlying criminal proceedings because Ellison and his father made various complaints to the United States Attorney's Office in Billings, Montana, while the undersigned was employed there. Ellison suggests that the undersigned was the United States Attorney for this district, which is incorrect. The undersigned was an Assistant United States Attorney, assigned to the civil division of the office. In that capacity, it is extremely unlikely that the undersigned would have had any knowledge or involvement with any aspect Ellison's situation had it been reported to the U.S. Attorney's Office, and certainly none is recalled. Thus, there is no

reason to conclude that mere employment in an office where Ellison or his father allegedly delivered information would be reason to question the undersigned's impartiality, as required by § 455(a).

Additionally, there is nothing in the record to indicate that the undersigned participated in any way in any aspect of Ellison's matter while at the U.S. Attorney's Office or expressed an opinion on the merits of his case or controversy. The "criminal complaints" Ellison attached as exhibits to his petition in support of this claim were prepared, at the earliest, in 2018, well after the undersigned's employment with the United States Attorney's Office had terminated.  Therefore, recusal is not required under § 455(b)(3).

Additionally, Ellison previously filed a recusal motion concerning the undersigned in February of 2020 in another matter.  See, *Ellison v. Fletcher*, Cause No. CV-17-168-BLG-DLC, Mot. Recusal (Doc. 31).  There, Ellison took issue with the undersigned's recommendation that his petition be dismissed, but nowhere in the motion or the affidavit is there any mention that Ellison or his father had met with the undersigned or provided information about the car arson, the conspiracy at play against him, or the Seattle "bad men."  See, (Docs. 31 & 31-1.)  In that motion, Ellison appears to allege that the undersigned was biased against him simply by virtue of being a member of the Yellowstone County community and his "local political views."  See, (Doc. 31 at 3.)

In denying Ellison's motion, the District Court found there to be no evidence that the legal determination made was based on anything other than "an impartial view of the law and the facts of this case."  See, *Ellison v. Fletcher*, Cause No. CV-17-168-BLG-DLC, Or. at 7-8 (D. Mont. Feb. 25, 2020).  This Court's prior adverse rulings to Ellison were based either on his failure to exhaust or his untimely filing and an application of the relevant law.  There is no indication that the rulings were the result of prejudice or impartiality.

Ellison's statement now, after years of filing documents in this Court, that the undersigned had prior dealings and knowledge of him, and his legal plight is simply not credible.  It is supported only by his own conclusory statements.  A reasonable person would not find that such a statement forms the basis to reasonably question the impartiality of this Court.  *Nelson*, 718 F. 2d at 321.  Furthermore, Ellison's belief that the undersigned is somehow complicit in the conspiracy at play against him is absurd.

Likewise, his assertion that Judge Christensen was somehow covering up this conspiracy by referencing Judge Johnston and not the undersigned in the September 2021 Order is similarly preposterous.  As set forth above, Ellison has been a rather prolific filer in this Court.  Aside from the present habeas petition, he has filed four others.  One was assigned to Magistrate Judge Ostby,[91] one to

---

[91] See, *Ellison v. Kirkegard*, Cause No. CV-16-123-BLG-SPW-CSO, Pet. (filed Aug. 22, 2016).

Magistrate Judge Johnston,[92] and two to the undersigned.[93]  Additionally, Ellison

has filed four § 1983 complaints, three of which Judge Johnston was assigned as

the magistrate judge and one of which was assigned to the undersigned.[94]  Judge

Christensen's statement in the September 2021 Order was immaterial to the overall

COA analysis.  Further, it clearly appears to be an oversight which is

understandable given the number of matters, involving different magistrate judges,

that Ellison has filed in this Court.  His belief that Judge Christensen is unfair or

impartial is based upon nothing more than an "unsubstantiated suspicion of

personal bias or prejudice" and does not support recusal.  *Holland*, 519 F. 3d at

909.  Additionally, Ellison faults Judge Christensen for not considering certain

items of "exculpatory" evidence, including the Stevens brothers' transcripts.  But,

as explained above, Judge Christensen did consider the items and determined that

they would not have affected the ruling that Ellison's prior habeas petition was

untimely.  See, Section I(1)(h) (discussion of Claims 8 & 9), supra.

    While recusal is inappropriate under § 455, Ellison also fails to make the

---

[92] See, *Ellison v. Fletcher,* Cause No. CV-17-102-H-DLC-JTJ, Pet. (filed Oct. 30, 2017).

[93] See, *Ellison v. Fletcher*, Cause No. CV-17-168-BLG-DLC-TJC, Pet. (filed Dec. 26, 2017); *Ellison v. Guyer*, Cause No. CV-18-176-BLG-DLC-TJC, Pet. (filed Dec. 19, 2018).

[94] See, *Ellison v. Yellowstone County et al*., Cause No. CV-18-56-BLG-BMM-JTJ, Comp. (filed March 23, 2018); see also, *Ellison v. Yellowstone County et al*., Cause No. CV-18-60-BLG-BMM-JTJ,Comp. (filed April 2, 2018); *Ellison v. Yellowstone County et al*, Cause no. CV-18-173-BLG-DLC-TJC, Comp. (filed Nov. 30, 2018); see also, *Ellison v. Kirkegard et al*., Cause No. CV-17-45-H-DLC-JTJ, Comp. (filed April 17, 2017).

requisite showing of legal sufficiency of the affidavit under the second prong of

§144.  The only extrajudicial source supporting Ellison's affidavit is his own

conjecture and continued conspiracy theory.  Moreover, the fact that Ellison may

take issue with prior adverse rulings is an insufficient basis to support recusal.

*O'Connor v. U.S.*, 935 F.2d 275 (9th Cir. 1991).  Ellison has not specifically

alleged facts to fairly support his contention of bias.  See, *Sibla*, 624 F.2d at 868.

Ellison has not established recusal is justified under either §144 or § 455,

and he has also failed to demonstrate any reasonable basis on which to question

this Court's impartiality in this matter.  The facts, as presented, do not warrant

recusal.

The motions for recusal, (Docs. 17 & 30), will be denied as to the

undersigned and a recommendation for denial will be made as the motions relate to

Judge Christensen.

### b.  Motion to Change Venue

Venue for a petition for writ of habeas corpus under § 2254 will lie in the

district court for the district in which the petitioner is in custody, or it may be filed

in the district court of the district in which the challenged state court proceedings

took place, and each of these courts shall have concurrent jurisdiction to entertain

the application.  28 U.S.C. § 2241(d).  Pursuant to Local Rule 3.2(b)(2)(A), venue

in a habeas case is proper in this district in the division containing the county

where judgment was entered if the judgment is challenged.

Ellison is in custody in Montana, and the challenged court proceedings also took place in Montana.  Venue is, therefore, appropriate in the District of Montana under § 2241(d).  Also, the judgment being challenged in this action was entered in Yellowstone County, Montana.  Accordingly, venue is proper under the Local Rules in the Billings Division of this Court.

A district court may transfer any civil action to any other district or division where it might have been brought for "the convenience of parties and witness, in the interest of justice."  28 U.S.C.A. § 1404(a).  In this case, however, Ellison does not request transfer to another district where the action might have been brought, and has failed to state how the convenience of the parties and witnesses, or the interests of justice, would be served by transfer of this case to another district. Ellison simply reiterates his belief of judicial bias in this district, which has been addressed above.

Ellison's Motions to Change Venue, (Docs. 6 & 30), will be denied.

### iii.    Motion for Order

Ellison has filed a motion for an to be issued to the Montana Attorney General.  (Doc. 15.)  This motion is somewhat difficult to follow.  It appears Ellison is asking this Court to direct the Montana Attorney General to dismiss his two convictions based upon "United States Supreme Court Common Law" and the

American Bar Association Rules of Professional Conduct or, alternatively, order the Montana Attorney General's Office to respond as to why the charges have not been dismissed. See, (Doc. 7 at 1.) Ellison then reiterates his claims of prosecutorial misconduct, lack of probable cause, and the state statute precluding prosecution based on the same transaction. *Id.* at 2-3. Finally, Ellison repeats his "secondary transfer" argument and cites again to *Osborne* and *Melendez-Diaz*. *Id.* at 3-4. Ellison generally asserts the Montana Attorney General's office has conceded these issues, that he has presented adequate exculpatory evidence, and that the conspiracy against him demands dismissal. *Id.* at 4-6.

Ellison misunderstands the role of this Court. Federal district courts, as courts of original jurisdiction, do not serve as appellate tribunals to review errors allegedly committed by state courts. *MacKay v. Pfeil*, 827 F. 2d 540, 543 (9th Cir. 1987); *see also Atlantic Coast Line R. Co. v. Brotherhood of Locomotive Engineers*, 398 U.S. 281, 296 (1970) ("lower federal courts possess no power whatever to sit in direct review of state court decisions"). Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court only if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); *Williams v. Taylor*, 539 U.S. 362, 375 (2000). To the extent that Ellison has alleged he suffered violations of his rights as guaranteed by the U.S. Constitution, as discussed herein, this Court

has found those claims lacking in merit and recommends the petition be dismissed with prejudice.  That is the beginning and end of this Court's analysis.  Thus, it would be entirely inappropriate for this Court to review and dismiss the state convictions, as suggested by Ellison, or to direct the Montana Attorney General's Office to do so.

The Motion for Order (Doc. 15) will be denied.

### iv.    Motion to Appoint Counsel

Ellison requests that counsel be appointed to represent him.  (Doc. 21.) Ellison reasserts his conspiracy claims and belief that the State of Montana has conceded such a conspiracy exists by virtue of its waiver of the claim.  *Id*. at 1. Ellison also suggests counsel is required because he is having difficulty mailing various items, including his Judicial Ethics Complaints, from Montana State Prison.  *Id*. at 2.  Ellison believes criminal charges should be filed against Warden Salmonsen for this "obstruction of justice," and that such acts constitute "extraordinary circumstances" warranting appointment of counsel.  *Id*. at 3. Ellison also believes he has established entitlement to a "Franks" hearing and that counsel should be required.  *Id*. at 4.  Finally, Ellison claims that State agents, including Yellowstone County prosecutors and law enforcement officers, have fabricated evidence against him "for their own personal benefit" and he is prevented from seeking relief via a § 1983 case.  *Id*. at 4-5.  Ellison also states his

belief that the undersigned "turned a blind eye" to the wrongdoing against him while employed in the United States Attorney's Office.  *Id*. at 3-4, 5.

There is no constitutional right to counsel in a habeas corpus action. *Coleman v. Thompson*, 501 U.S. 722, 755 (1991).  A habeas petitioner has a right to counsel, as provided by rule, if counsel is necessary for effective discovery or if an evidentiary hearing is required.  See, Habeas Corpus Rule 6(a) & 8(c).  Counsel may be appointed at any stage of the proceedings if "the interests of justice so require."  28 U.S.C. § 2254(h); 18 U.S.C. § 3006A(a)(2)(B).  Under § 3006A, the court must consider the likelihood of success on the merits, the complexity of the legal issues involved, and the petitioner's ability to articulate his claims pro se. *Weygandt v. Look,* 718 F.2d 952, 954 (9th Cir. 1983) (per curiam).

To date, Ellison has been able to adequately present his claims and protect his interests, in this case and others.  Additionally, neither discovery nor an evidentiary hearing is warranted.   The Court appreciates that Ellison, like many habeas petitioners, lacks legal training and resources.  For this reason, the Court independently reviews each petition.  Ellison does not require counsel as a matter of due process, and the Court declines to exercise its discretion to appoint counsel.

Ellison's request for counsel, (Doc. 21), will be denied.

### v.    Motion for Summary Judgment

Ellison moves for Summary Judgment under Fed. R. Civ. P. 56(a) based

upon the State's purported refusal to brief multiple claims in Ellison's state court

PCR appeal.  See, (Doc. 26 at 1.)  Included are his claims of actual innocence,

malicious prosecution, and double jeopardy.  *Id.* at 2-3.

Ellison filed his petition, brief in support, and voluminous state court

documents in March of 2021.  (Docs. 1, 2, and 2-1.)  Since that time, Ellison has

filed various motions referenced herein.  The prescreening of Ellison's petition has

been particularly labor intensive because it not only involves a large state court

record, but he also references other legal proceedings and events spanning a nearly

15-year period.  As explained herein, the Court has addressed the merits of

Ellison's petition and a recommendation for dismissal is being made.  Therefore,

the State has not been served or required to answer Ellison's petition.

Accordingly, Ellison's motion for summary judgment will be denied.  While

the Federal Rules of Civil Procedure may be applied to habeas proceedings,

Ellison's motion for summary judgment is not appropriate in this instance or at this

juncture.  See, Rule 12, Rules Governing Section 2254 Cases.

The Motion for Summary Judgment, (Doc. 26), will be denied.

### vi.    Motion for Relief from Judgment

Ellison reiterates the arguments he has pending before the Ninth Circuit

regarding Judge Christensen's "perjury" and the undersigned's impartiality.  These

arguments have been addressed above.  No judgment has yet been entered in the

present matter.  Thus, a motion under Rule 60 is premature.  Moreover, this case is not the proper vehicle for Ellison to re-litigate or attempt to reopen his closed habeas matters.

The Motion for Relief for Judgment, (Doc. 33), will be denied.

Based upon the foregoing, the Court enters the following:

## ORDER

1.  The Clerk of Court is directed to attach a complete copy of Judge Wald's Order Denying Postconviction Relief, in Cause No. DV-18-1629, to this document.

2.  Ellison's Motions for Hearing (Docs. 4 & 10) are DENIED.

3.  Ellison's Motions to Change Venue (Docs. 6 & 30) are DENIED.

4.  Ellison's Motions for Recusal (Docs. 17 & 30) are DENIED as related to the undersigned.

5.  Ellison's Motion for Order (Doc. 15) is DENIED.

6.  Ellison's Motion to Appoint Counsel (Doc. 21) is DENIED.

7.  Ellison's Motion for Summary Judgment (Doc. 26) is DENIED.

8.  Ellison's Motion for Relief from Judgment (Doc. 33) is DENIED.

## RECOMMENDATION

1.  Ellison's Petition (Doc. 1) should be DISMISSED with prejudice.

2.  Ellison's Motions for Recusal (Docs. 17 & 30) should be DENIED as they relate to Judge Christensen.

100

3.  The Clerk of Court should be directed to enter judgment in favor of Respondent and against Petitioner.

4.  A certificate of appealability should be DENIED.

### NOTICE OF RIGHT TO OBJECT
### TO FINDINGS & RECOMMENDATION
### AND CONSEQUENCES OF FAILURE TO OBJECT

Ellison may object to this Findings and Recommendation within 14 days. 28 U.S.C. § 636(b)(1). Failure to timely file written objections may bar a de novo determination by the district judge and/or waive the right to appeal.

<u>Ellison must immediately notify the Court of any change in his mailing address.</u>  Failure to do so may result in dismissal of his case without notice to him.

DATED this 2nd day of March, 2022.


*/s/ Timothy J. Cavan*
Timothy J. Cavan
United States Magistrate Judge