IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| LIONEL SCOTT ELLISON,<br><br>        Petitioner,<br><br>    vs.<br><br>JAMES SALMONSEN; STATE OF MONTANA,<br><br>       Respondents. | CV 21–26–BLG–DLC<br><br><br><br>ORDER |

Before the Court is United States Magistrate Judge Timothy J. Cavan's Order and Findings and Recommendation (Doc. 35) and Petitioner Ellison's pending motions: Motion for Emergency Stay and Injunctive Relief (Doc. 36); Motion for Cease-and-Desist Order (Doc. 42); Motion to Alter Judgment (Doc. 46); Motions to Stay (Doc. 47, 63); Motion to Dismiss the Underlying Indictment (Doc. 57); and Motion to Compel (Doc. 62). For the reasons stated below, Judge Cavan's Findings and Recommendation will be adopted in full and Ellison's remaining motions will be denied. Because the factual background is detailed in the Findings and Recommendation (Doc. 35 at 2–11), it will not be restated here.

Judge Cavan recommended that the Court deny and dismiss Ellison's Petition (Doc. 1) and deny Ellison's Motions for Recusal as they relate to Judge Christensen (Docs. 17, 30). (Doc. 35 at 1). Ellison timely filed objections to the

1

Findings and Recommendation.  (Doc. 38.)  Consequently, Ellison is entitled to *de novo* review of those findings and recommendations to which he has specifically objected.  28 U.S.C. § 636(b)(1)(C); *United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003).  Absent objection, this Court reviews findings and recommendations for clear error.  *McDonnell Douglas Corp. v. Commodore Bus. Mach., Inc.*, 656 F.2d 1309, 1313 (9th Cir. 1981).  Clear error exists if the Court is left with a "definite and firm conviction that a mistake has been committed." *United States v. Syrax*, 235 F.3d 422, 427 (9th Cir. 2000).

ANALYSIS

I.      **Petition for Writ of Habeas Corpus (28 U.S.C. § 2254)**

The Court is required to screen all actions brought by prisoners who seek relief.  28 U.S.C. § 1915(a).  The Court must dismiss a habeas petition or portion thereof if the prisoner raises claims that are legally frivolous or fails to state a basis upon which relief may be granted.  28 U.S.C. §§ 1915A(b)(1), (2).  Ellison's Petition before this Court includes a combination of claims already considered by the state courts of Montana and new claims, or at least variations on those claims already resolved in the state courts.

For those claims already "adjudicated on the merits" in state court, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") "bars relitigation . . . subject only to the exceptions listed in §§ 2254(d)(1) and (d)(2)."

*Harrington v. Richter*, 562 U.S. 86, 89 (2011).  Accordingly, this Court cannot

grant habeas relief under AEDPA unless the state court's analysis:

> resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law, as
> determined by the Supreme Court of the United States; or resulted in a
> decision that was based on an unreasonable determination of the facts
> in light of the evidence presented in the State court proceeding.

28 U.S.C. §§ 2254(d)(1)–(2).  "This is a difficult to meet and highly deferential

standard for evaluating state-court rulings, which demands that state-court

decisions be given the benefit of the doubt."  *Cullen v. Pinholster*, 563 U.S. 170,

181 (2011) (internal citation and quotations omitted); *see also Mendez v. Small*,

298 F.3d 1154, 1158 (9th Cir. 2002) ("To warrant habeas relief, the state court's

application of Supreme Court authority must be objectively unreasonable, not just

an incorrect application of federal law.").

For those claims that have not been fairly presented to the highest state

court, the claim is said to be procedurally defaulted if the state court would now

refuse to consider it because of the state's procedural rules.  *Gray v. Netherland*,

518 U.S. 152, 161–62 (1996).  Generally, federal courts will not hear such claims

unless the petitioner can demonstrate cause for his noncompliance and actual

prejudice or establish that a miscarriage of justice would result from the lack of

review.  *See Schlup v. Delo*, 513 U.S. 298, 321 (1995); *see also McKinney v. Ryan*,

730 F.3d 903, 913 (9th Cir. 2013).  However, the Court is empowered to bypass a

procedural default issue in the interest of judicial economy when the claim clearly fails on the merits. *See Flournoy v. Small*, 681 F.3d 1000, 1004 n.1 (9th Cir. 2012); *see also Franklin v. Johnson*, 290 F.3d 1223, 1232 (9th Cir. 2001) ("appeals courts are empowered to, and in some cases should, reach the merits of habeas petitions if they are, on their face and without regard to any facts that could be developed below, clearly not meritorious despite an asserted procedural bar"); *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) (noting that, in the interest of judicial economy, courts may proceed to the merits, in the face of procedural default issues).

Federal courts look to the "last reasoned decision" from a lower state court to determine the rationale for the state courts' denial of a claim. *Cannedy v. Adams*, 706 F.3d 1148, 1156 (9th Cir. 2013); *see also Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991) ("Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground."). Here, the Montana Supreme Court reviewed the record and found no error with the state district court's decision denying the merits of Ellison's petition. *Ellison v. State*, 477 P.3d 1123 (Mont. 2020). Accordingly, this Court must presume that the Montana Supreme Court adopted the state district court's reasoning.

In the Petition presently before the Court, Ellison presents the following

claims: (1) actual innocence, insufficient evidence, lack of probable cause; (2) judicial bias; (3) forced mental incoherence at trial; (4) malicious prosecutorial misconduct; (5) ineffective assistance of counsel; (6) perjury by public officials; (7) collateral estoppel/double jeopardy; (8) violation of due process; and (9) violation of equal protection.  (Doc. 1.)

Claims 8 and 9 were never presented to the state courts.  Additionally, Ellison has changed the nature of the claims and/or added additional considerations to portions of his judicial bias claim (Claim 2) and prosecutorial misconduct claim (Claim 4) that were not presented to the state courts.  Judge Cavan elected to address the merits of Claims 8 and 9, as well as those portions of claims outlined above that were not presented to the state courts.  Accordingly, the Court will address those claims in this Order as well.

### a. Actual Innocence, Sufficiency of the Evidence, Lack of Probable Cause (Claim 1)

In Claim 1, Ellison argues his actual innocence to the charges of tampering with or fabricating evidence (Count II) and impersonating a public official (Count IV).  (Doc. 1 at 24–30.)  Ellison's claim of actual innocence rests entirely on his arguments regarding insufficient evidence and lack of probable cause. Accordingly, all three arguments are addressed together.

In his Petition for Writ of Habeas Corpus, Ellison argues that the DNA evidence introduced against him at trial was "without legal merit" and "could not

be used as legal Probable Cause [sic]."  (Doc. 1 at 22.)  The DNA evidence Ellison

is referring to was found on ropes that had been used to tie the doors of Ellison's

home shut during a staged crime scene on March 14, 2013.  *State v. Ellison*, 428,

P.3d 826, 828–29 (Mont. 2018).  The Montana State Crime Lab determined that

the DNA found on the ropes matched Ellison's DNA.  *Id.*  Ellison argues that

"secondary DNA transfer" of his DNA from the doorknobs of his home onto the

ropes rendered the evidence "unreliable" and insufficient for probable cause,

making his conviction infirm.  (Doc. 1 at 23–24.)

In his Petition for Post-Conviction Relief filed with the state district court,

Ellison raised this same argument.  The district court dismissed Ellison's claim,

holding both that Ellison's claims were procedurally barred and that they lacked

merit.  (Doc. 2-1 at 374.)

Judge Cavan found that there was no legal basis under AEDPA to disturb the

state court's ruling on this claim because Ellison "failed to demonstrate that the

jury's findings were unsupported or fell below the threshold of "bare rationality."

(Doc. 35 at 28.)   Ellison objects, stating that these findings "are not consistent

with the authoritative binding United States Supreme Court's 'Clearly Established'

Laws and Principles of Law [sic]," repeating the same arguments found in his

Petition.  (Doc. 38 at 19.)  Reviewing this claim *de novo*, the Court concludes that

Ellison has presented no legal basis under AEDPA to disturb the state court's

ruling.

To support his argument, Ellison cites to *DA's Office v. Osborne*, 557 U.S. 52 (2009); *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009); and *Thompson v. City of New York*, 2 F. Supp. 3d 374 (E.D.N.Y. 2014), aff'd, 592 Fed. Appx. 36 (2d Cir. 2015) (unpublished).  (Doc. 1 at 23, 27–28.)  However, Ellison's argument does not find support in the cases cited or elsewhere in the law.

In *Osborne*, the Supreme Court discussed how "DNA testing has an unparalleled ability both to exonerate the wrongly convicted and to identify the guilty."  557 U.S. at 52.  The Court's holding, however, pertained only to whether a defendant has "a right to access state evidence for DNA testing that might prove innocence." *Id.* at 53.  Nowhere in the *Osborne* opinion does the Court hold that DNA evidence is now an insufficient basis for probable cause or de facto unreliable evidence.  In fact, the Court holds that a defendant "has no constitutional right to obtain postconviction access to the State's evidence for DNA testing," despite the fact that "modern DNA testing technology is so powerful that it actually increases the risks associated with mishandling evidence."  *Id.* at 52, 82.

In *Melendez-Diaz*, the court addressed whether the Confrontation Clause prohibits the admission of a forensic report prepared by an analyst who swore to the truth of the reported test results before a notary public.  557 U.S. at 307–08. Ellison's case is distinguishable from *Melendez-Diaz* because the forensic analysts

from the Montana State Crime Lab testified at Ellison's trial and were subject to cross-examination.[1]

In *Thompson*, the court rejected the argument Ellison advances in his petition as it relates to probable cause and DNA evidence. In that case, the court ruled there was probable cause, based in part on DNA evidence, even where an officer "had not ruled out innocent explanations [including secondary DNA transfer] for why [the suspect's] DNA was on the [evidence]." 2 F. Supp. 3d at 377.

As already identified by the state district court, Ellison has provided no caselaw or other authority that supports his argument. The cases Ellison cites to in his Petition do not add any credibility to his argument. Thus, Ellison has failed to establish that the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

Because Ellison also argues in his Petition that the evidence was insufficient to convict him, the Court must also apply 28 U.S.C. § 2254(d)(2). This section

---

[1] Lacey Van Grinsven is a serologist who collected DNA samples from: the knots of the ropes found at the crime scene, the lighter, and the pocketknife for DNA analysis. (*See* Trial Tr. 397:16-417:16, Doc. 2-1 at 507–12.) Jennifer Revis-Siegfried performed DNA analysis on the collected items. On one of the ropes, she identified the major DNA profile as a mix of two contributors, with the major profile being that of an unknown male. (*See* Trial Tr. 417:23–43:19, *Id.* at 512–18.) Megan Ashton is a forensic scientist who matched a buccal swab provided by Lionel Ellison to the DNA profile that was obtained from the swabs taken from the rope knots. (*See* Trial Tr. 444:3–71:16, *Id.* at 518–25.) Judith Hoffman analyzed items for possible ignitable liquid residue. (*See* Trial Tr. 472:5–82:11, *Id.* at 525–28.)

applies "where the petitioner challenges the state court's findings based entirely on the state record," including where "the finding is unsupported by sufficient evidence . . . the process employed by the state court is defective . . . or [where] no finding was made by the state court at all." *Taylor v. Maddox*, 336 F.3d 992, 999 (9th Cir. 2004), *overruled on other grounds by Murray v. Schiro*, 745 F.3d 984, 999–1000 (9th Cir. 2014).

The question when reviewing the sufficiency of the evidence in a habeas corpus proceeding is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also Coleman v. Johnson*, 566 U.S. 650, 656 (2012) (per curiam) ("[T]he only question under *Jackson* is whether [the jury's] finding was so insupportable as to fall below the threshold of bare rationality.").

Ellison states "[t]he State of Montana's case relied exclusively on the presumption that the DNA found on the rope, [sic] was evidence of a crime." (Doc. 1 at 26.)  This is simply not true.  Trial testimony revealed that on the morning of March 14, 2013—the day of the staged crime scene—Ellison's mother had placed a 911 call reporting that the doors of the Ellison family home had been tied shut from the outside and that the house was on fire.  (Trial Tr. 146:4–11, Doc. 2-1 at 444.)  When law enforcement and the fire department official arrived, they

found that the fire had already been extinguished and there were black marks on the outside of the house that looked like a fire had burned.  (Trial Tr. 148:6–8, i*d.*) Ellison told officers he had broken out glass in a door, cut a rope to open the door, and used a fire extinguisher to put out the fire.  (Trial Tr. 148:19–50:12, *id.* at 444–45.)

Deputy Fire Marshall Schilling investigated the scene and testified that it had been staged to look as though a Molotov-cocktail type bomb had started the fire.  Deputy Schilling reached this conclusion after discovering that someone had embedded glass fragments in the window screen to create the appearance that a Molotov-cocktail had exploded, yet only a small fire had been lit and caused no actual damage to the house.  (*See* Trial Tr. 280:1–81:20, *id.* at 477–78; Trial Tr. 310:13–23, i*d.* at 485.)

Deputy Schilling also testified that one of the ropes tied to a doorknob had slack in it and the door could still be opened.  (Trial Tr. 296:8–20, i*d.* at 481.) Another rope was tied between a door and a wagon wheel, which if pulled hard enough would have tipped over allowing the door to open.  (Trial Tr. 297:13–98:10, *id.* at 482.)  Finally, another door was tied shut toward the hinges, allowing the door to still be opened.  (Trial Tr. 311:10–13:3, *id.* at 485–86.)

Additional evidence refuting Ellison's version of events include the Ellisons' apparent lack of concern over the incident when talking with officers (*see, e.g.*,

Trial Tr. 365:14–68:14, *id.* at 499), inconsistent statements about what transpired after Ellison noticed the fire (*see, e.g.*, Trial Tr. 222:2–8, 224:5–12, *Id.* at 463), and the DNA evidence found on the ropes matching Ellison's DNA.  In summary, Ellison has failed to demonstrate that the state court's findings regarding the sufficiency of the evidence and the existence of probable cause were not supported by sufficient evidence in the court record.

Ellison advances other theories which have no basis in law or fact to support his claim.  The Court will briefly dispel of these arguments.  First, Ellison argues that his acquittal for arson must mean that the jury did not believe he set the fire. (Doc. 1 at 64–65.)  Ellison's logic is not sound.  Under Montana law, to be guilty of arson, one must cause damage to the property of another exceeding $1,500. Mont. Code Ann. § 45-6-103(1)(a) (2021).  However, as already discussed, there was no damage to the Ellison's home caused by the staged fire.  This is just one possible explanation for why Ellison may have been acquitted of arson but not the Tampering with Evidence and Impersonation charges.

Second, Ellison attempts to string together several disconnected events, alleging a broad conspiracy against him initiated by Detective Fritz years before the criminal case at issue.  The Court fails to see how these baseless claims lend any strength to Ellison's argument that there was insufficient evidence and no probable cause to charge him in the underlying criminal matter.

In conclusion, Ellison has failed to provide even a modicum of evidence demonstrating that the jury's findings were unsupported or fell below "bare rationality." *Coleman*, 566 U.S. at 656.  Accordingly, there is no basis under *Jackson* or AEDPA to disturb the state court's ruling and Ellison's first claim is denied.

### b. Judicial Bias (Claim 2)

In Claim 2, Ellison alleges judicial bias and misconduct extending from the state district court to the Montana Supreme Court.  (Doc. 1 at 31.)  Ellison raises these claims against Judge Jones, who presided over his trial and sentencing, and Judge Wald, who presided over his post-conviction relief proceeding.  (*Id.*)  Additionally, Ellison claims that the Montana Supreme Court violated his due process rights by failing to adjudicate Claim 7 on appeal, and that the Justices of the Montana Supreme Court are prejudiced against him.  (*Id.*)

First, Ellison's claims regarding Judge Jones stem from an alleged dispute between Judge Jones and Ellison's father, Claude Ellison, over construction work performed by Claude's company at the Special K Ranch.  (*Id.* at 36.)  The district court determined that the alleged business dealing was an "invention" of Ellison's, not supported by the evidence, and in fact Ellison's story had "shifted according to what benefits him at the time."  (Doc. 2-1 at 375–76.)

The district court noted that Ellison had already raised this same issue in a

motion to disqualify Judge Jones for cause file prior to his resentencing hearing, which was denied.  (Doc. 2-1 at 376.)  The Montana Supreme Court had also addressed Ellison's claims of bias, stating that "Ellison's bias claims are based on conjecture, and he has not provided evidence substantiating bias on the part of the District Court."  (*Id.* (citing *State v. Ellison*, 455 P.3d 447, 447 (Mont. 2019).)  The district court noted that "nothing has changed since the Supreme Court made these observations.  Ellison has not provided any 'documents and exhibits demonstrating Judge Jones' bias.'"  (*Id.*)  In fact, Judge Jones went on the record to correct Ellison's claims that there were any dealings between himself and Claude Ellison or Special K Ranch.  (*Id.*)

Ellison offered no new evidence in his Petition to support his claims against Judge Jones.  (Doc. 1 at 31–34.)  Judge Cavan reviewed the district court's decision and found that "Ellison has presented no facts to support a claim of actual bias" and "because Ellison offers only speculation for his claim of bias [against Judge Jones], and an unreliable affidavit from Claude regarding a purported business dealing that occurred years earlier, Ellison fails to demonstrate actual bias or the appearance of impropriety."  (Doc. 35 at 32, 34.)  Judge Cavan concluded that this Court "must afford deference under AEDPA," and "Ellison is not entitled to relief.  (*Id.* at 34.)

Ellison has not raised any new arguments relating to Judge Jones in his

objections.  (Doc. 38 at 20.)  Because the district court addressed Ellison's judicial

bias claim as it pertains to Judge Jones, this court will review the district court's

findings on that issue under the AEDPA standard.

A criminal defendant is guaranteed the right to a fair and impartial judge by

the Due Process Clause.  *See In re Murchison*, 349 U.S. 133, 136 (1955).  A

petitioner claiming judicial bias must overcome a "presumption of honesty and

integrity" on the part of the judge.  *Withrow v. Larkin*, 421 U.S. 35, 47 (1975).  In

the context of federal habeas review of whether a state court judge's conduct was

proper, the question is whether the state judge's conduct "rendered the trial so

fundamentally unfair as to violate federal due process under the United States

Constitution."  *Duckett v. Godinez*, 67 F.3d 734, 740 (9th Cir. 1995).

As already stated, Ellison provided no new evidence to support his claim

against Judge Jones. Ellison relies on two affidavits from Claude Ellison outlining

the alleged business dealings between Judge Jones and Claude's business.  (Doc. 1

at 36; Doc. 2-1 at 681–84, 694.)  These same affidavits were provided in the prior

proceedings where this issue was addressed.

The second of these affidavits describes an "argument" which ensued

"between the Ellison's [sic] and Mike Dooley, the [Special K] ranch manager, with

Judge Jones present."  (Doc. 1 at 36; Doc. 2-1 at 694.)  Ellison derives from this

alleged series of events that "bias is present and implied."  (Doc. 1 at 36.)  Judge

14

Jones has denied any memory of the event or dealing between himself and Special K Ranch and Claude Ellison.  (Doc. 2-1 at 375 (citing Resentencing Tr. 35:15–36:13).)  Even assuming this event had occurred, it is not clear to the Court how the events, as described in the affidavit, raise issues of bias.

The appearance of bias, alone, has been deemed sufficient to require recusal in only a few, narrow circumstances.  Due process requires recusal where (1) a judge "has a direct, personal, substantial pecuniary interest in reaching a conclusion against [a litigant]," (2) "a judge becomes 'embroiled in a running, bitter controversy' with one of the litigants," or (3) "the judge acts as 'part of the accusatory process.'"  *Carter v. Galaza*, 491 F.3d 1119, 1131 (9th Cir. 2007) (citations omitted).  Ellison has not presented any evidence to suggest that Judge Jones would fall into any of these three categories or anything comparable.  Accordingly, the Court finds no basis under AEDPA to overturn the state district court's ruling on this issue.

Ellison also raised new judicial bias claims in his Petition to this Court.  Those claims include allegations against Judge Wald, who presided over his post-conviction relief hearing, and the Montana Supreme Court.[2]  (Doc. 1 at 36.)  First, Ellison appears to allege that Judge Wald was biased during the post-conviction

---

[2] Ellison also asserts collateral estoppel and double jeopardy violations and the violation of his due process rights.  The Court will address Ellison's judicial bias and misconduct claims here and the merits of his collateral estoppel and double jeopardy claims below.

relief proceedings. (*Id.*) Judge Jones retired before the post-conviction relief

proceedings and was replaced by Judge Wald. Ellison states that Judge Wald came

from Judge Jones' district prosecutor's office. (*Id.*) This statement is false as

Judge Wald was previously a criminal defense attorney. *See 2015 John Adams*

*Award – Matt Wald*, MONT. ASS'N OF CRIM. DEF. LAWS. (Mar. 12, 2015),

https://www.mtacdl.org/lawyers/lawyers-of-the-year/380-2015-john-adams-award-

matt-wald.

Second, Ellison alleges that the district court is biased against him because

the court failed to adjudicate Claim 7 during post-conviction relief proceedings.

(Doc. 1 at 31–32.) Further, Ellison alleges that the Montana Supreme Court is

biased against him because that court held, on appeal, that Claim 7 lacked merit.

(*Id.*) Claim 7 concerns collateral estoppel and double jeopardy. Connecting this

procedural history to the claim of judicial bias, Ellison presents his allegations in

the form of a question to this Court: "What other officials, Judicial [sic] members

of the bar were involved and why would the court refuse to rule on Ellison's Claim

#7? Was Money [sic] involved?" (*Id.* at 33.)

Ellison also alleges judicial misconduct stemming from Ellison's appeal to

the Montana Supreme Court, where Justice Rice mistakenly stated that Ellison had

been charged with the offense of sex without consent. (*Id.* at 35.) Ellison

subsequently filed a judicial misconduct claim with the Montana Judicial

Standards Commission against Justice Rice for "plac[ing] a [sic] out right lie onto

that opinion." (Doc. 2-1 at 1040–43.)  Ellison goes on to state, without any factual

support, that Justice Rice "clearly prejudiced the other Justices in [his later] appeal,

Chief Justice McGrath, Justice Baker, Justice San[d]efur, and Justice James

Jeremiah Shea." (Doc. 1 at 35.)  Ellison then further claims that these Justices

were prejudiced by the "false narrative from the State Prosecutors in Yellowstone

Count, Linneweber and Mees." (*Id.*)  Ellison concludes "The four named Justices,

especially Justice Rice[,] should have rightly recused themselves per State and

Federal Law." (*Id.*)

Ellison provides no facts demonstrating that Judge Wald or the Justices of

the Montana Supreme Court acted without their presumed honesty or integrity.

*Withrow*, 421 U.S. at 47.  Ellison relies solely upon conjecture and a narrative

describing a far reaching and elaborate conspiracy against him, again without any

evidentiary support.  Accordingly, there is no constitutional violation, and the

Court denies these remaining portions of Ellison's second claim that had not been

presented to the state court.

### c.  Forced Mental Incoherence at Trial (Claim 3)

In Claim 3, Ellison alleges that "the State knowingly and then [sic]

purposely withheld food from Ellison the final two days of the [state] trial," which

had the effect of rendering him incoherent at trial due to hypoglycemia.  (Doc. 1 at

39.)  Ellison asserts that this violated his Eight Amendment right to be free from

cruel and unusual punishment and his Fifth and Fourteenth Amendment rights to

due process.  (*Id.*)

The district court dismissed the claim, finding that (1) there was substantial

evidence contradicting Ellison's version of events, (2) Ellison relied on an

inaccurate interpretation of this Court's earlier Order related to this matter (*Ellison*

*v. Washington*, 2019 U.S. Dist. LEXIS 224348, at *21–22 (D. Mont. 2019)), and

(3) "Ellison failed to explain what impact his being 'more coherent' would have

had on the trial."  (Doc. 2-1 at 377–80.)  Judge Cavan, likewise, reviewed Ellison's

claims and concluded that "Ellison has failed to show that the state courts denial of

this claim 'was contrary to, or involved an unreasonable application of, clearly

established Federal law, . . . or 'was based on an unreasonable determination of the

facts.'" (Doc. 35 at 40.)

Ellison objects to the Findings and Recommendation and repeats the same

arguments presented to the district court.  (Doc. 38 at 21.)  Ellison again argues

that this Court ruled in his favor regarding this claim in *Ellison v. Washington*.

(*Id.*)  Ellison provides no new evidence to support his claim.  Reviewing this claim

*de novo*, the Court concludes that Ellison has presented no legal basis under

AEDPA to disturb the state court's ruling.

Ellison's claim of forced mental incoherence is not supported by the

18

evidence before the Court—the same evidence that was before the district court. Ellison's trial attorney, Michael Kakuk, denied that Ellison was deprived of food during his trial.  (Doc. 2-1 at 378.)  Mr. Kakuk also stated that "Ellison was always coherent and actively involved in the defense of his case.  He was never not fed.  I bought him lunch during the trial." (*Id.*)  Ellison elected not to take the stand on advice of counsel and so informed the court, stating explicitly that he was "waiving the right to take the stand." (*Id.*)  This evidence contradicts Ellison's claims that he was not fed and therefore suffered mental incoherence.

Ellison repeatedly and incorrectly states that this Court ruled in his favor on his mental incoherence claim in *Ellison v. Washington*.  (Doc. 1 at 41; Doc. 38 at 21.)  Ellison states that Judge Johnson's Findings and Recommendation in that case concluded "it is undisputed fact" that the "Yellowstone County Detention Facility Segregation guards . . . did not feed Ellison the last two days of trial, intentionally, to knowingly make Ellison incoherent, and unable to object when his attorney did not present a defense." (Doc. 1 at 41; Doc 38 at 21.)  In reality, Judge Johnson's Findings and Recommendation merely found that "there is a *genuine issue of material fact* regarding whether [a Yellowstone County Detention Facility Segregation guard] made an intentional decision to deny Mr. Ellison food knowing that denial of such food would place Mr. Ellison at a substantial risk of suffering serious harm." *Ellison*, 2019 U.S. Dist. LEXIS 224348, at *22.

Ellison has failed to show that the state court's denial of this claim "was contrary to, or involved an unreasonable application of, clearly established Federal law," 28 U.S.C. § 2254(d)(1), or it "was based on an unreasonable determination of the facts," id. § 2254(d)(2).  Claim 3 is therefore denied.

### d.  Malicious Prosecutorial Misconduct (Claim 4)

In Claim 4, Ellison asserts that "his due process rights have been violated by the malicious prosecutorial misconduct of the two Yellowstone County prosecutors who knowingly and purposely violated Ellison's First, Fourth, Fifth, Eighth and Fourteenth Amendments Rights."  (Doc. 1 at 42.)  These assertions raise two distinct issues: *Brady* violations and prosecutorial misconduct.

On appeal to the Montana Supreme Court from the denial of his post-conviction claim, Ellison altered the nature of his claims, thereby denying the district court an opportunity to adjudicate their merit.  Accordingly, the State did not respond to three of the arguments made by Ellison, specifically issues one, three, and four below.[3]  Ellison now asserts that the State's failure to respond constitutes the State "conced[ing] and abandon[ing] these issues by law."  (Doc. 1 at 42, 49, 51.)

Ellison's Claim 4 now includes four "issues" that allegedly constitute

---

[3] Generally, the Montana Supreme Court will not address an issue raised for the first time on appeal or a party's change in legal theory because it is fundamentally unfair to fault the trial court for failing to rule correctly on an issue it was never given the opportunity to consider.  *See Day v. Payne*, 929 P.2d 864, 866 (Mont. 1996).

"malicious prosecutorial misconduct."  These are: (1) filing of the affidavit and

information to charge despite knowing it lacked merit and was based on

"illegitimate and fabricated probable cause;" (2) "the arresting detective . . .

knowingly and purposely supress[ing] and with[holding] exculpatory evidence,"

specifically "an audio recording of the eye-witnesses and the petitioner the day of

the bombing of the Ellison home" and a photo depicting a cut on Ellison's hand;

(3) "knowingly making false statements concerning the Park County charges;" and

(4) making "false statements at trial, and . . . deliberately attack[ing] the credibility

of the eyewitness."  (Doc. 1 at 42.)

### i. *Brady Violation by Law Enforcement*

In his Petition, Ellison claims that the state committed *Brady* violations by

withholding a taped statement that he and his parents made to Billings Police

Department Detective Richardson the morning of the fire that would have

supported his testimony that Detective Fritz was present at the scene of the fire.

(Doc. 1 at 44.)  Ellison also alleges that the State hid a photo showing a cut on

Ellison's hand that would have impeached Detective Richardson's testimony that

there had been no injury to Ellison's hand.  (*Id.* at 46.)  This same claim was raised

in state court.  (Doc. 2-1 at 381.)  Ellison claims that had the jury heard this

evidence, "the credibility of the State's case would have been impeached as well as

Fritz's credibility, which more probably than not would have resulted in acquittal

of all charges." (Doc. 1 at 45.)

The district court found that none of this alleged evidence existed, and even if it did exist, its exclusion did not prejudice Ellison. (Doc. 2-1 at 381.) The district court also noted that Ellison attempted to enter irrelevant evidence during his resentencing for Tampering and Impersonation. This evidence related to Ellison's alleged 2010 "abduction."

Judge Cavan assessed the findings of the state court in addition to Ellison's modified claims and found Ellison's Claim 4 "does not survive deferential review and should be denied in its entirety." (Doc. 35 at 53.) Ellison objected to Judge Cavan's findings and recommendation as to Claim 4 but offered no new evidence or arguments. (Doc. 38 at 22–27.)

A *Brady* violation occurs when the State fails to disclose any evidence that is material to a defendant's guilt or punishment. "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). When determining whether a *Brady* violation has occurred, the question for the Court is "not whether the defendant would more likely than not have received a different verdict with the evidence," but whether, despite the evidence's absence, the trial

22

resulted in a "verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

The district court's findings are supported by the trial testimony of Marlene and Claude Ellison, Detective Richardson, and Fire Marshall Schilling.  Regarding the alleged recordings, Claude Ellison testified that he did not give formal a statement to authorities, but instead was advised by his attorney to tell authorities they would have to seek a subpoena and take his deposition.  (Trial Tr. 213:5–15, Doc. 2-1 at 461.)  Detective Richardson confirmed that neither Claude nor Marlene provided formal statements.  (Trial Tr. 366:23–67:25, *id.* at 499.)  Even if the tapes did exist, Ellison's parents testified during the State's case-in-chief and repeated the same story that Ellison claims was on the tapes, thereby making their alleged exclusion immaterial.  (*Id.* at 381.)

Regarding the photo depicting a cut on Ellison's hand, both Detective Richardson and Fire Marshall Schilling testified that they observed no injury on Ellison's hand after responding to the fire at the Ellison home.  (Trial Tr. 340:9–21, 341:5–12, Doc. 2-1 at 492; Trial Tr. 271:2–20, *Id.* at 475.)  Moreover, testimony by Claude Ellison was inconsistent with Ellison's description of the photo, with Claude stating that he believed the hand to be bruised in the photo but was unsure if it had been cut.  (Trial Tr. 222:2–8, 224:5–12, *Id.* at 463.)  There is also no evidence that the State ever possessed such a photo.  Ellison claims that the photo

was taken by Marlene Ellison at the direction of Ellison's attorney at that time, Elizabeth Honaker, but does not claim to have provided the photo to the State. (Doc. 1 at 46.)

Ellison fails to meet the necessary showing required to establish a *Brady* violation. Accordingly, the Court must afford AEDPA deference to the state court's decision and Ellison's *Brady* claim is denied.

### ii. Prosecutorial Misconduct

Issues one, three, and four fall under the "prosecutorial misconduct" umbrella. In those issues, Ellison claims a conspiracy against him by prosecutors Mees and Linneweber, in concert with Detective Fritz. Ellison alleges that these individuals worked together to fabricate probable cause for the Yellowstone County offense and prevented Ellison from seeking redress for the wrongs stemming from his alleged abduction in 2010. (Doc. 1 at 43.) Ellison states that Linneweber was fired from his position as Park County prosecutor after the Park County Commissioners learned that Linneweber had suppressed a 40-minute dash camera video of law enforcement locating Ellison. (*Id.* at 43–44.) Ellison claims that the video contained proof that Detective Fritz was responsible for his 2010 abduction. (*Id.* at 44.) Ellison also argues that Linneweber presented false statements about Ellison's Park County charges to the trial court during a pretrial hearing, prejudicing Ellison in subsequent proceedings. (*Id.* at 49.) Last, Ellison

argues that Mees acted improperly by suggesting that the jury take the testimony of Claude and Marlene Ellison "with a grain of salt."  (*Id.* at 50).

As previously stated, Ellison has altered the nature of these claims following state court proceedings.  To the extent Ellison alleges a wide-ranging conspiracy against him consisting of prosecutors, police, and government officials, the state district court has already addressed these claims.  Regarding the alleged conspiracy, the district court found that "Ellison has not provided any evidence of the existence of this conspiracy and who is involved appears to shift over time." (Doc. 2-1 at 383.)  The court went on to state that Ellison's "evidence" of this alleged conspiracy consists of "no more than conclusory statements that are not supported by evidence and thus do not justify post-conviction relief."  (*Id.*)

Judge Cavan addressed the new claims raised by Ellison in his Petition, in addition to those claims presented to the state courts.  Judge Cavan concurred with the district court's conclusion regarding the alleged conspiracy and further determined that "to the extent Ellison believes the state courts' adjudication of his prosecutorial misconduct claim is 'contrary to existing and established United States Supreme Court law' . . . he is incorrect."  (Doc. 35 at 53.)  Ellison objected to these findings and recommendations but made no new arguments and presented no new evidence.  The Court reviews this claim *de novo* and finds that there are no grounds to disturb the district court's ruling.  The Court further concludes that

25

Ellison's altered claims are without merit, and therefore are denied.

A petitioner is entitled to habeas corpus relief if the prosecutor's misconduct constitutes a violation of due process. *See Greer v. Miller*, 483 U.S. 756, 765 (1987) (citing *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). "To constitute a due process violation, the prosecutorial misconduct must be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.'" *Id.* (quoting *United State v. Bagley*, 473 U.S. 667, 676 (1985)).  The Court is to review the claim of prosecutorial misconduct within the context of the entire trial. *Id.* at 765–66.  Where the claim of prosecutorial misconduct is based on remarks made by a prosecutor, the test is whether "the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process,'" not merely whether the remarks "were undesirable or even universally condemned." *Darden v. Wainright*, 477 U.S. 168, 181 (1986) (quoting, *DeChristoforo*, 416 U.S. at 643.)

As the district court and Montana Supreme Court found, there is no evidentiary support for Ellison's claims.  First, there is no indication Linneweber was fired from his position as Park County Attorney.  Instead, it appears that Linneweber voluntarily left this position after being offered employment with Yellowstone County.  As noted by this Court in 2020, Ellison's version of events and the conspiracy against him evolved over time to serve Ellison's needs. *See*

26

Order and Findings and Recommendations at 9 n.10, *Ellison v. Fletcher*, No. 17–cv–168 (D. Mont. Jan. 7, 2020).  The Court has also reviewed the 40-minute dash camera recording and finds that the video contains no information that would support Ellison's contention that Detective Fritz orchestrated his abduction.

Ellison's concern regarding the statements made by Linneweber during Ellison's pretrial hearing also lack merit.  During that hearing, the State and Mr. Kakuk argued as to whether each of Ellison's prior convictions and past acts should be excluded as irrelevant or prejudicial.  (Omnibus Hr'g Tr. 13:23–29:4, Doc. 2-1 at 403–07.)  During this exchange, the State sought to introduce the 2010 Park County abduction and explained why it believed the information to be relevant for trial and how it related to the Arson, Tampering, and Impersonation charges.  (Omnibus Hr'g Tr. 20:4–27, *id.* at 405.)  Ellison's cherry-picking of certain comments made by Linneweber, which were part of a much larger conversation held outside the presence of the jury regarding the admissibility of certain evidence at trial, is not availing.  Moreover, there has been no evidence provided by Ellison demonstrating these comments prejudiced his right to a fair trial.

Ellison presents a similar argument regarding Mees's closing argument at trial.  Ellison takes issue with Mees's statement that the jury should take Claude and Marlene Ellison's testimony "with a grain of salt."  (Doc. 1 at 50.)  This

statement was made only once during closing and was made in conjunction with a discussion of matters that affected the witnesses' credibility. (*See* Trial Tr. 575–602, Doc. 2-1 at 551–58.) Notably, the defense did not object to the grain of salt reference. (*See* Trial Tr. 610–21, *id.* at 560–63.) The jury was properly instructed regarding the credibility of witnesses, the presumption of innocence, and the applicable legal standards. Therefore, the Court finds that Mees's comment, viewed in the context in which it was said and the closing arguments as a whole, clearly falls short of the *Darden* standard and did not deny Ellison due process.[4]

Accordingly, there are no grounds under AEDPA to disturb the state district court's ruling and Claim 4 is clearly without merit; therefore, Claim 4 is denied.

### e.  Ineffective Assistance of Counsel (Claim 5)

In Claim 5, Ellison alleges that his right to the effective assistance of counsel was violated at both the trial and appellate level in the state courts of Montana. (Doc. 1 at 52.) Ellison alleges that his trial counsel, Mr. Kakuk, was ineffective by: instructing his parents not to testify that they saw Detective Fritz at their house the morning of the house fire; failing to properly investigate Detective Fritz's alibi for the morning of the fire; refusing to communicate with Ellison; and abandoning basic defense counsel duties by refusing to cross-examine Fritz or impeach him

---

[4] *See Parker v. Matthews*, 567 U.S. 37, 48 (2012) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)) (noting that the *Darden* standard leaves "more leeway . . . in reaching outcomes in case-by-case determinations").

using Claude and Marlene Ellison's suit against him, refusing to recall Claude and Marlene Ellison during the defense's case-in-chief, refusing to present a cell phone received from Ellison's former attorney, refusing to present a letter from Ellison's former attorney purporting to impeach the alibi of Detective Fritz, refusing to consult a DNA expert or investigate secondary DNA transfer; and preventing Ellison from testifying in his own defense.  (Doc. 1 at 53–54.)  Ellison also alleges that both trial and appellate counsel should have identified the multiple prosecution statute and raised that issue at trial and on appeal respectively.  (*Id.* at 52–53.) Ellison raised substantively the same arguments in the district court.[5]  (Doc. 2-1 at 384–85.)

Applying the two-prong test established in *Strickland v. Washington*, 466 U.S. 668 (1984), to analyze ineffective assistance of counsel claims, the district court found that Mr. Kakuk's performance did not fall below an objective standard of reasonableness and that none of the complained of conduct would have changed the outcome of the proceedings.  (Doc. 2-1 at 385–89.)  Judge Cavan found that the state court reasonably rejected Ellison's ineffective assistance of counsel claims.

---

[5] In the district court, Ellison's IAC claims included: (1) instructing his parents not to testify that they saw Detective Fritz at their house the morning of the house fire; (2) failing to conduct an adequate pretrial investigation; (3) not adequately communicating with Ellison; (3) possessing a phone that allegedly contained a picture of Ellison's bloody hand and electing not to show it to the jury; (4) conducting a second omnibus hearing without Ellison's knowledge where the "rules at trial changed;" (5) abandoning the defense trial strategy and refusing to allow Ellison to testify; (6) not cross-examining Detective Fritz; (7) not ensuring Ellison was adequately fed, leading to his mental impairment during trial and inability to assist in his own defense; and, (8) failing to argue that no witness identified Ellison on the phone call relative to his Impersonation of a Public Servant conviction.  (Doc. 2-1 at 384.)  Ellison also alleged that his appellate counsel was ineffective for failing to present his PCR claims on direct appeal.  (*Id.* at 385.)

In his objections, Ellison did not raise any new arguments, instead "firmly stand[ing] on this claim in it's [sic] entirety, as presented in his Petition." (Doc. 38 at 28). After reviewing this claims *de novo*, the Court finds that there is no basis under AEDPA to disturb the state court's ruling.

As the district court identified, the proper analysis for ineffective assistance of counsel claims is derived from *Strickland*. *Strickland*'s two-prong test requires a defendant to establish: (1) that counsel's performance was objectively deficient, and (2) that counsel's deficient performance prejudiced the defendant. 466 U.S. at 687. Any review must be "highly deferential" and must adopt counsel's perspective at the time of the challenged conduct. *Id.* at 689; *see also Cullen v. Pinholster*, 563 U.S. 170, 190 (2011) (stating that federal review of a state court's decision on an ineffective assistance of counsel claim is "doubly deferential"). The burden is on the petitioner to overcome the presumption that counsel's actions constitute sound trial strategy. *Id.* Applying this analysis to each of Ellison's allegations of ineffective assistance, the Court concurs with the district court that Ellison's claim has no merit.

The argument that Mr. Kakuk perform deficiently by attempting to persuade Claude and Marlene from identifying Fritz as present at the scene of the home fire is without merit. As the district court noted, even if this were true, Claude and Marlene clearly did not heed Mr. Kakuk's advice because both testified that they

saw Fritz flee from scene.  (Doc. 2-1 at 386.)  Mr. Kakuk denies the allegation and states that he merely cautioned the Claude and Marlene not to testify about Ellison's history because it may open the door to Ellison's history of staging crime scenes.  (*Id.*)  In any event, such advice would have been reasonable and had no impact on the outcome of the trial.

Ellison's claims regarding inadequate investigation are without merit.  As the district court determined, it was undisputed that Ellison had touched the ropes, and no blood was found on the ropes, so the DNA/blood issues were immaterial as discussed above.  Ellison's claim that the serologist was advised not to test for blood is undermined by the serologist's own testimony that she did not see any blood, and if she had she would have tested for it.  (Trial Tr. 412:8–19, Doc. 2-1 at 510.)

Ellison's argument on the abandonment of defense counsel duties also lacks merit.  Mr. Kakuk explained that his decision not to recall Claude or Marlene was due to the "problematic" theories that both had presented and his desire to prevent inadvertently opening the door to any prior bad acts by Ellison.  (Doc. 2-1 at 386.)  Similarly, Mr. Kakuk's decision not to cross-examine Detective Fritz was intended to avoid reinforcing elements of the State's theory.  (Doc. 2-1 at 388.)  The "alibi" letter, which was not discussed in the district court, does not establish that Detective Fritz lacked an alibi for the early morning hours of March 14, 2014.

(*See* Doc. 1 at 53.)  Ellison again raises the alleged recording of Claude and Marlene Ellison, but as discussed above, such evidence has not been proven to exist and would have been duplicitous of trial testimony.

Ellison's allegation that Mr. Kakuk prevented him or somehow coerced him into not testifying is not supported by the record.  Ellison met with Mr. Kakuk after the court went into recess following the close of the State's case-in-chief.  (Trial Tr. 570:8–11, Doc. 2-1 at 550.)  Ellison informed the court that he had been advised by his attorney not to take the stand.  (Trial Tr. 570:24–571:3, *Id.*)  The court then advised Ellison that it was ultimately his decision whether to testify and Ellison subsequently waived his right to testify.  (571:4–15, *Id.*)  There is no indication that Ellison was incoherent at that time and Ellison fails to explain how his testifying would have affected the trial.

Ellison also claims Mr. Kakuk refused to present a cell phone containing a photograph of Ellison's bloody hand.  Mr. Kakuk explained that he received the phone from Greg Stovall, the investigator for Ellison's former attorney, Elizabeth Honaker.  (*Id.* at 386.)  Mr. Kakuk stated that he viewed the photos personally and did not see a photo of Ellison's hand.  (*Id.*)  Ellison further claims that this same phone was in Stovall or Honaker's possession at the time when certain phone calls were made for which Ellison was charged with Impersonation.  (Doc. 1 at 54.) However, records show that the phone from which the Impersonation calls were

made had not been purchased until August 19, 2014, whereas the house fire

occurred on March 14, 2013.  So, the same phone could not have been used to take

a photo of Ellison's hand the same day as the house fire and subsequently to make

the Impersonation phone calls.  In total, there is no showing that Mr. Kakuk

performed deficiently by failing to present the phone as evidence of either the

bloody hand or that Ellison did not make the Impersonation calls.

The claim that Mr. Kakuk failed to communicate with Ellison was addressed

by the trial court during the August 10, 2015, hearing.  (Omnibus Hr'g Tr. 1–12,

Doc. 2-1 at 400–03.)  Mr. Kakuk acknowledge difficulty reaching Ellison via

phone while he was in jail, but those issues were resolved.  (*Id.* at 387.)  Ellison

has not offered any argument that these communication difficulties had any

adverse impact on his trial.

Finally, Ellison's claim regarding trial and appellate counsel's failure to

raise the multiple prosecution statute has already been addressed on direct appeal,

where the Montana Supreme Court reversed Ellison's conviction for the second

count of Tampering with Evidence and found that trial counsel had been

ineffective for failing to object to the second count under the statute.  *State v.*

*Ellison*, 428 P.3d 826, 833 (Mont. 2018).  The Court need not re-address this issue.

In summary, the district court's analysis of Ellison's ineffective assistance of

counsel claim was not contrary to, or an unreasonable application of, *Strickland*.

Therefore, there is no basis for the Court to disturb the district court's ruling and Ellison's Claim 5 is denied.

### f. Perjury by Public Officials (Claim 6)

In Claim 6, Ellison alleges that the "prosecutors [sic] witness knowingly committed perjury" during Ellison's state court trial and that the state knowingly allowed this "in order to cover up for their criminal deeds" and to escape a § 1983 civil suit. (Doc. 1 at 60.) Specifically, Ellison claims that "[Detective] Richardson deliberately falsely stat[ed] that the ropes tying the doors shut were loose" and that Ellison hadn't cut his hand. (*Id.*) Ellison also claims that "Detective Frank Fritz[] falsely stated . . . that he had only seen Ellison twice." (*Id.*)

The district court found that the statements Ellison took issue with were "matters of opinion, not material, or statements that are in the province of the jury to assess and thus insufficient to warrant post-conviction relief." (Doc. 2-1 at 383.) The court also pointed out that "the jury had access to the ropes and the items the doors were tied to and could give proper weight to both Detective Richardson's testimony and the physical evidence." (*Id.*) Regarding Detective Fritz's testimony, the court noted that Detective Fritz testified he "believed" he had two "face-to-face" interactions, "which is distinct from simply seeing Ellison" and otherwise immaterial. (Doc. 2-1 at 384.) The court therefore denied relief.

Judge Cavan agreed with the assessment of the state court that the

statements were "immaterial and insufficient to warrant relief." (Doc. 35 at 71.) Ellison objected to the findings and recommendations but offered no new evidence. (Doc. 38 at 29.) After reviewing these claims *de novo*, this Court finds that there is no basis under AEDPA to disturb the state court's ruling.

"'[A] conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment' . . . only if three elements are satisfied[:]" (1) "the testimony or evidence in question must have been false or misleading," (2) "the State must have known that it was false or misleading," and (3) "the testimony or evidence in question must be material." *Panah v. Chappell*, 935 F.3d 657, 664 (9th Cir. 2019) (citing *Napue v. Illinois*, 360 U.S. 264, 269 (1959)) (other citations omitted).

With regard to the allegation against Detective Richardson, his statements that the ropes were loose cannot be said to be "false or misleading," but was simply his opinion derived from his assessment of the scene, which was supported by the opinion of Deputy Fire Marshall Schilling. (Trial Tr. 296:19–20, Doc. 2-1 at 481.) Regarding Detective Richardson's statements about Ellison's hand being cut, this information is both immaterial and consistent with other trial testimony, such as that of Deputy Fire Marshall Schilling. (Trial Tr. 269:24–272:2, *Id.* at 475.) Additionally, Ellison has failed to provide evidence tending to show that the State knew this testimony to be false or misleading.

35

Second, Ellison's claims mischaracterize Detective Fritz's testimony and fail to meet the three necessary prongs.  When asked at trial whether he knew Lionel Ellison, Detective Fritz stated that he had "conducted several investigations into Mr. Ellison," including one in September 2009 and a second in October or November 2009.  (Trial Tr. 550:21–558:8, *Id.* at 545–47.)  Then, when asked how many "face-to-face" interactions he had with Ellison, Detective Fritz responded that he "believe[d]" there had been two: when he conducted the initial interview of Ellison in September 2009 and when he arrested Ellison in 2009.  (Trial Tr. 557:5–13, *Id.* at 547.)

Ellison does not offer any evidence proving additional "face-to-face" interactions with Detective Fritz, which the state court accurately pointed out are distinct from merely seeing Ellison.  (*Id.* at 384.)  Additionally, Detective Fritz only testified that he believed he had two face-to-face interactions, so if he was mistaken, his statements would not amount to being false.  Moreover, any possibility that Detective Fritz had more than two face-to-face interactions with Ellison is immaterial.  And finally, Ellison offers no evidence that the State knew Detective Fritz's statements were false.

Ellison also takes the opportunity to make further accusations against Detective Fritz.  (*See* Doc. 1 at 60.)  However, these accusations have no bearing on whether perjury occurred, and therefore the Court will not address them.

Accordingly, finding that there is no basis under AEDPA to disrupt the district court's ruling, Ellison's Claim 6 is denied.

### g. Collateral Estoppel/Double Jeopardy (Claim 7)

Ellison makes two arguments in Claim 7.  First, Ellison argues that the State erred by not briefing his double jeopardy/collateral estoppel claim during PCR proceedings, and the district court erred by not addressing the claim in its order. (Doc. 1 at 61).  Second, Ellison argues that once he was acquitted of the crime of arson (Count I), the doctrine of collateral estoppel precluded the state from pursuing the tampering charges (Counts II and III).  (Doc. 1 at 61, 64–65.)

Contrary to Ellison's claim, the State did brief the claim on appeal from the PCR proceedings.  (Doc. 2-1 at 80–83.)  In that briefing, the State argued that Ellison's double jeopardy claim was not cognizable because the doctrine of *res judicata* "prohibited reconsideration in a PCR proceeding of claims previously raised and considered on direct appeal."  (*Id.* at 80–81) (citing Mont. Code Ann. § 46-21-105(2) (2021)).  Ellison's claim had already been resolved on direct appeal, where the Montana Supreme Court vacated Ellison's second tampering conviction, thereby determining that the second tampering conviction should remain in place. (*Id.* at 81) (citing *Ellison*, 428 P.3d at 833).  The State also addressed Ellison's argument that the application of collateral estoppel would apply to the tampering charges, pointing out that overturning one of Ellison's tampering convictions "does

not mean the remaining count can or should have been disposed in the same trial

proceeding." (*Id.* at 81–82.)

The Montana Supreme Court addressed Ellison's collateral estoppel/double

jeopardy claim and agreed with the State's position, stating:

> Ellison also faults the District Court for failing to address his double
> jeopardy claim. Ellison alleges that the two charges of evidence
> tampering violated his right to be free from double jeopardy.
> Although the District Court did not address that issue, it lacks merit in
> any event because we vacated the second evidence tamping charge in
> Ellison's first appeal.

*Ellison v. State*, 477 P.3d 1123, 1123 n.1 (Mont. 2020) (citing *State v.*

*Ellison*, 428 P.3d 826, 833 (Mont. 2018)).

Judge Cavan addressed both portions of Ellison's claim, ultimately

finding that the Montana Supreme Court's denial of this claim was

reasonable. (Doc. 35 at 72–76.) Ellison raised no new arguments in his

objections. (Doc. 38 at 29.) Reviewing this claim *de novo*, the Court

concludes that there are no grounds to overturn the decision of the state

court, and this claim is denied.

Ellison's arguments have no merit. Ellison relies on the Montana

Supreme Court's holding in *State v. Tadewalt*, 922 P.2d 463 (Mont. 1996),

to support his argument. (Doc. 1 at 61.) *Tadewalt* provides a three-part test

to determine whether a subsequent prosecution in a separate jurisdiction is

barred under state law.[6]  922 P.2d at 465.  This test is inapplicable to

Ellison's claim because Ellison was not prosecuted by two separate

jurisdictions for the same transaction.  Ellison also cites to the state statute

barring subsequent prosecution based upon the same transaction, Mont.

Code Ann. § 46-11-503(1)(a) (2021), and the corresponding statutory

definition of "same transaction."  (Doc. 1 at 62).  Again, this statute is

inapplicable because Ellison was not prosecuted multiple times for the same

transaction.[7]  Finally, as correctly identified by Judge Cavan, Ellison's

argument would require this Court to review the Montana Supreme Court's

application of state law, which is not cognizable under federal habeas

review.  *See Hendricks v. Zenon*, 993 F.2d 664, 674 (9th Cir. 1992) ("claim .

. . exclusively concerned with state law and therefore not cognizable in a

federal habeas corpus proceeding"); *Mendez v. Small*, 298 F.3d 1154, 1158

(9th Cir. 2002) ("A state court has the last word on the interpretation of state

law."); *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) ("it is not the

province of a federal habeas court to reexamine state-court determinations

---

[6] "[A] subsequent prosecution is barred under this statute, by its terms, if the following three factors are met: (1) a defendant's conduct constitutes an offense within the jurisdiction of the court where the first prosecution occurred and within the jurisdiction of the court where the subsequent prosecution is pursued; (2) the first prosecution results in an acquittal or a conviction; and (3) the subsequent prosecution is based on an offense arising out of the same transaction."

[7] While the Montana Supreme Court determined Ellison was wrongly prosecuted for two counts of tampering when the events arose out of the same transaction, at no point did the Montana Supreme Court determine that, under state law, the charge of arson and the charge of tampering arose out of the same transaction.

on state-law questions").

Accordingly, this Court finds no grounds under AEDPA to disturb the state court's ruling.  Claim 7 is therefore denied.

### h.  Due Process & Equal Protection (Claims 8 and 9)

As explained above, Claims 8 and 9 are procedurally defaulted because Ellison failed to present these claims in state court.  Nonetheless, this Court has exercised its discretion to review these claims in the interest of judicial economy. *Lambrix*, 520 U.S. at 525.

First, in Claim 8 Ellison alleges that the State courts, and by extension this Court, violated his "right to the due process of law" by refusing to admit evidence that "links the petitioners [sic] two recent petitions for post conviction relief, and proves beyond doubt the existence of the 'bounty' placed on Ellison."  (Doc. 1 at 66.)  The evidence Ellison sought to admit was transcripts of two recorded video statements taken in 2008 from Justin and Aaron Stevens, whom Ellison describes as "admitted 'gangsters'" from Seattle.  (*Id.*)  According to Ellison, these transcripts support his theory that there is a wide-spread conspiracy against him and that someone affiliated with Detective Fritz was paying for others to terrorize and conspire against Ellison.  (Doc. 1 at 68–70; Doc. 2-1 at 41; Doc. 38 at 30.)  Ellison believes that this evidence proves his "innocence of the car fire 'Arson'" charge and exonerates him of staging his own abduction and tampering with

evidence in 2010.  (Doc. 1 at 68–70; Doc. 2-1 at 41; Doc. 38 at 30.)

Next, in Claim 9, Ellison alleges that his sentence of 15 years for vehicular arson was fundamentally unfair and violated his Due Process rights.  (Doc. 1 at 69–70).  Ellison ties this claim back to the broad conspiracy he believes exists against him, stating the following:

> [T]he fact that the Courts of Montana [sic] would exclude evidence of a 'Bounty' [sic] by a private individual and corporation being placed upon Ellison; and the proven involvement of State Public officials who have weaponized the Montana Judicial system as a whole, to protect each other from culpability of criminal . . . acts [the alleged abduction, torture, and rape of Ellison and the alleged attempt by Detective Fritz to burn down the Ellison home], and the resultant criminal and civil wrongdoings by the State of Montana at the district court level, and up.

(Doc. 1 at 71.)

Ellison goes on to claim that he "was mislead by a Billings attorney that the car fire would only be a deferred misdemeanor, if he plead guilty," and that his "attorney Jeff Michael lied to Ellison" causing Ellison to "unknowingly and unintentionally plead guilty to a felony."  (*Id.* at 72.)  Ellison extends these allegations to Judge Watters, who subsequently refused to allow Ellison to withdraw his *Alford* plea.  (*Id.* at 73.)  Going further, Ellison claims that this Court compounded the constitutional violation by finding his habeas petition challenging the vehicular arson to be untimely and finding that Ellison had not met the necessary showing required to excuse his late filing in *Ellison v. Fletcher*, No. 17–

cv–168.  (*Id.*)  Based on these arguments, Ellison asks this Court to reopen *Ellison*

*v. Fletcher* and argues that the judges of this Court should not be allowed to

preside over the re-opened proceedings.  (*Id.* at 78.)

Finally, Ellison claims that "his First Amendment right against retaliation

has been violated by public officials, and their misuse of the courts for their

personal protection and interest."  (Doc. 1 at 71, 75.)  Ellison cites *Lozman v. City*

*of Riviera Beach*, 138 S. Ct. 1945, 1947 (2018) (citing *Harmtan v. Moore*, 547

U.S. 250, 265–66 (2006)), for the premise that "a plaintiff alleging a retaliatory

prosecution must show the absence of probable cause for the underlying criminal

charge."  (Doc. 1 at 75.)  Ellison then states the "State of Montana admitted it

lacked probable cause in the present matter, and Ellison has proven that the State

lacked it in DC–07–0907 by virtue of the States own expert analysis of the video

that the state claimed to be probable cause."  (Doc. 1 at 75.)

Judge Cavan reviewed Ellison's Claims 8 and 9 and found that they had no

merit.  (Doc. 25 at 83.)  In his objections, Ellison raised no new arguments.  (Doc.

38 at 30.)  This Court reviews these claims *de novo* and concludes that there was

no due process nor equal protection clause violations and Ellison's Claim 8 and 9

have no merit.

Ellison's claims fail for several reasons.  First, this Court did consider the

transcripts in *Ellison v. Fletcher*, despite the fact that the documents were filed

nearly four months after the matter was closed.  Order Denying Motion for Rehearing, *Ellison v.,* Fletcher, No. 17–cv–168 (D. Mont. June 9, 2020).  There, this Court explained:

> Ellison seems to argue that the information contained in the two 2008 depositions should alter this Court's prior finding that his federal habeas petition was untimely.  But Ellison fails to make the requisite showing of a convincing nature that would compel this Court to alter its prior decision.  The deposition evidence at issue is not newly discovered.  Although Ellison may have not had the physical deposition transcripts in his possession, he knew of their existence and the information they contained.  *See*, (Doc. 40 at 3.)  Moreover, upon review of the deposition, there is nothing in either document which would establish that Ellison was actually innocent of the crime of Arson.  Ellison has not submitted evidence to demonstrate clear error exists.  Likewise, he has not established this case presents the rare circumstance in which extraordinary relief should be afforded.  Therefore, Ellison's motion for reconsideration shall be denied.  Ellison's remedy, if any, lies in appeal.

*Id.* at 2–3. So, contrary to Ellison's assertions, this Court did consider the transcripts he claims exonerate him and determined they would not have altered the original finding.

Second, a claim of state sentencing error is generally not cognizable on federal habeas review unless the "error was 'so arbitrary and capricious as to constitute an independent due process or Eight Amendment violation.'" *Richmond v. Lewis*, 506 U.S. 40, 50 (1992) (citing *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990)); *see also Rhoades v. Henry*, 611 F.3d 1133, 1142 (9th Cir. 2010); *Makal v. State of Arizona*, 544 F.2d 1030, 1035 (9th Cir. 1976) ("So

long as the type of punishment is not based upon any proscribed federal grounds such as being cruel and unusual, racially or ethnically motivated, or enhanced by indigency, the penalties for violations of state statutes are matters of state concern.").

Ellison was sentenced as a Persistent Felony Offender ("PFO"), which is "a procedural sentence enhancement required by statute" that replaces the sentence for the underlying felony. *State v. DeWitt*, 149 P.3d 549, 551 (Mont. 2006); *see also State v. Gunderson*, 237 P.3d 74, 84 (Mont. 2010). The PFO statute provides that "a persistent felony offender shall be imprisoned in the state prison for a term of not less than 5 years or more than 100 years." Mont. Code Ann. § 46-18-502 (2021). Because Ellison's sentence was within the statutorily proscribed 5- to 100-year range, Ellison cannot demonstrate that the sentence is arbitrary or capricious.

Although Ellison claims that his sentence violates the Equal Protection Clause, this issue has already been litigated and deemed meritless. Ellison's argument rests on his repeated claims that he was wrongfully convicted for vehicular arson, that he was wrongfully prosecuted for the home arson, that he "has been convicted and imprisoned by the Court of Montana based upon conjecture and presumption," and that there is a conspiracy against him. (Doc. 1 at 73.) As discussed throughout this Order,

there is no basis in fact or law to support Ellison's claims. *See Jones v. Gomez*, 66 F.3d 199, 204–05 (9th Cir. 1995) ("[C]onclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief.").

Finally, *Lozman* does not offer the support that Ellison believes it does. In that case, the Supreme Court addressed the narrow issue of whether the defendant's admission that probable cause existed to arrest him barred a First Amendment retaliation claim. 138 S. Ct. at 1947, 1955. Here, Ellison claims that there was no probable cause to charge him. Moreover, Ellison has failed to provide any actual evidence demonstrating that a retaliatory motive existed or that the State lacked probable cause.

For these reasons, Ellison's Claims 8 and 9 are without merit and are denied in their entirety.

### i. "Common Scheme" Claims

In his objections to Judge Cavan's Findings and Recommendations Ellison included an "Addendum of 'Common Scheme' Claims." (Doc. 38 at 31.) According to Ellison this is "new evidence" that proves Ellison's actual innocence. (*Id.*) The addendum consists of eighty pages of exhibits, none of which are "new evidence" to this Court, and none of which prove actual innocence. (Doc. 38-1.) Because there are no actual claims to address in these materials, there is nothing

45

for the Court to review for the purposes of this Order.

## II.    Motions for Recusal

Judge Cavan issued findings and recommendations on Ellison's Motions for Recusal (Docs. 17, 30) as they pertain to Judge Christensen.  (Doc. 35 at 86–94.) Ellison has objected.  (Doc. 38 at 3–18.)  The Court must review *de novo* those findings and recommendations to which the petitioner has specifically objected. 28 U.S.C. § 636(b)(1)(C); *Reyna-Tapia*, 328 F.3d at 1121.  Accordingly, the Court reviews Judge Cavan's findings and recommendations on these motions *de novo*.

Ellison moves for the recusal of the undersigned based upon the belief that the undersigned could not be impartial or unbiased.  (Doc. 17 at 1).  Ellison's concerns regarding the undersigned are part of his broader belief that there is a wide-spread conspiracy against him that precludes any judge in the District of Montana from fairly presiding over his Petition for Writ of Habeas Corpus.  (*Id.* at 2.)  Ellison takes particular issue with the undersigned's refusal to consider "the sworn testimony of two known and admitted Seattle Organized [sic] crime 'gangsters'" in Ellison's prior habeas proceedings, *Ellison v. Fletcher*, No. 17–cv– 168.  (*Id.*)  In response, Ellison filed judicial complaints with the Ninth Circuit against the undersigned for abuse of discretion.  (*Id.* at 4–9; *see also* Doc. 33-1 at 9–14.)

Ellison also asserts that the undersigned committed perjury in a prior matter

by "knowingly and purposely falsely stat[ing] that 'United States Magistrate Judge, [sic] John T. Johnston handled pre-trial proceedings'" when it had been Judge Cavan.  (Doc. 30-1 at 3.)  Ellison alleges that this was an effort to cover up for Judge Cavan's failure to recuse himself in that matter.  (*Id.*)  Ellison cites to 28 U.S.C. §§ 144, 455 as grounds for recusal.  (Doc. 17 at 3; *see also* Doc. 6 at 4.)

When considering a motion under § 144, the Court should first evaluate whether to grant recusal pursuant to § 455.  If the Court determines that recusal is inappropriate under § 455, then the Court should determine the legal sufficiency of the affidavit filed pursuant to § 144.  *United States v. Sibla*, 624 F.2d 864, 868 (9th Cir. 1980).  Under 28 U.S.C. § 455(a), a judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned."  Under 28 U.S.C. § 144 a party to a proceeding in a district court must file "a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding."

"The standard for recusal under 28 U.S.C. §§ 144, 455 is 'whether a reasonable person with knowledge of all the facts would conclude that the judge's impartiality might reasonably be questioned.'"  *United States v. Studley*, 783 F.2d 934, 939 (9th Cir. 1986); *see also United States v. Nelson*, 718 F.2d 315, 321 (9th

Cir. 1983.)  Both §§ 144 and 455 are limited by the "'extrajudicial source' factor which generally requires as the basis for recusal something other than rulings, opinions formed[,] or statements made by the judge during the course of trial." *United States v. Holland*, 519 F.3d 909, 913–14 (9th Cir. 2008); *see also United States v. Azhocar*, 581 F.2d 735, 739 (9th Cir. 1978) (noting that under § 144, the affidavit "must state facts which if true fairly support the allegation that bias or prejudice stemming from (1) an extrajudicial source (2) may prevent a fair decision on the merits").

Ellison's argument for recusal under § 455 is based entirely on his unsubstantiated and conclusory statements.  Ellison's allegation that the undersigned was somehow covering up a conspiracy against him by mistakenly naming Judge Johnston rather than Judge Cavan has no basis in fact or reason and the mistake was immaterial to the overall analysis.  Ellison is also simply incorrect when he states that the undersigned refused to consider certain additional evidence, specifically the deposition transcripts of the Seattle "gangsters."  The undersigned did in fact consider those materials when denying Ellison's Motion to Rehear at 2–3, *Ellison v. Fletcher*, No. 17–cv–168 (D. Mont. June 9, 2020), where the undersigned stated, "upon review of the depositions, there is nothing in either document which would establish that Ellison was actually innocent of the crime of Arson."  Accordingly, Ellison has relied solely upon "unsubstantiated suspicion of

personal bias or prejudice" which is insufficient for recusal under § 455. *Holland*, 519 F.3d at 909.

Looking next at § 144, Ellison again fails take make the requisite showing. The only extrajudicial source Ellison provides for support is Ellison's own unsupported conclusion that there is a conspiracy against him that includes the undersigned. *Sibla*, 624 F.2d at 868 ("An affidavit filed pursuant to [§ 144] is not legally sufficient unless it specifically alleges facts that fairly support the contention that the judge exhibits bias or prejudice directed toward a party that stems from an extrajudicial source.").

No reasonable person could find that the undersigned's impartiality might reasonably be questioned based solely on Ellison's unsubstantiated allegations. Accordingly, the Court adopts Judge Cavan's recommendation and denies Ellison's Motions for Recusal (Docs. 17, 30) as they pertain to the undersigned.

## III.   Outstanding Motions

Ellison has filed seven additional motions since the filing of Judge Cavan's Findings and Recommendation: Motion for Emergency Stay and Injunctive Relief (Doc. 36); Motion for Cease-and-Desist Order (Doc. 42); Motion to Alter Judgment (Doc. 46); Motions to Stay (Docs. 47, 63); Motion to Dismiss the Underlying Indictment (Doc. 57); and Motion to Compel (Doc. 62).

In these motions Ellison continues to present the same arguments as those

contained in his Petition or already presented to the court through Ellison's various motions.  In some cases, Ellison recycles the exact motion that was denied on its merits in another proceeding.  (*Compare* Doc. 42, *with* Motion for Cease and Desist Order, *Ellison v. Washington*, No. 18-cv-00056, (D. Mont. Apr. 15, 2022).)  Ellison apparently believes that by simply changing the title of the motions, or filing them in this new proceeding, the Court is bound to reconsider his arguments ad nauseam.  This is not so.  The Court holds the authority to "weed out frivolous or simply repetitive motions" that waste public resources.  *Hoffman v. Tonnemacher*, 593 F.3d 908, 911 (9th Cir. 2010) (citing *Knox v. Southwest Airlines*, 124 F.3d 1103, 1106 (9th Cir. 1997); *see also Jackson v. Arizona*, 885 F.2d 639, 640 (9th Cir. 1989) (citing *Neitzke v. Williams*, 490 U.S. 319, 324 (1989)) (noting that "IFP litigants, unlike paying litigants, have little 'economic incentive to refrain from filing frivolous, malicious, or repetitive lawsuits,' so "to prevent such abusive litigation, [28 U.S.C § 1915(e)(2)] permits federal courts to dismiss IFP claims 'if satisfied that the action is frivolous or malicious.'").

The Court finds that Ellison's repeated filing of motions with this court— totaling seventeen in the current action alone—that do not differ in substance, evidence, or argument from one to the other, or which have been repeatedly and consistently denied for lacking merit, constitutes frivolous, malicious, and repetitive filing.  Accordingly, the Court summarily denies these motions without

again reaching the merits of Ellison's claims.

Accordingly, IT IS ORDERED that Judge Cavan's Findings and Recommendation (Doc. 35) is ADOPTED in full.

1. Ellison's Petition (Doc. 1) is DISMISSED with prejudice.

2. Ellison's Motions for Recusal (Docs. 17, 30) are DENIED as they relate to the undersigned.

3. The Clerk of Court is directed to enter a judgment in favor of Respondent against Petitioner.

4. A certificate of appealability is DENIED.

IT IS FURTHER ORDERED that Ellison's Motion for Emergency Stay and Injunctive Relief (Doc. 36) is DENIED.

IT IS FURTHER ORDERED that Ellison's Motion for Cease-and-Desist Order (Doc. 42) is denied.

IT IS FURTHER ORDERED that Ellison's Motion to Alter Judgment (Doc. 46) is denied.

IT IS FURTHER ORDERED that Ellison's Motions to Stay (Docs. 47, 63) are denied.

IT IS FURTHER ORDERED that Ellison's Motion to Dismiss the Underlying Indictment (Doc. 57) is denied.

IT IS FURTHER ORDERED that Ellison's Motion to Compel (Doc. 62) is

denied.

DATED this 27th day of September, 2022.

Dana L. Christensen, District Judge
United States District Court